UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                Case No. 06-CR-320

DAVID R. OLOFSON,

    Defendant.

**RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS INDICTMENT AND ON DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

## I. PROCEDURAL BACKGROUND

On December 5, 2006, a federal grand jury sitting in the Eastern District of Wisconsin returned a single-count indictment charging David R. Olofson ("Olofson") with knowingly transferring a machine gun in violation of 18 U.S.C. § 922(o). On December 6, 2006, Olofson was arraigned on the charge and entered a plea of not guilty. The case was originally randomly assigned to the Honorable J.P. Statdtmueller for trial. However, for reasons not material to this recommendation, the case was eventually reassigned to the Honorable C.N. Clevert, Jr. and a new pretrial motion schedule was established. In accordance with that schedule, on April 12, 2007, Olofson filed a motion to dismiss the indictment and a motion to suppress certain statements that he made to law enforcement personnel on July 19, 2006. On May 29, 2007, an evidentiary hearing was conducted on the motion to suppress. Thereafter, briefs were filed by the parties setting forth their respective positions on the defendant's motion to suppress. Previously, the parties had filed their

1

briefs setting forth their respective positions on the defendant's motion to dismiss the indictment. Thus, the defendant's motions are now fully briefed and are ready for resolution. For the reasons which follow, it will be recommended that the defendant's motion to dismiss the indictment and the defendant's motion to suppress both be denied.

## II. MOTION TO DISMISS THE INDICTMENT

Olofson moves to dismiss the indictment, which charges him with transferring a machine gun, contrary to 18 U.S.C. § 922(o), on two grounds. First, he argues that Congress exceeded its authority to regulate interstate commerce when it prohibited the intrastate transfer of a machine gun. Second, he argues that prohibiting the transfer of a machine gun infringes on his Second Amendment right to keep and bear arms.

As Olofson readily acknowledges, his challenge to the indictment on both these grounds is foreclosed by Seventh Circuit precedent. He asserts that he only raises these issues to preserve his appellate rights. Indeed, in *United States v. Kenney*, 91 F.3d 884 (7th Cir. 1996) the court held that § 922(o) is a constitutional exercise of Congress's Commerce Clause authority to regulate activities having a substantial relation to interstate commerce. And in *Gillespie v. City of Indianapolis*, 185 F.3d 693 (7th Cir. 1999), the court held that Second Amendment rights do not inure to the individual, but to the people collectively. "[T]he Second Amendment establishes no right to possess a firearm apart from the role possession of the gun might play in maintaining a state militia." *Id.* at 710.

As Olofson acknowledges, this court is bound by Seventh Circuit precedent on these claims. If there is to be a change in that precedent, such change must be made at the appellate level. Thus, it will be recommended that Olofson's motion to dismiss the indictment be denied.

2

### III. MOTION TO SUPPRESS STATEMENTS

**A. Factual Background**

As noted above, an evidentiary hearing was conducted on the defendant's motion. Testifying at that hearing were Special Agent Jody Keeku ("Keeku") of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), Officer Georgia Trochinski ("Trochinski") of the Berlin Police Department, and the defendant. The testimony from the hearing is summarized below.

A search warrant was issued by United States Magistrate Judge Patricia Gorence on July 18, 2006. That warrant authorized law enforcement personnel to search Olofson's residence at 197 East Monroe Street in Berlin, Wisconsin for evidence that he possessed a machine gun and that he manufactured and distributed firearms without a license.

On July 19, 2006, at approximately 11 a.m., a combination of federal and local law enforcement officers, including members of the Green Lake County Sheriff's Department swat team, executed the warrant. Keeku testified that the swat team wore tactical vests, knee pads, and helmets and that all members of the swat team were armed and had their guns drawn. The officers knocked on the door of the residence. Olofson answered the door and was told that the agents had a search warrant. At that time Olofson was placed in handcuffs. Also present at the residence were Olofson's friend, Everett Eastman ("Eastman") and Olofson's two children – ages four and seven. Eastman was also handcuffed. Eastman and Olofson were placed in separate squad cars. The two Olofson children were placed in Trochinski's squad car.

After approximately fifteen minutes, Keeku approached Olofson. She told him that he was not under arrest, but that he could not enter the residence while the search was being conducted. She asked him whether he would be willing to accompany her to the police station to speak with law

3

enforcement. Olofson responded that he would be willing to do so.

Before accompanying the agents to the police station, Olofson made arrangements for someone to watch his children. The agents had removed the handcuffs from Olofson by this point in time. Olofson called his wife to discuss the situation with her, and he ultimately asked a friend of his to watch his children until his wife arrived home. Keeku completed a statement for Olofson to sign acknowledging that he wanted his friend to watch the children until his wife returned home later in the day. Olofson signed the statement.

Olofson then got into an unmarked police van with Keeku and Trochinski. Keeku was in the backseat with Olofson while Trochinski drove. Olofson was not handcuffed at this time. In total, Olofson was handcuffed for about twenty minutes. The officers drove Olofson to the Berlin Police Department, which is about five blocks from Olofson's residence. Once at the police station, Olofson, Keeku and Trochinski went to Trochinski's office. The office was approximately 8 feet by 10 feet. Keeku and Trochinski both sat behind desks, while Olofson sat near the office's door. Once in Trochinki's office, Keeku again told Olofson that he was not under arrest and that he could leave at any time, but that he could not return to his residence until the search was completed. Olofson indicated that he understood and that he wanted to stay and answer the law enforcement agents' questions. On several occasions while Olofson was in Trochinski's office, Keeku called the officers who were executing the warrant to see whether they were finished. Each time, she advised Olofson that he could not return home until the search was completed.

Keeku and Trochinski questioned Olofson about the firearms offenses that were the subject of the search warrant. Olofson spent from approximately 1:00 p.m. until about 4:45 p.m. with Keeku and Trochinski at the police station. Not all of that time was spent answering the agents' questions.

4

Much of the time was spent "passing time while the search warrant was being executed." Olofson was allowed to use the bathroom while he was at the police station. To get to the bathroom, Trochinski had to show Olofson to the back of the police station and open a locked door between her office and the bathroom.

During the interview at the police station, Keeku and Trochinski were armed but their weapons were not drawn. At no time during his stay at the police station did Olofson indicate that he no longer wished to answer questions; at no time did Olofson indicate that he wanted to speak with an attorney; at no time did Olofson ask whether he could leave. Olofson seemed comfortable and at ease during the interview. Indeed, according to the agents, he appeared "smug."

At no time while he was with the agents was Olofson advised of his *Miranda* rights.

Keeku testified that, after the search was completed, Olofson walked home from the police station. Olofson testified, however, that he did not walk home. Instead, Olofson testified that Trochinski drove him home. Trochinski testified that she could not remember whether or not she drove Olofson back to his home.

**B. Discussion**

Olofson argues that he was subject to custodial interrogation at the Berlin police station. Thus, because he was not advised of his *Miranda* rights prior to such interrogation any statement he made at the police station to Keeku and Trochinski must be suppressed. In response, the government concedes both that Olofson was interrogated and that he was not advised of his *Miranda* rights prior to such interrogation. However, the government argues that Olofson was not in custody while at the police station and there was therefore no need to give him *Miranda* warnings. Such being the case, the single issue for this court to resolve is whether Olofson was "in custody" at the time he was at

5

the police station.

A custodial interrogation occurs when there is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "This inquiry is determined from the view of 'how a reasonable man in the suspect's position would have understood his situation.'" *United Sates v. Jones*, 21 F.3d 165, 170 (7th Cir. 1994). "A totality of the circumstances test is used to determine whether a reasonable person would have believed he or she was free to leave." *United States v. Lennick*, 917 F.2d 974, 977 (7th Cir. 1990). In considering the totality of the circumstances, factors a court is to consider include (1) whether the encounter occurred in a public place; (2) whether the suspect consented to speak with the officers; (3) whether the officers informed the individual that he was not under arrest and was free to leave; (4) whether the individual was moved to another area: (5) whether there was a threatening presence of several officers and a display of weapons or physical force; (6) whether the officers deprived the defendant of documents needed to continue on his way; and (7) whether the officers' tone of voice was such that their requests would likely be obeyed. *United States v. Barker*, 467 F.3d 625, 628-29 (7th Cir. 2006). I shall now apply those factors to the facts in this case.

The initial encounter in this case occurred at Olofson's home. However, at the time Olofson was actually interrogated by Keeku and Trochinski, he was not in a public place. Rather, he was in Trochinski's office at the Berlin police department.

It is undisputed that Olofson consented to speak to Keeku and Trochiski. Indeed, it is undisputed that he agreed to accompany them to the police department in order to do so. Furthermore, it is undisputed that on several occasions, all such occasions being prior to the

6

commencement of the interrogation, Olofson was advised that he was not under arrest. To be sure, he was told that he could not return to his home until the search was completed, but he was never told that he was not free to leave the presence of Keeku and Trochinski.

Olofson was moved from his residence to the police station. However, such move was with his permission. Stated another way, it is undisputed that he consented to accompanying Keeku and Trochinski to the police station.

When law enforcement first knocked on Olofson's front door and announced their presence, they displayed their weapons and there was a show of force. Indeed, Olofson was initially handcuffed and placed in a squad car. However, by the time that Olofson agreed to accompany Keeku and Trochinski to the police station, the handcuffs had been removed, he was no longer in the squad car, he had made a phone call to his wife and he had made arrangements for a neighbor to watch his children until his wife returned from work later that day.

Olofson had not been deprived of documents that would have prevented him from continuing on his way (as would be the case, for example, if Olofson had been driving and law enforcement took from him his driver's license). Indeed, at the time Keeku asked Olofson if he would be willing to speak with Trochinksi and her, he could have gone anywhere he wanted to go, except into his residence, at least until the search was completed.

Finally, there is no indication that Keeku and Trochinski used tones of voice such that their requests would likely be obeyed. To the contrary, all indications are that the conversations between Keeku and Olofson leading up to his agreeing to accompany Trochinski and her to the police station were nothing but cordial.

Moreover, while at the police station, Olofson was not handcuffed. He was told that he was

7

not under arrest and that he could leave at any time. He was not seated in an enclosed and locked interview room, but rather in Trochinki's office. There was no display of weapons by either Keeku or Trachinski. There is no evidence of any threats being made towards him. He was allowed to use the bathroom facilities.[1] Perhaps most tellingly, Olofson's demeanor, as described by Keeku and Trochinski, was calm, at ease, even "smug."[2] In other words, he was fully aware that he could leave at any time and go anywhere he pleased, except for his residence.

The bottom line is that I am persuaded that Olofson was neither in custody nor had been deprived of his freedom of action in any significant way at the time he was interrogated by Keeku and Trochinski at the Berlin police department. The cases that the defendant cites in support of his position (*Sprosty v. Buckler*, 79 F.3d 635 (7th Cir. 1996) and *United States v. Hanson* 237 F.3d 961 (8th Cir. 2001)) present fact situations that are markedly different from the facts in his case and therefore do not call for a conclusion different than that which I have reached.

In *Sprosty*, the court, on federal habeas review, found that the petitioner had been in custody at the time of his interrogation and therefore should have been advised of his *Miranda* rights. Unlike in the instant case, however, the petitioner in *Sprosty* had, for example, been <u>guarded</u> by an armed police officer during the entire time the search of his residence was taking place.

> Sprosty's detention involved significantly more than merely requiring him to remain
> at home during the search. . . . [T]he way in which the officers initially approached

---

[1] To be sure, he was accompanied to the restroom facilities by Trochinski, but that was because the door between her office and the restroom needed to be unlocked.

[2] Although the test to be applied in assessing Olofson's custodial status in this case is an objective one (i.e., "how a reasonable man in the suspect's position would have understood his situation." *Jones*, 21 F.3d at 170), I am also mindful that Olofson is not some young, naive, inexperienced man. To the contrary, he is intelligent, articulate, and currently a member of the United States Army Reserve.

8

> Sprosty, barring his path from the mobile home and escorting him inside, the fact that one armed officer was exclusively occupied with guarding Sprosty for nearly three hours while four other officers searched, and the persistent requests by the officers that Sprosty lead them to the incriminating evidence are all factors which distinguish this case from *Burns* and *Saadeh*. When viewed in their totality, these facts demonstrate that Sprosty's freedom of action was significantly restrained in a way that increased the likelihood that Sprosty would succumb to police pressure to incriminate himself.

*Sprosty*, 79 F.3d at 642-43.

In *Hanson*, the court held that the defendant was the victim of a custodial interrogation and therefore suppressed his statement because, prior to his giving such statement, he had not been given *Miranda* warnings. The defendant in *Hanson* "agreed to go with the agents away from the familiarity of his home to the field station to look at photos of 'recent vandalism' at [a] clinic." *Hanson*, 237 F.3d at 964. What Hanson did not know is that the agents were going to question him concerning an arson attempt. *Id.* Such trickery was not used in Olofson's situation. To the contrary, Olofoson knew very well what Keeku and Trochinski wanted to talk to him about, to wit, the matters for which his house was being searched. Thus, unlike the defendant in *Hanson* on whom the officers used a ruse in order to get him to agree to leave his home and accompany them to the field office, Olofson was not "tricked" into accompanying Keekua and Trochinski to the police station. Unlike in *Hanson*, the law enforcement officers in the instant case did not use a "deceptive strategem" to get Olofson to go with them.

Furthermore, although the agents in *Hanson* told the defendant that he was not under arrest and that he was free to leave, the court found that they also "kept him in an isolated office for hours, and threatened time in federal prison if Hanson did not cooperate, diminishing Hanson's sense of freedom of action." *Id*. at 965. "The agents wanted a confession from Hanson, and it appears that

9

they deliberately waited until they had the suspect in an intimidating environment before they advised him of their true purpose for bringing him to the station. Hanson could not have believed that he was free to leave." *Id*. No such sort of threatening behavior occurred in Olofson's case.

In contrast, Olofson's case bears a significant similarity to the fact situation in *United States v. Jones*, 21 F.3d 165 (7th Cir. 1994), in which the Seventh Circuit held that the defendant was not in custody at the time he made incriminating statements. In *Jones*, the defendant was involved in a reverse sting operation involving narcotics. *Id*. at 167. The narcotics transaction occurred in a motel room, and after the transaction, at approximately 9:10 p.m., a uniformed officer entered the motel room with gun drawn, and ordered one of the participants to empty his pockets. *Id*. Jones then exited the motel room, where an officer met Jones, and asked to speak with him. *Id*. Approximately five to seven other police officers were present. *Id*. Jones was told he was not under arrest. *Id*. Jones agreed to speak with officers, and was then taken to a squad car, where he agreed to be transported to police headquarters. *Id*. Jones was driven approximately four miles to police headquarters by two officers. *Id*.

At police headquarters, two to three officers spoke with Jones in a large room with three or four desks. *Id*. The door was closed during questioning but unlocked. *Id*. Jones was informed that he was not under arrest and that he was free to leave. *Id*. During the questioning, Jones consented to a search, and a search was conducted early the next morning in Jones's presence. *Id*. After the search, Jones was driven back to his office. *Id*.

In concluding that the encounter between Jones and the officers was non-custodial in nature, the court emphasized that Jones was not physically restrained, was told he was not under arrest and was free to leave, and was not subject to threatening gestures or strong arm tactics. *Id*. at 170. The

10

court also noted that Jones expressed that he was treated well by the officers, which was an indication as to the conditions under which he was questioned. *Id*. The court concluded that despite the confrontational nature of Jones's initial encounter with officers and the fact that a gun was displayed by an officer, "[a]n examination of the entire record . . . leads to the conclusion that Mr. Jones was not subjected to custodial interrogation after he consented to go to the police headquarters." *Id*.; *see also United States v. Scheets*, 188 F.3d 829, 842 (7th Cir. 1999) (defendant was not in custody despite the fact that his encounter with the investigating officers was just under three hours in a security office and squad car, as defendant was told he was not under arrest and was free to leave, was not subject to strong arm tactics, and willingly chose to continue his encounter with the officers).

Like the situation in *Jones*, Olofson was not physically restrained, he was told he was not under arrest and was free to leave, and he was not subject to threatening behavior. Moreover, Olofson's calm demeanor during the questioning offers an indication as to the conditions under which he was questioned. As in *Jones*, despite the confrontational nature of the initial encounter and the length of time Olofson was at the police station, the totality of the circumstances supports the conclusion that Olofson was not in custody at the time of his interrogation.

Such being the case, and to reiterate, I am persuaded that Olofson was neither in custody nor had been deprived of his freedom of action in any significant way at the time he was interrogated by Keeku and Trochinski at the Berlin police department. Thus, it is recommended that Olofson's motion to suppress be denied.

**NOW THEREFORE IT IS RECOMMENDED** that Olofson's motion to dismiss the indictment be **DENIED**;

11

Case 2:06-cr-00320-CNC   Filed 06/21/07   Page 11 of 12   Document 57

**IT IS FURTHER RECOMMENDED** that Olofson's motion to suppress be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) - (C), Federal Rule of Criminal Procedure 59(b)(2), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

**SO ORDERED** this 21st day of June 2007, at Milwaukee, Wisconsin.

s/ William E. Callahan, Jr.<br>
WILLIAM E. CALLAHAN, JR.<br>
United States Magistrate Judge