UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

*vs*.                                      Case No. 06-CR-320

DAVID R. OLOFSON,

    Defendant.

**DEFENDANT'S POST-EVIDENTIARY HEARING MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS STATEMENT**

**I.**

**INTRODUCTION**

David R. Olofson, by counsel, asks this Court to suppress the statement he provided law enforcement on July 19, 2006. Olofson argues that he was subjected to custodial interrogation when he provided this statement but that he was not advised of his *Miranda* rights.

**II.**

**BACKGROUND**

On June 1, 2007, an evidentiary hearing was held regarding the defendant's motion to suppress. Testifying on behalf of the government were

Federal Bureau of Alcohol, Firearms and Tobacco Agent Jody Keeku and Berlin Police Officer Georgia Trochinski. Olofson testified on his own behalf.

A search warrant was issued by United States Magistrate Judge Patricia Gorence on July 18, 2006, which authorized law enforcement to search Olofson's residence at 197 East Monroe Street in Berlin, Wisconsin for evidence that he possessed a machine gun and that he manufactured and distributed firearms without a license. The search warrant was the result of an investigation in which law enforcement was told by Robert Kiernicki that he received an automatic firearm from Olofson earlier in 2006. Agent Keeku testified that, based on Kiernicki's statement and because possession of an automatic firearm violates federal law, there was probable cause to arrest Olofson for possessing an automatic firearm when the agents executed the search warrant.

On July 19, law enforcement executed the warrant at 11 a.m. Accompanying Keeku were twenty other federal and local officers, including the Green Lake County Sheriff's Department swat team.

Agent Keeku said that after knocking and announcing their presence, the swat team made a "dynamic entry" into the residence. A dynamic entry is a forced entry into a residence when no one answers the door. Agent Keeku testified that the swat team wears tactical vests, knee pads, and helmets and that all members

of the swat team were armed and had their guns drawn as they entered the residence.

Olofson met the officers at the door. Agent Keeku testified that law enforcement told Olofson that they had a warrant to search the residence and "took him into custody." (Ev. Hrg. Tr. at p. 8). By "custody," Agent Keeku testified, she meant that the officers secured and handcuffed Olofson.

Also present in the residence were Olofson's friend Everett Eastman and Olofson's two children – ages four and seven. Eastman was also handcuffed and placed in custody and the children were placed in Officer Trochinski's squad car. Meanwhile, Olofson and Eastman were placed in separate squad cars.

About fifteen minutes after law enforcement arrived at the residence, Agent Keeku first approached Olofson in the squad car and told him that the officers had a warrant to search his residence, that law enforcement was interested in speaking with him, and asked if he would accompany the officers to the Berlin Police Department. Although Agent Keeku advised Olofson that he was not under arrest, she told him that he could not return to his residence until the search was completed. Olofson agreed to speak with the officers at the police station.

Meanwhile, Keeku testified, two other ATF agents took Olofson's two children "into their custody" and walked them to Eastman's residence one block away from Olofson's residence. (Ev. Hrg. Tr. at p. 11). Olofson had told the agents

that the children could stay with a neighbor while officers searched the house. Agent Keeku also completed a statement for Olofson to sign indicating that Eastman could watch his children until Olofson's wife returned home later in the day. Olofson agreed to sign the statement.

Olofson was then moved from a squad car into an unmarked police van with Keeku and Trochinski. Keeku was in the back seat with Olofson while Trochinski drove. Olofson was not handcuffed at this time. In total, Olofson was handcuffed for about twenty minutes. The officers drove Olofson to the Berlin Police Department, which is about five blocks from Olofson's residence. Once at the police station, the officers led Olofson to Trochinski's office. Officer Trochinski said her office is about eight feet by ten feet. There are no windows to the outside. Officer Trochinski said her office is in the "secure" area of the police department and that Olofson could not have left the building without an officer opening a door for him.

Once in Trochinski's office, Agent Keeku again told Olofson that he could not return to his residence until the search warrant was executed, but that he was not under arrest and that he could leave at any time. Agent Keeku said Olofson understood her comments but agreed to stay and speak with the officers. Keeku testified that Olofson might have asked later during the interview if he could return to his residence and she said not until the search was completed. Keeku testified

that she called one of the officers executing the warrant several times during the afternoon to find out if the search was complete. Each time, she advised Olofson that he could return home until the search was over.

The officers then questioned Olofson regarding the firearms offenses that were the subject of the search warrant. The interview lasted from 1 p.m. to about 4:45 p.m. Olofson was allowed to use the bathroom. To get to the bathroom, Trochinski had to show Olofson to the back of the police station and open a locked door between her office and the bathroom. During the interview at the police station, Keeku and Trochinski were armed but their weapons were not drawn. Olofson was never advised of his *Miranda* rights.

Keeku testified that after the interview was over and she verified that the search was completed, Olofson walked home. Olofson, however, testified that Officer Trochinski drove him home. And Officer Trochinski testified that she could not remember whether she drove Olofson back to his home.

### III.

### ARGUMENT

As noted above, Olofson argues that he was subjected to custodial interrogation, but not advised of his *Miranda* rights, when he was questioned

regarding his knowledge of automatic firearms. His statement should therefore be suppressed.

### A. Custodial Interrogation

A suspect subjected to custodial interrogation must be advised of his *Miranda* rights before the statement is given for it to be admissible as evidence against the suspect. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

#### 1. Interrogation

A suspect is "interrogated" when he is subject to express questioning or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). The functional equivalent of express questioning includes words or actions on the part of police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Id.* at 300-01.

Olofson was "interrogated" when he was asked at the police station about his participation in the firearms offenses that were the subject of the search warrant. Specifically, Olofson was asked whether he knew how to change a semi-automatic weapon into an automatic weapon. This question was reasonably likely to lead to an incriminating response given that Olofson was suspected of possessing and transferring an automatic firearm and a search warrant had been issued for Olofson's residence allowing law enforcement to search the home for evidence of these crimes.

## 2. Custody

A person is in "custody" when his movement is constrained to a degree comparable to a formal arrest. *United States v. Yusuff*, 96 F.3d 982, 987 (7th Cir. 1996). To determine whether a suspect is in custody, the Court must assess the objective circumstances of the situation from the perspective of a reasonable person in the suspect's position. *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

The Court should consider the totality of circumstances when making this determination. *California v. Beheler*, 463 U.S. 1121, 1125 (1983). Relevant considerations when determining the totality of circumstances are: 1) whether the encounter occurred in a public place; 2) whether the suspect consented to speak with the officers; 3) whether the officers informed the individual that he was not under arrest; 4) whether the individual was moved to another area; 5) whether there was a threatening presence of several officers and a display of weapons or physical force; 6) whether the officers deprived the defendant of documents he needed to continue on his way; and 7) whether the officers' tone of voice was such that their requests would likely be obeyed. *United States v. Barker*, 467 F.3d 625, 629 (7th Cir. 2006).

Here, the custodial nature of Olofson's encounter with law enforcement was established from the beginning when twenty local police officers and federal agents, including a fully armored swat team with guns draw, descended upon Olofson's residence to execute the search warrant. Olofson was immediately placed

in handcuffs and told to sit in a police squad car. Or, in the words of Agent Keeku, the officers "took him into custody." (Ev. Hrg. Tr. at p. 8).

The coercive nature of the encounter continued when Olofson's children were seized by police officers, escorted to a neighbor's house, and Olofson was directed to sign a release indicating that he allowed law enforcement to place his children with a neighbor while the search warrant was executed. Agent Keeku added to the custodial nature of the situation when she told Olofson that he could not return to his house until the search warrant was executed.

Thus, by the time Olofson was asked whether he would accompany the officers to the police station for questioning regarding the firearms charges, an armed swat team had invaded Olofson's home, he had been placed in handcuffs and escorted to the back of a squad car, and his four- and seven-year-old children had been removed from his custody and placed with a neighbor on the orders of law enforcement. Given these circumstances, a reasonable person would not have felt free to decline the officers' request to accompany them to the police station for questioning.

Moreover, the coercive nature of the environment was exacerbated at the police station. Although the handcuffs were removed and Olofson was told he was not under arrest and free to leave, he was placed in a small and enclosed office in the secure area of the Berlin Police Department. He could not leave the building

unless an officer unlocked the door to let him out. And even when he asked to use the restroom, Officer Trochinski had to accompany him to unlock the door between her office and the restroom. Further, he was reminded that he was not allowed to return home until the search warrant was executed. This was reinforced several times during the three-hour interview when Agent Keeko telephoned the officers at Olofson's house to learn whether the search was complete. When she was told that the search was not finished, she repeated to Olofson that he could not return home.

To summarize the factors to determine whether a suspect was in "custody," the encounter with Olofson did not occur in a public place, it occurred in the secure area of the police station. Although Olofson consented to speak with the officers, he did so only after a swat team entered his house with their guns drawn, after he was handcuffed and placed in a squad car, and after his children were taken from his custody and removed from his house. Although the officers informed Olofson that he was not under arrest, he was told that he could not return to his residence until the warrant was executed. And the officers needed nearly six hours to execute the warrant. Olofson was removed from his residence and driven to the police station in a law enforcement vehicle by Officer Trochinski. Finally, there was an inordinately threatening presence of officers and a display of force given that 20 officers were on hand to execute the warrant and an armed swat team

was utilized. Thus, the factors outlined by the Supreme Court in *Beheler* warrant a finding that Olofson was in custody when he made his statement at the Berlin Police Station.

This case is similar to the settings considered "custodial" by the Seventh and Eighth circuit courts of appeals. In *Sprosty v. Buchler*, 79 F.3d 635 (7th Cir. 1996), the Seventh Circuit held that a suspect was in "custody" when police executed a search warrant at the defendant's home. Although the court acknowledged that briefly detaining a suspect while a search warrant is executed does not, without more, amount to "custody" for purposes of *Miranda,* special circumstances were present. *Id.* at 642. For example, the police surrounded the suspect's car when they arrived to execute the warrant, the officers blocked the driveway from his car to the street, and escorted the suspect inside. And while four of the officers executed the warrant, an armed and uniformed officer remained with the suspect to guard him. The court also observed that the search lasted three hours and the suspect was repeatedly asked to reveal where incriminating photographs were located during that three-hour period. *Id.*

In many respects, the case at bar presents a more custodial setting given that twenty officers were on the scene – including a swat team. Further, Olofson was handcuffed, placed in a squad car and driven to the police station for questioning, and was repeatedly told that he could not return to his residence until

the search was completed. But the similarity between this case and *Sprosty* is that they are examples of cases where the coercive atmosphere created by law enforcement overcomes the general rule that briefly detaining a suspect while a search warrant is executed does not normally amount to custody.

In *United States v. Hanson*, 237 F.3d 961 (8th Cir. 2001), the Eighth Circuit held that a suspect was in custody when agents appeared at the suspect's door and asked him to accompany them to a police station to discuss an arson investigation. At the station, the suspect made incriminating statements and was not advised of his *Miranda* rights. In finding the setting custodial, the court noted that the suspect did not initiate contact with the agents and traveled to the police station in the back seat of a law enforcement vehicle. *Id.* at 965. The fact that the suspect was told he was not under arrest and was free to leave was obviated by the fact that he was dependent upon the officers to find his way out of the building and back to his home and he was interviewed for three hours. *Id.*

Similarly, although Olofson was told that he was not under arrest and was free to leave, he was dependent on the officers to unlock the doors to the secure area of the police station. He was also dependent on the officers to give him permission to return to his home. Like *Hanson*, the officers' perfunctory reassurances that Olofson was not in custody and was free to leave did not diminish the coercive nature of the environment at the police station.

## CONCLUSION

Olofson was subjected to custodial interrogation when he was interrogated by Agent Keeku and Officer Trochinski at the Berlin Police Department on July 19, 2007. Because he was not advised of his *Miranda* rights before this interview, the statements must be suppressed.

Dated at Milwaukee, Wisconsin, June 15, 2007.

Respectfully submitted,

**/s/ Brian P. Mullins**
Brian P. Mullins, Bar # 1026891
Counsel for David Olofson
FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
517 E. Wisconsin Avenue, Room 182
Milwaukee, WI 53202
Tel: 414-221-9900
Fax: 414-221-9901
brian_mullins@fd.org