UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

  v.                                            Case No. 06-CR-320

DAVID R. OLOFSON,

        Defendant.

DECISION AND ORDER ADOPTING THE RECOMMENDATION OF THE MAGISTRATE JUDGE, DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT, AND DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

On June 21, 2007, Magistrate Judge William E. Callahan issued a recommendation that the court deny defendant David R. Olofson's motions to dismiss the indictment and to suppress statements. Defendant timely filed an objection to the recommendation, which the court now reviews de novo.

Olofson is charged in a one-count indictment with transferring a machine gun in violation of 18 U.S.C. § 922(o). He moved to dismiss the indictment on the grounds that Congress exceeded its authority to regulate interstate commerce when it prohibited the intrastate transfer of a machine gun and that prohibiting the transfer of a machine gun infringes on his Second Amendment right to keep and bear arms. At the same time, Olofson admits "that controlling Seventh Circuit case law conflicts with his positions, and [he] only raises that issues to preserve the matters on appeal."

Indeed, the Seventh Circuit in *United States v. Kenney*, 91 F.3d 884 (7th Cir. 1996), held that § 922(o) is a constitutional exercise of Congress' Commerce Clause power. Further, the Seventh Circuit has held the Second Amendment establishes no right to possess

a firearm apart from the role possession of the gun might play in maintaining a state militia. *Gillespie v. City of Indianapolis*, 185 F.3d 693, 710 (7th Cir. 1999). In light of these cases, the motion to dismiss will be denied.

Next, Olofson argues that he was subjected to custodial interrogation but not advised of his *Miranda* rights when making a statement on July 19, 2006, at the Berlin Police Department. Olofson's statements could be considered incriminating because he expressed a familiarity with how to transform a semiautomatic firearm into a "machine gun," and he is charged with transferring a machine gun. Magistrate Judge Callahan conducted an evidentiary hearing on May 29, 2007, and concluded that Olofson was not in custody for purposes of *Miranda.*

Olofson maintains that Magistrate Judge Callahan erred because he did not consider that Olofson could not leave the police station without an officer unlocking the door for him. He argues that he was in the secure area of the Berlin police station, and that a person cannot leave the secure area of the station without an officer unlocking the door. Moreover, Olofson asks the court to consider that a swat team "stormed" his house to execute the search warrant, that he was initially placed in handcuffs, that his children were removed from the house and taken to a neighbor's house, and that he was told he could not return home until the search warrant was executed.

At the hearing, the government called Federal Bureau of Alcohol, Firearms, and Tobacco Special Agent Jody Keeku and Berlin Police Officer Georgia Trochinski. Both participated in the execution of the search warrant and the interrogation at the Berlin Police Department. Olofson testified on his own behalf. The court has reviewed the transcript of the hearing and the facts are set forth below.

Keeku testified that approximately 20 officers were involved in the executive of the search warrant at Olofson's residence at 11:00 a.m. on July 19, 2006. (Tr. pp. 6, 7, 19) The ATF, Berlin Police Department and Green Lake County Sheriff's Department SWAT team executed a "dynamic entry" dressed in SWAT gear (tactical vests, knee pads, helmets, additional firearms, and handcuffs). (Tr., pp. 7, 19) A dynamic entry means they first knock and that if no one approaches the door within several minutes they will make an entry. (Tr. p. 7, 8) Olofson answered the door and was told by the officers that they had a federal search warrant. (Tr. p. 8)

Officers secured and handcuffed Olofson and Olofson's friend, Everett Eastman. (*Id.*) Olofson and Eastman were taken to separate vehicles. (Tr. p. 9) Keeku estimates that Olofson remained handcuffed for approximately twenty minutes. (Tr. p. 20)

Keeku entered the house and observed Olofson's children coming up the basement stairs. (Tr. p. 9) Keeku took the children to the front yard and Officer Georgia Trochinski placed the children in her vehicle. (*Id.*) Later, and with Olofson's permission, the children were taken by Everett Eastman to his home to wait for their mother. (Tr. pp. 12-13)

Approximately 15 minutes after officers entered Olofson's home, Keeku approached Olofson as he sat in a squad car and informed him that they had a federal search warrant and that they were interested in speaking with him. (Tr. pp. 9, 10) Keeku asked Olofson whether he would come to the Berlin Police Department to speak with the officers. (Tr. p. 10) In addition, Keeku informed Olofson that he was not under arrest, but that he could not enter his house while the search was being conducted. (Tr. pp. 10, 22)

Olofson, who was uncuffed, accompanied Keeku and Trochinski about five blocks to the Berlin Police Department in a tan, unmarked Explorer. (Tr. p. 13) They parked and entered the front door of the Police Department, which is attached to City Hall. (*Id.*)

Once inside, Olofson, Keeku and Trochinski went to Trochinski's office in an administrative area. (Tr. p. 13) Trochinski described the office as being approximately eight feet by ten feet with five doors. (Tr. p. 29) There is an entry room door, a door to a small room with recording equipment and three doors to closets. (*Id.*) Trochinski sat on Keeku's right side, and both officers were seated at desks with computers and their weapons were concealed by long shirts. (Tr. p. 14, 24-25) Olofson sat in one of three chairs in front of the officers, which was closest to the door. (*Id.*)

At first the door was closed, but it remained open after Olofson went to the bathroom. (Tr. p. 14, 30) Trochinski showed Olofson where the bathroom was located in the back of the police department. (Tr. pp. 16, 30) After exiting Trochinski's office there is another door to the left and a series of two doors with glass, which allows you to see outside and exit with the use of a key fob. (*Id.*) The bathroom is located in a secure area reserved for people who are either in custody or otherwise at the department and needing to use the bathroom. (*Id.*) Olofson was unsupervised at that time and was gone approximately five minutes. (Tr. p. 16)

Keeku explained to Olofson that he could not go back to the residence while the search was being conducted, but that he was not under arrest and could leave at any time. (Tr. p. 14) He agreed to stay and speak with the officers. (*Id.*) After he indicated that he understood, they began to question Olofson. (Tr. p. 15) He remained in the office with the officers approximately three hours, from 1:00 p.m. to 4:45 p.m. (*Id.*) However, the officers did not ask questions the entire time. (*Id.*) After asking questions specific to the alleged violations, they were "just more or less passing time while the search warrant was being executed." (*Id.*)

4

Keeku testified that Olofson never indicated that he didn't want to answer any more questions or that he wanted to speak with a lawyer. (Tr. p. 16) Keeku and Trochinski testified that Olofson never asked to leave. (Tr. pp. 16, 35) Trochinski testified that Olofson was "fairly smug," very comfortable, and "fairly at ease to be there." (Tr. p. 31) Keeku testified that Olofson walked home after the search was complete, but Trochinski could not remember whether he walked or was given a ride. (Tr. pp. 25, 31) Olofson was called to the witness stand to testify that he believes that both officers gave him a ride home, and that the officers made sure that everyone was out of the house before he was allowed to enter. (Tr. p. 38)

There is no objection to the portion of the recommendation setting forth the law governing when *Miranda* warnings are required. Put simply, the suspect must be both in custody and subjected to interrogation. *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006) (citing *United States v. Abdulla*, 294 F.3d 830, 834 (7th Cir. 2002)). A suspect is in custody if his movements are restrained to a degree associated with a formal arrest. *Abdulla*, 294 F.3d at 834. "Custody 'implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation; the essential element of a custodial interrogation is coercion.'" *United States v. Salyers*, 160 F.3d 1152, 1159 (7th Cir. 1998) (quoting *United States v. Martin*, 63 F.3d 1422, 1429 (7th Cir. 1995)).

The inquiry is objective, and the court looks to the totality of the circumstances when considering whether a reasonable person would have believed that he was free to leave. *Barker*, 467 F.3d at 628 (citing *United States v. Lennick*, 917 F.2d 974, 977 (7th Cir.1990)). The court considers whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to

another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed. *Id.,* 467 F.3d at 629.

The court agrees with the recommendation inasmuch as a reasonable person would not have believed that he was in custody during the three hours that Olofson spent at the Berlin Police Department. Mindful that Olofson was met at the door of his home by a SWAT team and that he was initially "secured" while the officers began to search his residence, the court notes that handcuffs were removed from Olofson after a short time and that Olofson was told repeatedly that he was not under arrest.

Olofson agreed, without any pressure, to accompany officers to the Berlin Police Department and to answer questions. He rode, uncuffed, approximately five blocks to the police station. Before and after arriving at the Police Department, Olofson was advised that he was not under arrest. And, while he was at the station, he did not ask to speak with a lawyer or ask to leave. Further, Olofson's movements were unrestrained and he went to the bathroom unmonitored. At all times during Olofson's stay at the Police Department, he appeared comfortable, smug and at ease. And while at the Department for three hours, much of the time was spent just "passing time" while the search warrant was being executed.

Notably, the door to Trochinski's office remained open after Olofson visited the bathroom, and at no time was it locked. Olofson was only told that he could not return to his residence while it was being searched. Finally, there does not appear to be any evidence that Officers Keeku or Trochinski acted in an intimidating manner, spoke to Olofson in a threatening tone, or made threatening gestures.

The cases cited by Olofson are inapposite. In *United States v. Hanson*, 237 F.3d 961 (7th Cir. 2001), the defendant traveled to a field station in the locked back seat of

6

Case 2:06-cr-00320-CNC     Filed 08/28/07     Page 6 of 8     Document 61

the government truck. *Id.*, 237 F.3d at 965. He was dependent on the officers to find his way out of the building and back home. *Id.* They took him to the station under a false pretense and only advised him of their true purpose for bringing him there once they had him in an "intimidating environment." *Id.* In addition, the defendant in *Hanson* testified that the officer warned "Let's not make this adversarial tit for tat. If you don't cooperate I guarantee you'll do federal time in prison. . . . " *Id.*, 237 F.3d at 964.

Olofson places additional reliance on *Sprosty v. Buchler*, 79 F.3d 635 (7th Cir.1996). There, the officers pulled up beside Sprosty in his driveway, blocked his path to the street, and escorted him inside his mobile home. *Id.*, 79 F.3d at 642. While the officers executed the search warrant, Sprosty sat guarded by an armed police officer for nearly three hours. *Id.* Repeatedly, throughout that time, the officers asked Sprosty to tell them where incriminating photographs were located and one of the officers offered Sprosty a deal if he would cooperate by disclosing the location of the evidence. *Id.* Officers even read Sprosty his *Miranda* rights but continued to question him after he allegedly requested an attorney or asked his mother to make the call. *Id.* at 638.

For the reasons stated above, the court finds that Olofson was neither in custody nor deprived of his freedom of action in any significant way while he was interrogated by Special Agent Keeku and Officer Trochinski at the Berlin police department.

Now, therefore,

IT IS ORDERED that the magistrate judge's recommendation on defendant's motion to dismiss indictment and on defendant's motion to suppress statements is adopted.

IT IS FURTHER ORDERED that defendant's motion to dismiss the indictment is denied.

IT IS FURTHER ORDERED that the defendant's motion to suppress statements is denied.

Dated at Milwaukee, Wisconsin, this 28th day of August, 2007.

        BY THE COURT

        s/ C. N. CLEVERT, JR.
        C. N. CLEVERT, JR.
        U. S. DISTRICT JUDGE