UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

  v.                   Case No. 06-CR-320

DAVID R. OLOFSON,

    Defendant.

**GOVERNMENT'S SENTENCING MEMORANDUM**

  The United States of America, by its attorneys, United States Attorney Steven M. Biskupic and Assistant United States Attorney Gregory J. Haanstad, hereby submits the following sentencing memorandum in support of its recommendation that a sentence of 33 months' imprisonment be imposed.

**I. Background**

  A federal grand jury returned an indictment in which David R. Olofson was charged with transferring a machinegun in violation of 18 U.S.C. § 922(*o*). A jury found him guilty on January 8, 2008.

  The United States Probation Office has prepared a presentence investigation report (PSR) in anticipation of the sentencing hearing in this matter. The PSR calculates the applicable total offense level as 18, the defendant's criminal history category as I, and the resultant guideline imprisonment range as 27 to 33 months. Neither party has objected to

those guidelines calculations. For the reasons set forth below, the government asks that a sentence be imposed at the top of the applicable guidelines range.

## II. Sentencing Scheme

The sentencing court first must calculate the advisory guidelines range, and then impose an appropriate sentence under all of the factors set forth in 18 U.S.C. § 3553(a). *See Gall v. United States*, 128 S. Ct. 586, 596 (2007); *United States v. Holt*, 486 F.3d 997,1004 (7th Cir. 2007). Section 3553(a) requires the court to consider the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guidelines range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(2).

2

**A.     Sentencing Guidelines calculations**

Again, the PSR contains the following guidelines calculations: a total offense level of 18; a criminal history category of I; and a resultant guideline imprisonment range of 27 to 33 months. Neither party has objected to those guidelines calculations, and the Court should adopt them.

**B.     Other statutory sentencing considerations**

The government's position is that a sentence of 33 months of imprisonment is warranted under 18 U.S.C. §3553(a).

1.     <u>Nature of the offense</u>

Olofson purchased bulk quantities of firearms and ammunition. He frequently provided both weapons and ammunition to other people; in fact, he told law enforcement agents that he had provided so many guns to different people that he could not keep track. Tr. 64. He couldn't remember who had his guns, and said that he didn't maintain any record of who had his guns because that would be too dangerous. Tr. 64.

One of the people to whom Olofson loaned a firearm was Robert Kiernicki. In the first half of 2006, Olofson on a number of occasions loaned Kiernicki an Olympic Arms, SGW Rifle, Model CAR-RR, .223 caliber bearing serial number F7079. Olofson previously had loaned that same gun to a number of other individuals. Olofson also gave Kiernicki hundreds of rounds of ammunition for the firearm. Tr. 34-37, 62, 63.

When Olofson provided the gun to Kiernicki, it operated as a machinegun – that is, it "fired more than one shot, without manual reloading, by a single function of the trigger."

3

*See* 26 U.S.C. § 5845(b). Moreover, at the time that he transferred the firearm to Kiernicki, Olofson knew that it fired automatically. The firearm had a selector switch that could be placed in any of three positions. One of the positions was marked "Safe"; one was marked "Fire"; and one was unmarked. When the selector switch was placed in the unmarked position – and only when the selector was placed in that position – the gun fired automatically. Olofson told Kiernicki that he had fired the gun in automatic mode in the past by moving the selector switch to the unmarked position. Tr. 38-39. And when he found out that law enforcement agents had seized the gun after Kiernicki was firing it automatically at a conservation club, Olofson expressed surprise, saying that he had himself fired automatically at the same club and never had any problems. Tr. 41, 49[1]

Olofson's firearm fired automatically because, although it was a semiautomatic AR-15, it had M-16 fire control components. More specifically, the firearm had an M-16 trigger, hammer, disconnector, and selector. Olofson's firearm was not manufactured with that configuration of M-16 fire control components. Tr. 120, 136-37.

Olofson was aware that those M-16 components were in his AR-15 and that it was those components that caused his firearm to fire automatically. E-mails and other documents on his computer showed that he had ordered M-16 parts. And he had a manual that described how to convert a semiautomatic AR-15 to an automatic M-16 by substituting

---

[1] This evidence does not square with Olofson's assertion that there was no evidence at trial that Olofson indicated to Kiernicki that the gun could fire automatically. Def. Sent. Memo. at 6. It also is contrary to Olofson's contention that "the evidence merely established that Mr. Olofson told Kiernicki not to use the AR-15 in the third setting because it did not have the right parts and would jam." Def. Sent. Memo. at 6.

4

the very M-16 parts that were in Olofson's converted machinegun – that is, the hammer, the trigger, the disconnector, and the selector. Tr. 74-80. Olofson knew that his firearm fired automatically and, given this evidence, likely was the person who made the conversions that allowed it to do so.

Olofson characterizes his gun as a "malfunctioning AR-15." Def. Sent. Memo. at 6. Olofson's gun was "malfunctioning" only in the obvious sense that, by firing automatically, it was not functioning as a semiautomatic AR-15 is designed to operate. If Olofson means to suggest by use of the term "malfunctioning" that the automatic fire capability of his gun was inadvertant and was something about which he had no knowledge, such a position has no support in evidence and is flatly contrary to the jury's unanimous verdict. Olofson's claim of "a conviction by technical application of the law" and his argument that there was no "intent behind the violation of law" similarly miss the mark. Def. Sent. Memo. at 6. The twelve neutral, detached jurors who heard the evidence in this case expressed their unanimous disagreement with Olofson's characterization. The jury's guilty verdict demonstrates that the jurors unanimously found that Olofson acted knowingly when he transferred his converted machinegun to Kiernicki. That is, the jury unanimously found that Olofson knew that it was an automatic-firing weapon that he was transferring to Kiernicki. And the jury had ample support for its finding given Olofson's own statements; his knowledge as to how to convert an AR-15 into an automatic by substituting M-16 parts; his ordering M-16 parts; and the subsequent location of M-16 parts in Olofson's gun.

5

Olofson also suggests that his offense is mitigated because he did not transfer his converted machinegun for illicit purposes and because he did not transfer more than one machinegun. Def. Sent. Memo. at 6. In truth, it is unclear why Olofson provided his converted machinegun to Kiernicki. Olofson told both Kiernicki and ATF Special Agent Keeku that he provided the gun so that Kiernicki could maintain his training and firearms skills. Tr. 38, 63. In any event, the sentence recommended by the government and by the sentencing guidelines already accounts for the fact that only one machinegun was transferred, as well as for the fact that it was not transferred specifically for an additional illicit purpose. Had these additional aggravating factors been present, a substantially longer sentence would have been warranted.[2]

Even without these additional aggravating factors, Olofson's conduct falls squarely within the compass of § 922(*o*). "The statute discourages proliferation of machine guns, as well as unlawful transfer to private hands that from time to time have uses for these guns, none of those uses good and virtually all of them criminal." *United States v. Franklyn*, 157 F.3d 90, 96-97 (2d Cir. 1998); *see also United States v. Kenney*, 91 F.3d 884, 890 (7th Cir. 1996) (discussing purposes of § 922(*o*)). The facts and circumstances of Olofson's offense are not unique, and warrant a sentence within the applicable guidelines range.

---

[2]The sentencing guidelines, for example, provide additional enhancements for offenses involving three or more machineguns and for offenses in which the defendant transferred a machinegun with an eye toward its being used in connection with another felony offense. U.S.S.G. §§ 2K2.1(b)(1) and 2K2.1(b)(5).

6

2. History and character of the defendant

Olofson is thirty-six years old. He joined the Army in 1989, and was on active duty until 1993, when he became a reservist. Olofson touts his military background, claiming that it shows his "patriotism and valor, especially now amidst the war in Iraq." Def. Sent. Memo. at 4.

But Olofson's military history has been far from exemplary. For example, Olofson was the subject of an extensive investigation by the United States Army in 2001 and 2002. At the time, Olofson's duties provided him access to Army computers at the Fond du Lac Reserve Center. The Army found that, with his access, Olofson had "reconfigured the center's information management systems. Additionally, [he] integrated [his] own personal computer systems into the Government systems. [Olofson] downloaded restricted files and established unauthorized nets. When personnel began investigating the unauthorized changes, [Olofson] destroyed security logs, removed drives, and deleted files." Olofson was absent without leave (AWOL) after learning of the investigation. Exh. A at 1, 5.

The Army specifically found that, among other things, Olofson had "permitted sensitive information to be vulnerable to hackers and other cyber security threats. SPC Olofson told several soldiers that he downloaded all unit information onto his personal computer at the end of each drill. . . . Olofson may have permitted Wisconsin militia groups to access the Internet through military IP addresses. . . . SPC Olofson has admitted to many soldiers that he is a member of an anti-government militia." The Army also found that

Olofson had violated the federal conspiracy statute, as well as the federal statute that prohibits unauthorized access to a government computer.[3] Exh. A at 4, 5.

The Army concluded that, as a result of Olofson's actions, "[n]inety-one soldiers' identities may have been sold or given to persons outside the military. . . . [S]oldiers' private information was accessed and illegal access by outside organizations was possible." Exh. A at 5.

The Army's investigation was not the only that revealed Olofson's connection to milita groups. The investigation into the present offense revealed that Olofson not only transferred guns and ammunition, but also dispensed advice regarding the relationship among guns, law, and government. His basic belief was that he was a "Sovereign" and that, as a member of that group, he was not bound by the laws of the United States, particularly laws that regulated firearms ownership. For example, when one individual e-mailed Olofson and asked him, "How does the untaxed registering of a machinegun work[?] Can one still build auto weapons and how is the paperwork done[?]" Olofson responded:

> MG's [machineguns] are just the small toys one can get. Remember, as a Sovereign you are unhindered by the regulations that the federal citizens have to follow. There is a separate set of paperwork dealers must fill out to cover there [sic] butts on where the weapons and other items went. That is what a Sovereigns alien ID number dose [sic] for him. It's just a way of accounting for where it went. Yes you can build any weapon you like. To learn more, especially details on the paperwork you should learn more about Sovereignty first. After some basic knowledge we will walk you through everything the first time to help you get the hang of it. Finding real freedom

---

[3] 18 U.S.C. §§ 371 and 1030.

8

for the first time is like a babies [sic] first steps. You haven't really done it before so you don't's know what it's like. But we can change that. Then you can literally do most anything you want so long as it interferes with no others rights or person.

Exh. B.

Olofson's interest also extended to other military items and to explosives. He distributed weapons, ammuniton, body armor, chemical protective suits, and gas masks.[4] In fact, Olofson offered weapons, armor, and personnel to conduct vigilante action. In a letter to a leader of a vigilante group, Olofson wrote:

> We have been following your problems with great interest and trepidation. We believe that by lending our support we can benefit your organization, the local landowners, and ourselves. You will find our multitude of cells very well equipped and trained. Most of us are ex military with a few from what are considered elite unites [sic]. . . . [W]e have many things most individuals do not to include light armor and heavy weapons. I do not think the heavier stuff is needed for the relatively light tasks you conduct down there but it can be useful if things were to get bad enough. Also we are looking to come down during a time of year when we can catch the most contraband coming across the boarder. Appropriate dates to accomplish that would be appreciated. We also need good Intel on the aria [sic]. Maps and photos, Arial [sic] if possible so we can further our planning. I will send some supporting transcripts and documentation to you soon to let you know just how serious we are and what a few of our qualifications are.

Exh. C.

Olofson contends that "[h]is military experience dovetails with his appreciation and respect for guns." Def. Sent. Memo. at 4. The more troubling connection is between

---

[4]Inventories and e-mails listing and offering these items were found on Olofson's computers. In response to one of Olofson's offers, one potential buyer inquired whether any of Olofson's "Israeli gas masks" would "fit kids 1 1/2 to 2 years old?"

9

Olofson's military service and his lawless activities. Olofson touted his military training and background in offering vigilante assistance; used his military position to access and download restricted Army files, including all unit information at the end of each drill, raising concerns within the Army that Olofson had disseminated the information to militia groups to which he was connected; and compromised the identities and private information of fellow soldiers.

The picture that emerges from Olofson's background is not one of a "responsible gun owner" whose "entire history with guns demonstrates a respect . . . for the laws concerning firearms." Def. Sent. Memo. at 5. Far from respecting firearms laws, Olofson has made clear his belief that, as a Sovereign, he was "unhindered by the regulations that the federal citizens have to follow." The conduct that underlies Olofson's conviction in this case shows that he acts in accordance with such beliefs.

Nor has Olofson's "gun ownership . . . always been responsible and . . . adhered to the law" as he now claims. Def. Sent. Memo. at 5. In addition to this case, Olofson has two prior convictions for weapon-related offenses. He was convicted of carrying a concealed weapon in 1994. According to court records, Olofson was ordered to donate $1,000 as part of his sentence. When he failed to make the donation as ordered, Olofson was cited for contempt.

Olofson also was convicted of disorderly conduct for a 2001 gun-related incident. He was escorting his son trick-or-treating on Halloween, when an anonymous caller reported to police that Olofson was carrying a concealed handgun. When police

10

approached Olofson, he had a loaded (with fifteen rounds of live ammunition) semi-automatic 9 millimeter pistol concealed in a holster on his back.[5]

Finally, Olofson contends that a sentence well below the applicable guidelines range is warranted in order to avoid the negative effects that his incarceration would have upon his family. Olofson's incarceration will no doubt be difficult for his family. The impact of a defendant's incarceration upon his family typically is among the most unfortunate consequences of a criminal conviction. But, in the federal sentencing system, family ties and responsibilities are not ordinarily relevant. *See, e.g.,* U.S.S.G. § 5H1.6. Nonetheless, Olofson attempts to distinguish his situation from the typical case. He argues that his case is not like that of a drug dealer who asks for leniency because, unlike the drug dealer, Olofson committed only a technical violation of law and acted without intent. Def. Sent. Memo. at 6. Olofson's attempts to diminish the significance of his offense, and his argument that he acted without general intent, are addressed above. For purposes of this section, it suffices to say that nothing about Olofson's situation suggests that the loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for similarly situated defendants.

3.  Purposes of Sentencing

The guidelines recommend a sentence of 27 to 33 months in prison. Olofson asks for a sentence of twelve months of probation. Such a sentence would dramatically

---

[5] Also inconsistent with Olofson's claim of responsible gun ownership is his having loaned guns to so many people that he had lost track of who had his guns.

depreciate the seriousness of Olofson's offense, would fail to afford adequate deterrence, and would fail to provide the needed measure of protection for the public. Indeed, in this case, a sentence at the top of the guidelines range is necessary to satisfy the purposes of sentencing.

Olofson argues that a prison sentence is not necessary because his "history and military experience shows no inclination on his part to violate the law." Def. Sent. Memo. at 7. It is difficult to comprehend how Olofson's military experience in any way shows that he is not inclined to violate the law. To the contrary, the 2001-2002 Army investigation concluded that Olofson had compromised sensitive and confidential military information and that, in doing so, he had violated federal law.

Olofson also argues that his conviction alone will deter him from committing offenses in the future: "Since he can no longer possess firearms, there is no concern that he will commit future gun crimes." Def. Sent. Memo. at 7. Any possession of firearms by Olofson in the future will of course be a felony. But he has already evinced a complete disregard for gun laws. Not only did he knowingly transfer a converted machinegun in this case, but he has prior convictions for violations of gun laws and considers himself "unhindered by the regulations that the federal citizens have to follow."

A sentence of 33 months in prison would protect the public, would deter both Olofson and others in the community from committing similar offenses in the future, would promote respect for the law, and would appropriately reflect the seriousness of this offense.

### III. Conclusion

Based on the foregoing, the government asks the Court to impose a sentence of 33 months' imprisonment.

Respectfully submitted at Milwaukee, Wisconsin, this 12th day of May, 2008.

>STEVEN M. BISKUPIC
>United States Attorney
>By:   s/Gregory J. Haanstad
>GREGORY J. HAANSTAD
>Assistant United States Attorney
>Gregory J. Haanstad: 1036125
>Attorney for Plaintiff
>Office of the United States Attorney
>Eastern District of Wisconsin
>517 East Wisconsin Avenue, Room 530
>Milwaukee, Wisconsin 53202
>Telephone: (414) 297-4581
>Fax: (414) 297-1738
>E-Mail: greg.haanstad@usdoj.gov