# FEDERAL DEFENDER SERVICES
## OF WISCONSIN, INC.
LEGAL COUNSEL

Daniel W. Stiller, Federal Defender
William U. Burke
Brian T. Fahl
Nancy Joseph
Calvin Malone
Brian P. Mullins
Thomas G. Wilmouth

517 E. Wisconsin Avenue
Suite 182
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901

April 15, 2008

**RECEIVED**
APR 1 6 2008
U.S. DIST. COURT ED OF WI
CHAMBERS OF JUDGE CHARLES N. CLEVERT, JR.

USPO LaKeasha K. Mallett
United States Probation Office
517 E. Wisconsin Avenue, Room 001
Milwaukee, Wisconsin 53202

RE: *United States v. David R. Olofson*
Case No. 06-CR-320

Dear Ms. Mallett:

David Olofson, by counsel, submits the following objections and clarifications to the presentence report:

¶7: Paragraph 7 states that Olofson purchased bulk quantities of firearms[1] and ammunition. This is incorrect. Although over the last twenty years Mr. Olofson has legally purchased numerous weapons and ammunition for those weapons, he has never purchased weapons or ammunition in bulk quantities.

¶ 8: Paragraph 8 states that "[w]hen Mr. Olfoson provided the gun to Mr. Kiernicki, it operated as a machine gun – that is, it fired

---

[1] The word "firearm" is a term of art in the NFA, which includes machine guns and other types of weapons but excludes most common guns, such as ordinary rifles, shotguns and handguns." *United States v. Thompson / Center Arms Co.*, 504 U.S. 505, 506-07 (1992). It is assumed that the presentece writer is not implying that Olofson trafficked in numerous illegal weapons, but was simply using the term "firearm" in its general sense as defined in 18 U.S.C. § 921(a)(3), which is the definition used by the sentencing guidelines. If, to the contrary, the presentence writer is using the term "firearm" as defined in 26 U.S.C. 5845(a), Olofson objects because there is no evidence that even suggests that Olofson owned or possessed any firearm other than the AR-15 that was determined to be a machine gun here.

       automatically more than one round with a single pull of the trigger." It would be more accurate to say that on the last time that Kiernicki borrowed the AR-15, it operated automatically. It is also important to note that there is no evidence that Olofson's AR-15 fired automatically prior to the last time Kiernicki borrowed the weapon.

¶9:  Paragraph 9 should state that **the Jury** determined that when he transferred the rifle to Mr. Kiernicki, Mr. Olofson knew that it fired automatically. Mr. Olofson's defense was that the AR-15 exhibited a malfunction called hammer-follow and, therefore, was not a machine gun. As a corollary to that defense, Olofson could not have known that his AR-15 fired automatically.

    Paragraph 9 states that "[w]hen the selector switch was moved to the unmarked position it fired automatically. According to Mr. Kiernicki, when he fired the AR-15 in this third position, the rifle fired three rounds and then jammed. He cleared the weapon and attempted to fire from the third position again. And again, the weapon fired three rounds and then jammed. In the ATF's first test of the weapon it met with similar results – the weapon fired a few rounds and then jammed, resulting in an ATF opinion that the weapon was not a machine gun. Rather, the ATF opined that the weapon was exhibiting the hammer-follow malfunction. Only at a second test, where an ammunition with a softer primer was used did Olofson's weapon fire automatically.

¶10:  Paragraph 10 asserts that Olofson's semi-automatic AR-15 fired automatically because it had M-16 fire control components, specifically an M-16 trigger, hammer, disconnector and selector. This is incorrect – the explanation is contained in Olofson's response to paragraph 11. Paragraph 10 also asserts that Olofson's rifle was not manufactured with that configuration of

parts. This is also incorrect. ATF Officer Kingery's testimony was that he did not believe that the SGW/Olympic Arms AR-15 was manufactured with all of those M-16 internal parts. He did testify that the AR-15's were manufactured with some of those M-16 parts. Defense expert Len Savage testified that he had contacted Bob Schuetzen, owner of SGW/Olympic Arms and that SGW's AR-15 rifles had been manufactured at a time with all four M-16 internal parts.

¶11: Olofson objects to paragraph 11 in its entirety. Although Olofson was obviously aware that his AR-15 had the four internal M-16 parts, those four parts do not cause an AR-15 to fire automatically. The combination of those four parts may have contributed to the hammer-follow malfunction, but they do not, by themselves, create a fully optional machine gun. The conversion book, government's exhibit 9, supports this proposition. The conversion book contains three methods for converting an AR-15 to a M-16: (1) M-16 duplication; (2) drop in auto-sear; and (3) lightning link. Neither the drop in auto-sear or lightning link were alleged to have been used with Mr. Olofson's weapon. The conversion at issue here is the M-16 duplication method.

As stated in Chapter One of the conversion book, with regard to the M-16 duplication method:

"All AR-15 lower receivers, whether they are Colt or after market have been machined in such a way as to leave an excess of metal on the inner rear walls and no auto-sear pin hole is drilled. This is done so the M-16 style auto-sear can't be installed.

What must be done, simply put, is change it to accept the M-16 auto-sear. To accomplish this you must remove the excess metal

from the inner walls of the lower receiver, and drill one small hole for the M-16 auto-sear pin."

(Gov. Ex. 9 at p. 3) Thus, according to the conversion book to convert an AR-15 to a M-16 an auto-sear must be added. In fact, according to the conversion book, a notch must be cut out of the receiver of the rifle in order for it to accept an auto-sear. (Gov. Ex. 9 at p. 9). There is no evidence that an auto-sear was ever used with Mr. Olofson's AR-15; nor was there any evidence that any modifications were made to the receiver of Mr. Olofson's AR-15 to accept an auto-sear. Despite the conversion book's auto-sear requirement, the government adhered to the idea that all that was needed to convert the AR-15 to a M-16 were the following M-16 parts, which were installed on Mr. Olofson's AR-15: a M-16 trigger, disconnector, hammer and selector switch. Again, the conversion book, which the government relies upon to support its belief, actually contradicts the government's position:

"For the parts needed to convert the AR-15 to M-16 configuration, other than the M-16 auto-sear parts, refer to drawings page 13, numbers 1, sear spring, 2 sear pin, 3, sear bushing, and 4 sear body [parts 1, 3, and 4 are normally assembled when you purchase them] are the *M-16 hammer, disconnector, trigger, selector switch and bolt carrier*, shown on page 11."

(Gov. Ex. 9 at p. 14)(*emphasis added*). According to the manual, not only is an auto-sear required, but a M-16 bolt carrier is also required to convert an AR-15 to a M-16. There was no evidence that either a M-16 auto-sear or bolt carrier was present on Mr. Olofson's AR-15.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

USPO LaKeasha Mallett
April 15, 2008
Page 5

>Additionally, ATF Officer Kingery testified that the same mechanical process that caused the hammer-follow malfunction in his first test of Olofson's AR-15, also caused the weapon to fire automatically in the second test, when the softer primered ammunition was used. This compels the conclusion that in both instances Olofson's AR-15 exhibited the hammer-follow malfunction and it was ultimately the use of the softer primered ammunition that caused the AR-15 to fire multiple rounds in the second test. In fact, this is not inconsistent with the government's position throughout the trial that it did not matter how or why, as long as the AR-15 fired more than one round of ammunition with a single pull of the trigger at any single point in time, it is a machine gun.

¶ 12: Olofson objects to the relevance of paragraph 12. The fact that Olofson possessed a number of legal weapons has no bearing on this offense. Likewise, the fact that he legally transferred between three and seven weapons over a twenty-year period has no bearing on this offense.

¶ 15: Paragraph 15 states that "at one point in 1994, he did have a legal federal firearm license." This is not correct. During this time period he did not have a FFL, rather he was listed as a responsible party on a FFL.

¶ 18: Olofson objects to the two-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(A). The enhancement, on its face, does not apply to Olofson's situation. The guideline provision states that "If the offense involved three or more firearms...." U.S.S.G. § 2K2.1(b)(1). Paragraph 18 reads the guideline provision to apply as if Olofson's offense was the illegal possession of any gun. That is not the case here; the instant offense concerns the possession of a particular illegal firearm. Here, it is clear that the offense only involved one firearm: Olofson's AR-15.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

USPO LaKeasha Mallett
April 15, 2008
Page 6

        Accordingly, there is no basis for the two-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(1)(A).

¶ 19: Olofson objects to the four-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(5). The enhancement applies if the defendant engaged in the trafficking of firearms. Paragraph 19 applies the enhancement because it alleges that Olofson, generally, purchased firearms and their parts for others. The reasoning offered by the presentence writer lacks the support of *Application Note 13*.

        In sum, the application note states that the (b)(5) enhancement only applies where the defendant transfers two or more weapons and that the defendant knew or had reason to believe that the transfer of the weapons is to an individual whose possession or receipt of the weapon would be unlawful or that individual would in turn use or dispose of the weapon unlawfully – in other words that the end user was prohibited from possessing the weapon. U.S.S.G. § 2K2.1, *Application Note 13*. There is no evidence that any weapon or part was transferred to a person that Olofson knew or had reason to believe was prohibited from possessing that weapon or part. Accordingly, there is no basis for the four-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(5).

¶ 23: Based upon the foregoing objections, the adjusted offense level should be 18 and not 24.

¶ 26: Based upon the foregoing, the total offense level should be 16 and not 22.

¶ 43: The neurological problem referenced in paragraph 43 disappeared around the time that Mr. Olofson was twenty years of age.

¶ 47:  Mr. Olofson is a combatives level one trainer and is an instructor certified in sniper training. Additionally, he has nuclear, biological and chemical warfare training. Mr. Olofson also has received numerous awards and commendations for meritorious service, including an Army achievement medal.

¶ 49:  The metal holdings referenced in paragraph 49 may be nearly worthless as Mr. Olofson does not actually posses the metal, but instead has warehouse receipts from NORFED, which may never be released due to pending federal litigation.

¶55:  Based upon the forgoing objections, Mr. Olofson submits that based on a total offense level of 16 and a Criminal History Category I, the guideline imprisonment range should be 21-27 months.

Thank you for your attention to these matters.

Sincerely,

Brian T. Fahl

BTF/lcw

c:  Brian P. Mullins
AUSA Gregory J. Haanstad
David R. Olofson

N:\Cases-Open\O-P\Olofson, David - 07-203\Sentencing\objects.wpd