UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

3 ---------------------------------------------------------------

4  UNITED STATES OF AMERICA,          )
                                      )
5                     Plaintiff,      )      Case No. CR 06-320
                                      )      Milwaukee, Wisconsin
6        vs.                          )      January 3, 2008
                                      )      2:08 p.m.
7  DAVID OLOFSON,                     )
                                      )      **ELECTRONICALLY**
8                     Defendant.      )      **RECORDED**

9 ---------------------------------------------------------------

10           **TRANSCRIPT OF FINAL PRETRIAL CONFERENCE**
              BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
11                  UNITED STATES DISTRICT JUDGE

12 APPEARANCES:

13  For the Plaintiff
    UNITED STATES OF AMERICA:       Office of the US Attorney
14                                  By: GREGORY J. HAANSTAD
                                    517 E Wisconsin Ave - Rm 530
15                                  Milwaukee, WI 53202
                                    Ph:414-297-4581
16                                  Fax: 414-297-1738
                                    gregory.haanstad@usdoj.gov
17  For the Defendant
    DAVID OLOFSON:                  Federal Defender Services of
18  (Present)                       Eastern Wisconsin, Inc.
                                    By: BRIAN T. FAHL and
19                                      BRIAN P. MULLINS
                                    517 E Wisconsin Ave - Rm 182
20                                  Milwaukee, Wisconsin 53202
                                    Ph: 414-221-9900
21                                  Fax: 414-221-9901
                                    brian_mullins@fd.org
22                                  brian_fahl@fd.org

23
    U.S. Official Reporter:         JOHN T. SCHINDHELM, RMR, CRR,
24                                  johns54@sbcglobal.net

25 Proceedings recorded by electronic recording,
   transcript produced by computer aided transcription.

1      P R O C E E D I N G S

2           (Audio file commenced at 2:08:40 p.m.)

3           THE CLERK:  Case Number 2006-CR-320, United States of

4    America v. David Olofson.  This matter is before the court for a

5    final pretrial conference.  May we have the appearances, please?

6           MR. HAANSTAD:  Good afternoon, Your Honor, Gregory

7    Haanstad for the United States.

8           THE COURT:  Good afternoon, sir.

9           MR. FAHL:  Good afternoon, Your Honor, Brian Fahl and

10   Brian Mullins appear on behalf of David Olofson who appears

11   today in person.

12          THE COURT:  Good afternoon to all of you as well.

13          As noted, this matter is here for a final pretrial

14   conference.  The court is also is in receipt of an amended

15   report filed as of today's date.

16          Are there any other matters outside of the report that

17   you need to highlight at this time?

18          MR. HAANSTAD:  Your Honor, I think that there are I

19   believe two additional matters.  There is currently pending

20   before the court a motion to compel discovery.  That was filed

21   on December 30th.  And I apologize, I had a few documents put in

22   a folder and I must have left it in my office, I don't have it

23   in front of me.  But the government has nothing responsive to

24   any of those requests.  And I don't know if the court would like

25   to go one by one, if that would be helpful or not, but the

2

1    overarching problem --

2           THE COURT:  Let me see if that's in my file.  I'm not

3    sure I had that brought to my attention.

4           No, I do not have anything concerning that motion.

5    Let me pull it up.  My computer is not on.

6           (Pause.)

7           THE COURT:  Why don't you go ahead while the clerk is

8    getting that document.

9           MR. HAANSTAD:  Sure.  The defense has made a couple of

10   requests of the government and U.S. Attorney's Office by letter

11   along the same lines as what's contained in the motion to compel

12   discovery.  And our response all along has been essentially the

13   same, and that is that those documents really aren't relevant to

14   any matter that's in issue in this trial.  And none of those

15   matters are discoverable under Rule 16.  That is, to the extent

16   they are discoverable under Rule 16 the government has already

17   provided them.

18          Now, in this motion to compel discovery the defense

19   contends that these things are discoverable pursuant to Brady.

20   And again, it's a little different variation I suppose on the

21   same theme.  That is, because none of this -- because none of

22   this evidence is relevant it's difficult to see how it can

23   possibly contain any exculpatory information, but it did.

24          Two issues that are present in this case; that is, the

25   two elements that the government has to establish are that,

1    first of all, this particular weapon with this particular serial

2    number that at one time belonged to Mr. Olofson and was later

3    transferred to another individual in northern Wisconsin, was a

4    machine gun; that is, that it fired automatically more than one

5    shot with a single function of the trigger.

6           Second, the government has to establish that the

7    defendant knew that this particular firearm was a machine gun.

8    None of the documents that are requested here really address

9    that.

10          These are a lot broader sorts of requests that relate

11   to ATF testing procedures in general and that relate to

12   classifications of particular models of firearms, but none of

13   those documents relate to this particular firearm that's at

14   issue in this case.

15          THE COURT:  Does the defense wish to be heard?

16          MR. FAHL:  Yes, Your Honor.  And I have some I guess

17   specific responses to each of the eight items of discovery that

18   we're requesting.

19          Regarding -- does Your Honor have it yet?

20          THE COURT:  She's getting the file.  Not at this

21   point, thank you.  Go ahead.

22          MR. FAHL:  Well, with regard to item number one which

23   we're asking for documents pertaining to the reports of

24   technical examination of this particular gun, Mr. Haanstad has

25   informed me that there is nothing out there that we don't

1    already have.  And the video that, while it cannot be produced,

2    if not allowed to be produced we can go see it at the ATF

3    headquarters.  And so in that regard I guess number one --

4              THE COURT:  So, insofar as the first request is

5    concerned you've asked for and the government has indicated that

6    it does not have any technical examination reports.  All right,

7    so why is there a motion being filed with respect to that?

8              MR. FAHL:  Well, that was not clarified until after

9    the motion was filed.

10              THE COURT:  So you're withdrawing that aspect of the

11    motion.

12              MR. FAHL:  That aspect, yes.

13              THE COURT:  All right, go ahead.

14              MR. FAHL:  Number two, a copy of testing procedures

15    that FTB, which is the training branch the ATF uses in the

16    examination, we feel that that is relevant to the published

17    testing procedures that were in place here.

18              There were two tests.  The first test came back as a

19    non-machine gun, and the tester opined that it was a condition

20    called hammer follow.  The special agent investigating the case

21    asked for a second test using a more sensitive ammunition.

22    Using this more sensitive ammunition there was then multiple

23    firings.

24              And I think where there's no, if there's a policy in

25    place regarding the use of the more sensitive commercially

1    available ammunition, if that's approved or is that just

2    something that was kind of happened in this case in a

3    case-by-case basis --

4          THE COURT:  Okay, let me stop you there.  You're

5    asking for a published testing procedures.  When you say

6    published what do you mean?

7          MR. FAHL:  Published in an ATF manual, some sort of

8    policy that ATF has regarding testing procedures.

9          THE COURT:  All right.  And is the government saying

10   that there is no, you do not have such documents?

11         MR. HAANSTAD:  Well, Your Honor, the U.S. Attorney's

12   Office doesn't.

13         THE COURT:  Well, that's not the point.

14         MR. HAANSTAD:  No, no, I'm sorry.  My understanding is

15   that ATF does not have specifically -- I guess when I heard

16   published that was one of my initial responses was to the extent

17   that it's published it's public and not within the exclusive

18   control --

19         THE COURT:  That was my original reaction as well.

20         MR. HAANSTAD:  But if the actual request is for

21   anything that's written, whether it's public or not, I can

22   follow up and ask ATF again.  But, the government's response

23   would still be the same, and that is that material is not

24   exculpatory and is not relevant to the issue, the disputed

25   issues in this case.

Case 2:06-cr-00320-CNC   Filed 06/10/08   Page 6 of 42   Document 107

1          THE COURT:  Well, the first thing we do need to find

2     out is whether or not this is an academic exercise.  I.e., is

3     there nothing in writing that would be responsive to the defense

4     request?  If there is no such information in writing, then we

5     need not go to the second question or the plateau which is

6     whether or not such evidence is admissible in evidence.  Whether

7     or not it's relevant depends on the context.  And at this point

8     in time we really don't have a clear context for this discussion

9     because no expert has testified, and I don't know whether or not

10    any expert will reference any policy or procedure or manual in

11    his or her testimony.  You have not said so and I can't offer

12    any opinion on the subject in a vacuum.

13          MR. HAANSTAD:  If Your Honor is inviting a response

14    here --

15          THE COURT:  I am.

16          MR. HAANSTAD:  The Firearms Technology Branch officer

17    who is going to testify will be providing in a way not expert

18    testimony.  That is, it's testimony that's based on his own

19    firsthand experience and his own perceptions when he pulled the

20    trigger of this particular firearm.

21          In that regard it's essentially Rule 701 evidence.

22    And the way in which it potentially becomes a matter of expert

23    testimony is that the expert will probably also testify as to

24    why this particular firearm fired automatically.  Now, that's

25    not an element of this offense.  That is, I think the

7

1   government's position would be that first element, that is, that

2   the firearm operated as a machine gun, can be established

3   through lay opinion testimony.  It's a little bit difficult to

4   understand how it is that the existence or nonexistence of any

5   particular procedures could bear upon whether or not when this

6   particular firearm was test fired it fired automatically.

7               THE COURT:  Yes.

8               MR. HAANSTAD:  And the witness that the government is

9   going to call to establish that during these test fires the

10  weapon fired automatically is not going to provide testimony or

11  draw any conclusions or inferences based on the existence or

12  nonexistence of any particular policies.  He will simply testify

13  that on three different occasions he put ammunition into this

14  firearm and pulled the trigger.  And as Mr. Fahl said, on the

15  first occasion the weapon did not fire automatically.  And he

16  will testify as to why in his opinion that was the case.

17              He'll testify that during that first test fire he used

18  military grade ammunition which has a thicker or a harder or

19  difficult to penetrate primer on it, so that although the second

20  round was chambered after the first round was fired, the hammer

21  did not hit that second round with sufficient force to crack

22  that thicker primer.

23              On the second test fire this officer used civilian

24  grade ammunition and loaded the weapon with I believe it was 10

25  rounds three different times, and with respect to each of those

1   three different times the weapon did fire automatically.  Those

2   reports both have been made available to the defense.

3           And finally, there's a third test fire that the

4   government arranged at the direction of Judge Stadtmueller when

5   the case was still assigned to him.  There was some question

6   initially in this case as to why it was that no defense expert

7   had examined the firearm or had really examined any documents

8   with respect to those test fires that I just mentioned.  And to

9   sort of alleviate any potential problems in front of the jury as

10  to whether or not this weapon actually fired automatically,

11  Judge Stadtmueller ordered that the government arrange a third

12  test fire and that the government make arrangements for that

13  test fire to be open to the defendant, defense counsel who at

14  that time was different counsel from present, and the defense

15  expert.  Again, that video-recorded test fire involved the same

16  officer putting commercial grade, civilian grade ammunition into

17  the firearm and testing it I believe another three times, and on

18  each of those three times it fired automatically.

19          So none of that evidence and none of that testimony is

20  going to bear in any way upon the existence or nonexistence of

21  any written procedures the ATF has.

22          THE COURT:  Well, that may very well be.  But the

23  question then is whether or not there is such material.  That

24  still doesn't answer the basic question.

25          MR. HAANSTAD:  Right.

1    THE COURT:  And whether or not you believe it's
2  relevant is not key.  It may not be relevant to your case in
3  chief, it may very well be relevant to the defense case in
4  chief.
5    MR. HAANSTAD:  And, Your Honor, I think I was a bit
6  sloppy here and sort of blended two things, that is, the
7  question of relevance and the question of whether or not this
8  material is exculpatory.  They're somewhat related, I think, but
9  still are distinct inquiries.  And the government certainly will
10  make the inquiry at ATF to see whether or not these things
11  exist.
12    But I know that with respect to some internal
13  documents that ATF has, the agency has some concern about
14  disclosing those.  So I just want to make clear that I will see
15  if they exist and I'll undertake my own independent examination
16  to see whether in my opinion those materials are exculpatory.
17  And maybe it's just a question we have to address later on as to
18  whether if those materials do exist the government's required to
19  turn them over under Brady.
20    THE COURT:  I think that is certainly the way to best
21  approach the defense motion.
22    MR. HAANSTAD:  Okay.
23    THE COURT:  Because the determination of whether or
24  not the information is exculpatory cannot be made unless you
25  know exactly what the material is.  And inasmuch as you don't

10

1  know what the material is it's difficult for you to take a

2  definitive position and bind the government and thereafter cause

3  this court to rule on a matter in a vacuum.

4          All right.  So, as far as the materials are concerned

5  how much time do you think you might need to find out exactly

6  what exists and the position you will have to take with respect

7  to anything that does exist?

8          MR. HAANSTAD:  I addressed this with some people in

9  the Firearms Technology Branch at ATF in West Virginia when I

10 received the motion on December 30th, and they've been in the

11 process of trying to pull together what they can that's

12 responsive to -- some of them are more easily answered than

13 others.  And in all candor I think part of the problem is that

14 it was the holiday season and they're short staffed there.  But

15 I spoke with two individuals, Max Kingery and Richard Vasquez

16 from the Firearms Technology Branch just this morning, and as of

17 this morning they were still putting together what they could

18 that was responsive to these requests.

19          I guess that's a long way of saying I'm not sure how

20 long it will take.  I would have to check to see what the

21 progress is right now.

22          THE COURT:  One second here.

23          (Pause.)

24          THE COURT:  I think it's certainly appropriate for the

25 court to raise a question regarding the timing of this motion.

11

1    The deadline for filing motions has passed in this case, that

2    is, discovery related motions and all pretrial motions except

3    for, of course, motions in limine.

4          I note too that Mr. Fahl appeared in this matter as of

5    August 21st, and that the motion for discovery was filed on

6    December 28th.  That motion followed a request of the defense to

7    adjourn the trial.  That motion to adjourn was filed on December

8    6th, and it was for various purposes, such as to give the

9    parties an opportunity to seek a resolution of this case short

10   of trial, to investigate potential defenses including

11   consultation with an expert witness who needs additional time to

12   complete her investigation and prepare for trial in case trial

13   is necessary, et cetera.

14         So, Mr. Fahl, can you tell me about this motion, and

15   in particular why I should consider the motion at this late

16   date?  And in responding pleased advise whether or not there is

17   an expert defense witness who needs this information since it

18   has a bearing on the government's efforts to secure the

19   information and any trial that will have to consider that

20   information.

21         MR. FAHL:  Yes, Your Honor.  As I note in the motion,

22   I requested this information for the first time on September

23   25th, 2007, by letter to Mr. Haanstad.  And that was prior to

24   what was going to be the originally scheduled trial.

25         Mr. Haanstad, and I responded I believe with regard to

12

1    items one and three on the discovery request, but that he didn't

2    think there was anything else with the video and that he didn't

3    believe Special Agent Keeku had any certificates and in any

4    regard she wasn't going to testify in as such as an expert that

5    she would need that there was a development.

6         And that was a conversation we had I believe in the

7    hallway downstairs and was never memorialized.  There was no

8    more contact with Mr. Haanstad so I filed a second request, and

9    that request was filed on December 10th, 2007, and both of those

10   letters should have been attached to the motion, that indicated

11   our earlier conversation and requested the still outstanding

12   documents or the things that we have not requested.

13         Defense counsel has retained expert witness,

14   originally Len Savage from Georgia who is the president of

15   Historic Arms LLC.  He has extensive experience with machine

16   guns and automatic weaponry.

17         The defense has two positions:

18         One, this is not a machine gun as defined under the

19   statute.  And number two, if there were any multiple firings,

20   those multiple firings were due to a malfunction.  And a

21   malfunction that can be caused by a thing such as soft primered

22   ammunition, but that does not make this particular gun a

23   firearm.

24         So each of these items requested has some bearing on

25   his testimony and the potential cross-examination of Mr. Kingery

1    or Mr. Vasquez.

2           THE COURT:  All right.  And again, why the tardy

3    submission?

4           MR. FAHL:  Well, Your Honor, I was hoping that we

5    could resolve this with the government short of filing a motion

6    to compel discovery.  And usually in these cases we do, but we

7    were unable to resolve it and that's why I filed the motion.

8           THE COURT:  Mr. Haanstad, can you comment on the

9    timing of the motion?

10          MR. HAANSTAD:  Well, I think that Mr. Fahl is right.

11   I don't have notes documenting times or dates, but that sounds

12   about right.  But our position from the beginning has been as it

13   is now, that is, that we're not required to disclose these

14   things because they're not exculpatory and otherwise

15   discoverable under Rule 16.

16          And I know that the court's rules contemplate that the

17   parties meet and if there is some sort of dispute over discovery

18   like this that a motion to compel discovery then is filed

19   documenting these previous efforts.

20          I don't know -- I have nothing further to add with

21   respect to what happened between September 25th, I believe it

22   is -- I'm sorry, September 10th I think it was, but at the first

23   letter request, and the three months that passed before the

24   discovery motion was filed.  Again, our position has been the

25   same from the beginning and remains the same today.

14

1    THE COURT:  Well, I know the letter that's attached to

2 the motion is dated December 10th and not September 10th.

3    MR. FAHL:  There's the September 25th.  There should

4 have been two letters attached.  September 25th was the first

5 one and the second was December 10th.

6    THE COURT:  I only have a December 10th letter here.

7    MR. FAHL:  December 25th.  September 25 and then

8 December 10.  I have a copy of the September 25 letter.

9    THE COURT:  Okay, well, would you hand it up?  Because

10 what I was handed was just a December 10th letter.

11    (Pause.)

12    THE COURT:  The first attachment that I have is a page

13 2, it says September 25th at the top.  It's only the second

14 page.  And it shows a citation to 11, United States vs. Staples

15 N.D., Oklahoma.

16    So apparently what happened in your submission was you

17 attached something in part but not the entire document because I

18 do have that.  I thought it was just a misprint.

19    MR. FAHL:  I apologize, Your Honor.

20    THE COURT:  Because the docket does not have a

21 complete copy of what you're referring to.

22    All right.  I'll accept this.  What about the other

23 aspects of your motion?

24    MR. FAHL:  They're all similar items.  If you want I

25 can discuss what I believe is the relevancy of each particular

1  item.

2      THE COURT:  And why should the government provide

3  this?  For example, you're talking about training certificates,

4  diplomas, levels of expertise, et cetera, on the AR-15 and the

5  M-16 firearms for Special Agent Jody Keeku.

6      MR. FAHL:  Because it was Agent Keeku who requested

7  the second test using the soft primered ammunition.  I believe

8  we would need -- if she does not have any expertise or training

9  on the M-16 or AR-15 type of firearms, especially as it relates

10  to the ammunition that goes in, it definitely called into

11  question the reasoning behind the second test.  And this kind of

12  all goes into the testing procedures.

13      The ATF, it's been well documented, has, I'm trying to

14  think of the word, but the -- can manipulate, they manipulate

15  their testing procedures over time and it makes it very hard.

16      In fact, there is pending currently before Congress

17  H.R. 1791 which was introduced by Congressman Gregory Georgia to

18  alleviate such a problem, not necessarily in cases of criminal

19  prosecutions, but for manufacturers of firearms who are having a

20  significant problem in the fact that there is -- really seems to

21  be a lack of testing procedures and --

22      THE COURT:  Let's be more specific.  What aspect of

23  the Federal Rules of Criminal Procedure entitle you to

24  information concerning certificates of this person?  You cited

25  in your motion Rule 16(b)(1)(C), and you've suggested that

16

1    you're entitled to Brady material, but what in particular would

2    entitle you to a certificate regarding this particular ATF

3    agent?

4            MR. FAHL:  Again, you know, really the, under Brady,

5    this is the type of evidence that would show whether or not

6    there was an understanding of what was happening by ordering the

7    soft primered ammunition test.

8            THE COURT:  But why would this be exculpatory

9    material?

10           MR. FAHL:  Because if it was -- if the purpose of the

11   soft [Inaudible] test was to introduce a multiple firing and

12   believe that would demonstrate --

13           THE COURT:  But what does that have to do with a

14   certificate?

15           MR. FAHL:  Well, it goes to the special agent's

16   expertise.

17           THE COURT:  That's not exculpatory.  Whether or not a

18   man has a driver's license, if a police officer has a driver's

19   license it doesn't make it more or less likely that somebody

20   caught behind the wheel of a car is licensed.  If a special

21   agent has a certificate for a particular weapon it doesn't make

22   it more or less likely that the weapon is or is not a machine

23   gun.

24           MR. FAHL:  No.  That's true, Your Honor.

25           THE COURT:  So why is this exculpatory?  Why are you

1    entitled to it under any federal rule of criminal procedure?  It

2    sounds to me like you're asking for material that may be

3    utilized in cross-examination, or may be the subject of argument

4    that may call into question whether or not things were done

5    fairly in your view, but that in and of itself does not indicate

6    that these materials are Brady material or that you're entitled

7    to receive this under any rule of criminal procedure.

8              MR. FAHL:  I can understand that specifically with

9    item number 3, Your Honor.  But, for example, item number 4

10   discusses this particular gun, not the serial number but this

11   particular manufactured -- the gun was manufactured --

12             THE COURT:  Before we go on to number 4 --

13             MR. FAHL:  Okay.

14             THE COURT:  -- let's deal with number 3.  Would you

15   agree after discussion that this would not constitute Brady

16   material?

17             MR. FAHL:  Yes.  I agree, Your Honor.

18             THE COURT:  So you withdraw this request?

19             MR. FAHL:  We will withdraw number 3, Your Honor.

20             THE COURT:  Okay, number 3 is withdrawn.

21             4, correspondence.

22             MR. FAHL:  Number 4 will indicate that the ATF was

23   aware that the gun at issue here was manufactured with M-16

24   parts.

25             THE COURT:  Yes.

1      MR. FAHL:  And I believe that's part of the

2  government's theory of why this is a machine gun is because it

3  has M-16 parts.  Well, and this goes on to, it's connected to 5

4  and 6.  The ATF has often said that this particular firearm, at

5  least based on representations of our expert witness, that this

6  particular firearm, the CAR-AR-15 by SGW Olympic Arms, is not a

7  machine gun, unless it has an M-16 bolt carrier or an auto sear

8  attached to it.  And 4, 5 and 6 would be items that would

9  document this fact.

10      THE COURT:  Mr. Haanstad?

11      MR. HAANSTAD:  Judge, our position again is that none

12  of these things are discoverable under Rule 16.  I think if

13  they're discoverable at all, or disclosable at all maybe is the

14  most appropriate term, it's under Brady.

15      And as with item number 2, again, Mr. Fahl has said

16  these determinations relate to this particular firearm, they

17  don't relate to this particular firearm, they relate to this

18  model of firearm.  But the fact that, for example, a

19  manufacturer may manufacture this gun as a machine gun doesn't

20  mean that Mr. Olofson can possess or transfer that machine gun.

21      The question here again is whether or not this

22  particular gun, this particular firearm with this particular

23  serial number fired automatically.  And whatever may or may not

24  have been said with respect to other guns and other tests really

25  has no bearing upon whether or not Mr. Olofson's firearm was a

1  machine gun.  So, again, I think it's the same problem that we

2  had with respect to number 2.

3        Now, that being said, with respect to 4, 5 and 6,

4  again, at this point I don't know exactly what's out there.

5  I've spoken to ATF, and more specifically the firearms

6  technology branch about this, and at that point my concern was

7  that there is somewhere buried in this material some sort of

8  determination with respect to Mr. Olofson's machine gun, just

9  because of the way that the request was presented in the motion,

10  and they assured me that that's not the case, that these are

11  much more general than that.

12        That being said, I was satisfied that those materials

13  were not exculpatory and were not subject to disclosure under

14  Brady.

15        Now, if the court would like I can inquire further,

16  again reserving the right to make another independent assessment

17  as to whether or not in light of new information there is any

18  exculpatory information in any of these requests.

19        THE COURT:  Again, I would agree with that approach.

20  It seems to me that we don't need to have an exercise

21  unnecessarily, and so that we need to first determine whether or

22  not there are any such documents that would be responsive to the

23  defense request, and, if so, whether or not the government

24  believes it should turn over that information as Brady material

25  or for other reasons under the Federal Rules of Criminal

1    Procedure.  And if the government does not, if these things

2    exist and the government believes it should not turn over the

3    materials for reasons such as they're not relevant or they are

4    not discoverable because of some other privilege that the

5    government might cite, then we'll deal with that as it arises.

6          So, in light of what we've discussed we need to find

7    out when we will be able to make some kind of determination, and

8    I gather you can't say at this point in time, Mr. Haanstad,

9    correct?

10         MR. HAANSTAD:  I can't.  I can do my best to find out

11   by the end of the day.

12         THE COURT:  All right.  I think that probably would be

13   the prudent course.  And in light of that I think we need to set

14   this motion aside.

15         MR. FAHL:  Okay.  And just to clarify, based on our

16   other conversation I'm going to withdraw items 7 and 8 from the

17   motion as non-discoverable under Brady.

18         THE COURT:  All right.

19         MR. FAHL:  And I want to note one other thing.  In

20   footnote one on the motion, we talked about some other requests

21   for some publicly available ATF rulings and things.

22   Mr. Haanstad said that he wasn't going to disclose those,

23   however, if they were in fact relevant or necessary for

24   examination, he would not object to their authenticity.

25         And I just wanted to put that on the record that,

1    yeah, I understand he's not waiving any other evidentiary

2    objections, but just a matter of authenticity would be conceded

3    by the government.

4            THE COURT:  Mr. Haanstad?

5            MR. HAANSTAD:  Well, that's right.  I mean, assuming

6    that -- again, when the defense asked for publicly available

7    information, again, it's nothing that the government intends to

8    introduce in its case in chief and it's not otherwise

9    discoverable under Rule 16.

10           To the extent that it's publicly available it doesn't

11   trigger any Brady obligations on the part of the government.

12   That was my response to those particular requests.

13           And to the extent that I was suggesting that the

14   defense can go out and get these materials themselves, what I

15   wanted to convey to Mr. Fahl was that, for example, if they can

16   go on the Internet or to the library and get these ATF rulings

17   that are public, the government's not going to object to the

18   authenticity of those documents.

19           I don't want to state that too broadly just because I

20   haven't seen what they intend to introduce yet, but assuming

21   that the documents are obtained from a reasonably viable source

22   like that I don't anticipate objecting to their authenticity.

23   Probably to the relevance, but not to their authenticity.

24           THE COURT:  All right, that's noted.

25           Let's turn to other trial related issues.  In your

1    pretrial report you project a two-day trial.  Are there any

2    unusual evidentiary issues that might impact the length of the

3    trial?

4           MR. HAANSTAD:  From the government's perspective,

5    Your Honor, the potentially -- the fact that it potentially has

6    the greatest impact on the length of the trial relates to the

7    issue of expert testimony.  Each party has identified an expert

8    witness, and based on what I know about the defendant's expert

9    at this point it's the government's contention that he should

10   not be qualified to testify as an expert.

11          And our position is based on the fact that, first of

12   all, we don't believe that he has adequate qualifications to

13   satisfy the requirements of Rule 702.  But also, again, it's not

14   clear at all from the summary that's been provided so far what

15   relevant evidence he's going to have to offer.  And to a large

16   degree the discovery request that's been made is tied up closely

17   with this proffered expert testimony.

18          This is an expert who to this point has never ever

19   seen this specific firearm and has not been present for any test

20   firings of the firearm.  I don't believe that he's seen the

21   video of the test firing of the firearm that was ordered by

22   Judge Stadtmueller last February.  So the notion that he's going

23   to be able to come in and testify that this particular firearm

24   does not fire automatically more than one round with a single

25   function of the trigger is difficult to grasp.

1        It appears based on these discovery requests and what

2   we know about this proposed expert that the intent instead is to

3   come in and offer broad criticisms of ATF both with regard to

4   prior rulings that they've made and with regard to current

5   testing procedures.  I think I made our position clear with

6   respect to the relevance.

7        THE COURT:  So, are you suggesting then that there

8   should be a Daubert examination of the defense witness in order

9   to determine whether or not he's competent to testify with

10  respect to the matters for which he will be tendered by the

11  defense?

12       MR. HAANSTAD:  Well, I think so, Your Honor.  The

13  difficulty I have is I still am not clear on what it is that

14  they propose this expert to testify to.

15       Again, if he's going to come in and testify that this

16  particular firearm, based on what I don't know, that this

17  particular firearm does not fire more than one shot with a

18  single function of the trigger, I think that we're in the Rule

19  701 and Rule 602 area and he doesn't have to be qualified as an

20  expert, that is, if he can testify based on his firsthand

21  knowledge or some sort of personal perception that this firearm

22  does not fire automatically.

23       But I'm getting the sense from the defense that that's

24  not what they're proposing here, that it's broader than that.

25  And if that's the case then I think we are in Rule 702 area.

24

1    And if we are in the area of Rule 702, it still remains unclear

2    what testimony he's going to be able to provide that is in any

3    way going to be useful for the jury in determining a fact in

4    issue in this case.

5            And if we get over that hurdle, then I think it's

6    still useful to explore his qualifications and the other Rule

7    702 factors.

8            THE COURT:  Mr. Fahl?

9            MR. FAHL:  Yes.  Perhaps I can clarify.  I don't

10   believe that Mr. Savage is going to deny that under the

11   restrictions of the test it fired multiple times.  The question

12   is whether or not multiple firings qualifies it as a machine

13   gun.  And there's a malfunction, whether or not this gun

14   malfunctioned, and whether or not that malfunction could be

15   brought about by using soft primered ammunition.

16           As to otherwise what else has been considered under

17   ATF rulings and individual determinations in his experience of

18   negotiating the placement or displacement of weapons on an NFTA

19   registry, whether or not this gun, based on even the tests that

20   have already been done, should be placed on that registry.  It's

21   his opinion that this is not a machine gun.

22           This is the same exact firearm -- same exact model of

23   firearm that was issued in the case Staples vs. United States.

24   And this issue was kind of litigated through the courts there,

25   and I think there was a similar concern about the nature of the

1  firearm as to whether or not it should be classified as a

2  firearm.

3        So, we can arrange, we have at this point a refundable

4  ticket with Mr. Savage coming in on Sunday afternoon.  I don't

5  believe an extensive examination of the firearm would be needed.

6  Something we could probably even do over a break on Monday

7  before the expert testimony takes place, which I would hope it

8  would alleviate some of Mr. Haanstad's concerns.

9        MR. HAANSTAD:  Judge, Mr. Fahl says that some of the

10 testimony, or one way in which this proposed expert testimony is

11 going to be useful will be in determining whether multiple

12 firings qualify a firearm as a machine gun.  The statute

13 provides that that's the case.  That is, Title 26 USC Section

14 5845(b) provides that a machine gun is any weapon which shoots

15 automatically more than one shot by a single function of the

16 trigger.  And that's the jury instruction that the defense has

17 agreed to.

18        MR. FAHL:  There's actually a comment, I noticed -- I

19 just noticed now that we submitted some language from the

20 Staples case which talks about firing until the trigger is

21 released or until the magazine is emptied.  That language is

22 from Staples and then was adopted by the Seventh Circuit in the

23 Fleischli case which I don't believe is necessarily the case.

24 There was five-round bursts and then it jammed, in which case

25 the firearm did not fire until the trigger was released or until

26

1    it emptied the magazine.

2         Then I believe that was the instruction that I

3    submitted to Mr. Haanstad yesterday afternoon, but I just now

4    noticed it wasn't in the amended final pretrial report.

5         THE COURT:  You're saying that in the test firing here

6    there was a jam.

7         MR. FAHL:  I believe so.  One of the test fires there

8    was a jam.

9         THE COURT:  All right.

10        MR. FAHL:  And the factual witnesses from the people

11   who were firing the weapon at the Berlin conservatory all talked

12   about it firing at five-round bursts and then it jammed.

13        THE COURT:  So what does that have to do with

14   Mr. Savage's qualifications to testify?

15        MR. FAHL:  Well, that goes to -- first, Judge, that

16   was what he was going to testify about.  As far as his

17   qualifications, I think that's something that's better done

18   through a voir dire of Mr. Savage.  I can submit his CV.  I know

19   he has testified in a federal court case in Washington, United

20   States vs. Kwan.  He was qualified as an expert witness there.

21        Even Mr. Haanstad's own -- I actually don't know if

22   it's going to be his witness, but somebody he has brought in,

23   Mr. Vasquez from the ATF has had multiple [Inaudible] with

24   Mr. Savage, and I believe, you know, their relationship is fine.

25   I don't believe Mr. Vasquez, unless -- I haven't heard

27

1  differently, has any problems with Mr. Savage because Mr. Savage

2  is somebody who designs and manufactures firearms, he used to

3  deal with ATF often to make sure that his firearms are in

4  compliance.

5      He has extensive skill.  He's taken a number of armory

6  courses.  He designs and manufactures his own guns.  And it's

7  very complicated to create a sort of rifle like this that is not

8  easily --

9      THE COURT:  For example, what?  What does he design?

10     MR. FAHL:  He's designed a number of rifles.  And he's

11  designed the Bren MKII SA, the Bren felt fed, the RPD SA, the

12  SGM SA and the 971 Sport Rifle, the Gunzilla project --

13     THE COURT:  What about the Bren MKII SA?

14     MR. FAHL:  Pardon?

15     THE COURT:  Did he design the Bren MKII SA?

16     MR. FAHL:  Yes.  If you would like, Your Honor, I

17  could give you a copy of his CV which lists the firearms that he

18  has designed, the firearms.

19     THE COURT:  It certainly would be helpful to have that

20  information in front of me when we proceed.  It's not

21  necessarily now obviously.  I'll take it, but it's not

22  essential.  Thank you.

23     MR. HAANSTAD:  And, Judge, I did receive from defense

24  counsel I think it was about a week and a half ago a faxed copy

25  of that CV and have been attempting to go through sort of point

28

1    by point and determine whether it's all it purports to be.  And

2    I can say that some of it appears from the government's

3    perspective at least to be quite misleading.  And it calls into

4    question --

5            THE COURT:  One second.  Mr. Fahl, you handed up this

6    information, I'm just wondering whether or not you'd like

7    this -- only part of this information tendered.  The first

8    sheet.  Is that something you want to keep?

9            Go ahead.

10           MR. FAHL:  In the end, Your Honor, I think this is

11   something that is best decided when Mr. Savage is present.

12           THE COURT:  I think you're right.

13           MR. FAHL:  We could go over his resume all day, but if

14   he can answer these questions and the credibility in your eyes

15   as he answers these questions I think will be determinative.

16           THE COURT:  Well, obviously the most appropriate time

17   is after the government has completed its case, unless you agree

18   that it is acceptable to have this examination take place prior

19   to the impanelment of the jury.

20           MR. FAHL:  I think after the case in chief.  I mean,

21   depending on what happens, I mean, it could be quite possible

22   Mr. Savage doesn't even have to testify.  But we don't know how

23   the government's case in chief is gonna go.  And in that sense

24   there's potentially that we could, you know, save ourselves some

25   time and effort.

29

1          THE COURT:  All right.  But it does look like we may

2     need to have some extra time built into our schedule for a

3     Daubert examination.

4          All right, let's talk about other trial related

5     matters.  You mentioned the instructions.  Are there any

6     significant disagreements with respect to instructions?

7          MR. HAANSTAD:  Your Honor, I think that there is with

8     respect to the definition of a machine gun.  And I apologize for

9     this.  I know that Mr. Fahl did send the defense's proposed

10    instructions and I thought that I had incorporated all of them,

11    but what he mentioned about Staples and the other case from the

12    Seventh Circuit obviously didn't make its way into here.  I must

13    have just missed it because I don't know what those instructions

14    said, so I'm not sure what our position is on that.

15         But there is another paragraph which as I noted in the

16    final pretrial report there's some disagreement on.  Defense

17    seeks an instruction that provides that a weapon that fires

18    automatically due to a malfunction of the weapon is not a

19    machine gun for the purposes of the statute unless the

20    malfunction is a result of an intentional manipulation of the

21    weapon, to convert the weapon from a semi-automatic weapon to a

22    machine gun.

23         I don't think that the defense has cited any authority

24    for that proposition.

25         THE COURT:  I can't imagine giving that kind of

1    instruction.

2              MR. FAHL:  Maybe it's -- what I'm getting at,

3    Your Honor, is --

4              THE COURT:  A knife is not a knife unless it cuts you.

5    That's essentially what you're saying.

6              MR. FAHL:  Well, there's a scienter requirement in the

7    statute.  And if somebody, the first time a machine gun

8    accidentally multiple fires, they're subject to prosecution.

9              THE COURT:  But that's not the point.  Your

10   instruction as just read suggests that if something is capable

11   of multiple firings as a machine gun, but on some occasion does

12   not fire as a machine gun because of a malfunction, the gun is

13   no longer a machine gun.

14             MR. FAHL:  And that's definitely not --

15             THE COURT:  And that seems to be the import of the

16   instruction that was just read.

17             MR. FAHL:  That's not what I intended to -- when you

18   read the statute, it seems that there's a scienter requirement

19   as to -- and it's even in the first part about the knowing

20   possession.  So a gun can malfunction and if the defendant is

21   unaware that this malfunction was going to happen, it just

22   doesn't seem like that is something that is covered by the

23   statute.

24             Whereas, if a gun malfunctions and a person continues

25   to use that malfunctioning gun as a machine gun, then that would

1  be covered by the statute.  It seems that when you read the

2  machine gun, 5845, 26 USC 5845, in conjunction with 922(o), I

3  think there's a scienter requirement that must be there.

4  Otherwise it becomes a strict liability.

5       MR. HAANSTAD:  The scienter requirement I think is

6  actually provided for in 924(a).  But it's also incorporated in

7  the first proposed jury instruction, the second element of which

8  is that the defendant knew or was aware of the essential

9  characteristics of the firearm which made it a machine gun.

10       MR. FAHL:  What we were trying and attempting to do,

11  albeit maybe very clumsily, was to indicate that there's a

12  difference between something -- I mean, obviously you're gonna

13  know that something functions as a machine gun if it fired five

14  times.  But the knowledge should almost predate the firing if

15  you understand what I'm saying.  It's that if something

16  malfunctions by accident and fires multiple shots, and the

17  government's suggestion is that a multiple shot automatically

18  makes this a machine gun, you know, there would be a lot of

19  people under this kind of strict liability theory would be

20  subject to prosecution possessing a machine gun even though it

21  was the mere malfunction that taking it to a gun shop could have

22  fixed.

23       And I'm trying to somehow differentiate those two

24  possibilities.  I apologize for the clumsy wording of it.

25       THE COURT:  Yeah, I think I understand the position

32

1    you're taking, but as articulated the instruction seems to miss

2    the mark.

3           MR. FAHL:  I understand.  I'd be happy to take another

4    crack at it, Your Honor, and do something that doesn't seem so

5    severe maybe.

6           THE COURT:  I think that would be an appropriate way

7    to proceed.  So why don't you re-craft that.

8           MR. FAHL:  I will, thank you, Your Honor.

9           THE COURT:  Mr. Haanstad, is there another instruction

10    that's problematic from the government's perspective?

11           MR. HAANSTAD:  The only other instruction that the

12    defense requested that I didn't include in the joint final

13    pretrial report was a definition of "possession."

14           I think -- the defendant here is not charged with

15    possession of a machine gun, he's charged with transferring a

16    machine gun.  Consequently, the government has provided the

17    elements for transfer and has provided the definition of

18    "transfer."

19           I think that -- if I'm not mistaken, I think what the

20    defense wants to be able to do is to suggest that possession of

21    a machine gun also is a criminal offense.  And because it is,

22    the informant in this case was arguably guilty of possessing a

23    machine gun and, therefore, had an incentive or has an incentive

24    to come in and testify falsely in order to curry favor with the

25    government.

Case 2:06-cr-00320-CNC   Filed 06/10/08   Page 33 of 42   Document 107

1          I guess the government's concern is that by needlessly

2    including this definition of possession along with the elements

3    of the offense, there might be some confusion on the part of the

4    jury as to what exactly it is that's charged here.  The statute,

5    again, covers both, transferring and possession, but we've

6    clearly charged Mr. Olofson with transferring a machine gun.

7          THE COURT:  Mr. Fahl?  Why do we need a possession

8    instruction?

9          MR. FAHL:  As I'm thinking about it, Your Honor, I'm

10   fine leaving out the possession.  The purpose was as

11   Mr. Haanstad described, and we can do that other ways, we don't

12   need the instruction in there.

13         THE COURT:  All right, the defense instruction

14   concerning possession is withdrawn.

15         MR. FAHL:  And I just want to make clear, I'm not sure

16   what we stood on including in the definition of machine gun, the

17   definition of fully automatic and the trigger [Inaudible] firing

18   until its completed.  That's from footnote 1 in Staples vs.

19   United States.  We'd like that in there and I don't know if the

20   government is conceding that should be in there or if they're

21   taking a contrary position.

22         THE COURT:  Mr. Haanstad?

23         MR. HAANSTAD:  At this point the government's position

24   is that it should not be in there.  It's not required under the

25   plain reading of the statute, but -- I have to say I haven't

1    looked at footnote 1 of Staples.  Like I said, I, for whatever

2    reason, I apparently missed that reference in the proposed

3    instructions that were sent by the defense.  So I'll take

4    another look and see whether I'm persuaded.

5         But at this point, again, it just seems to be

6    inconsistent with the statutory definition which provides that a

7    machine gun is any weapon that shoots more than one shot without

8    manual reloading by a single function of the trigger.  More than

9    one shot obviously doesn't, on its face at least, require the

10   complete emptying of the cartridge.

11        THE COURT:  I'll look at Staples also.  So we'll

12   reserve judgment on that.  Is there anything else?

13        MR. HAANSTAD:  No, Your Honor.

14        THE COURT:  Mr. Fahl?  Do you have any difficulties

15   with the instructions the government wants?

16        MR. FAHL:  No, not than as otherwise I've already

17   stated.

18        THE COURT:  All right, and so the court then will

19   generally use its boilerplate including the functions of the

20   court and jury, what constitutes evidence, what is not evidence,

21   definition of direct and circumstantial evidence, testimony of

22   witnesses, deciding what to believe, weighing the evidence

23   inferences, attorney interviewing witnesses, number of

24   witnesses.

25        And then we go to the indictment.  The nature of the

1  crime charged.  Presumption of innocence.  Burden of proof.

2  Weighing expert testimony.  And at this point we will probably

3  have knowingly, the definition.  And of course the substantive

4  charge in this case.  And definitions.  Plus, the jury's

5  recollection controls in addition to the court's summary

6  instruction at the end regarding the selection of the

7  foreperson, et cetera.  All right?

8          Now, with regard to trial practice and procedure, I do

9  want to note for the record, Mr. Olofson, that the court does

10  conduct side bar conferences out of the hearing of the jury and

11  uses so-called white noise during those conferences.  You as the

12  defendant have the right to attend all side bar conferences and

13  to be present during every aspect of this case, unless you

14  choose not to participate or otherwise attend.

15          What that means is if we go to the side bar, which is

16  to your right and my left near the window, you can come up, or

17  stay at your seat if you don't want to participate in the side

18  bar conference.  All right?  Do you understand that?

19          THE DEFENDANT:  I understand, Your Honor.

20          THE COURT:  You can make the decision either now or

21  later.  And if you decide not to participate in any side bar

22  conferences by your absence, that will be deemed a waiver of

23  your participation in that side bar conference only.  So you can

24  attend some, you can attend all, or you can attend none, it's up

25  to you.  All right?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Now, with respect to testimony, you of

3     course have an absolute right not to testify in this case, and

4     if you choose not to testify we will have a discussion outside

5     the presence of the jury for that purpose, that is, to make

6     clear you are choosing not to testify or, on the other hand, you

7     are choosing to testify.  Do you understand?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Now, with respect to jury selection.  Each

10    side of course has the statutory number of peremptory

11    challenges.  Given the proposed length of trial the court would

12    expect to impanel 13 jurors and would ask the parties whether or

13    not there is any preference with respect to the selection of the

14    alternate.

15         I will tell you my usual practice is to have each side

16    exercise one additional challenge.  That is, the government

17    would get seven strikes and the defense would get 11 strikes,

18    and the alternate juror would be selected randomly at the end.

19    So that we would impanel 13 and then at the end of the trial we

20    would throw all 13 numbers into the mixer, pull out one and that

21    person would be dismissed after the jury has been instructed and

22    after that person has been advised that they should remain

23    available to rejoin the jury panel in the event all 12 jurors

24    cannot convene and deliberate until a verdict is reached.

25              Is that acceptable or do you wish to follow the strict

1    Federal Rules of Criminal Procedure and/or some other procedure?

2              MR. FAHL:  That's acceptable to the defense,

3    Your Honor.

4              MR. HAANSTAD:  It is for the government too,

5    Your Honor.

6              THE COURT:  All right, we will do it that way.  The

7    court also gives to the parties an opportunity to supplement the

8    court's voir dire by asking questions of their own to the entire

9    panel.  Do you wish to avail yourself of that opportunity?

10             MR. HAANSTAD:  The government does not, Your Honor.

11             THE COURT:  Mr. Fahl?

12             MR. FAHL:  I guess generally no, but if an issue comes

13   up we'd like to reserve the right to do so if we feel it's

14   necessary.

15             THE COURT:  All right.  If we need to discuss

16   challenges for cause we will do that in the jury room, and if it

17   becomes necessary to interview any one or more of the jurors

18   with respect to matters that should not be shared with the panel

19   as a whole, we will do that in the jury room.  Is that

20   acceptable to both sides?

21             MR. HAANSTAD:  Yes, Your Honor.

22             MR. FAHL:  Yes, Your Honor.

23             THE COURT:  Is there any other matter that we need to

24   entertain today?

25             MR. HAANSTAD:  Not from the government, Your Honor.

38

1       MR. FAHL:  Not from the defense, Your Honor.

2       THE COURT:  All right, we are number one for jury

3  selection on the day of trial, so be prepared to proceed at the

4  beginning of the day.

5       MR. HAANSTAD:  Okay.

6       THE COURT:  Please let me know say within -- well,

7  today is Thursday, so by Monday, Mr. Haanstad?

8       MR. HAANSTAD:  Okay.

9       THE COURT:  -- what the government's position is and

10  we will have a brief conference to discuss any matters that need

11  to be resolved as a result of your determination.

12       MR. HAANSTAD:  Okay, thank you, Your Honor.

13       THE COURT:  So talk with Kris about scheduling

14  something if it becomes necessary.

15       MR. HAANSTAD:  Okay.

16       THE COURT:  All right?

17       MR. FAHL:  Thank you, Your Honor.

18       THE COURT:  All right, is there anything that we need

19  to attend to in terms of your use of the courtroom, your use of

20  Elmo, computers, sound system?

21       MR. FAHL:  I don't believe so.

22       MR. HAANSTAD:  No, Your Honor.

23       THE COURT:  Are there any issues with respect to

24  displays or demonstrative evidence during opening statements?  I

25  don't want any last-minute surprises about the use of things

1    that were not displayed to the other side.

2          MR. HAANSTAD:  Judge, we've got, I think the

3    government has 16 items identified on the exhibit list at this

4    time.  It's possible that some of those items will be displayed

5    during opening.

6          I guess another question I have, obviously this case

7    involves a machine gun which we intend to display to the jury

8    throughout the trial.  And to the extent that it's necessary to

9    show the jurors sort of the inner mechanical workings of that

10   gun I guess I just wanted to raise that as an issue.

11         I don't think we have in mind putting the gun up and

12   having an expert physically pull the trigger on it to show what

13   happens because we've got some diagrams and things like that

14   that demonstrate that without the need for sort of dry firing

15   this weapon.  But the weapon will be pointed around the

16   courtroom a little bit I think in the course of people

17   testifying about the mechanics of it.

18         THE COURT:  Well, I do want it to be clear that it's

19   my practice to have a bailiff check any weapons that are brought

20   in the courtroom.  They should be made inoperable when they come

21   into the courtroom.

22         MR. HAANSTAD:  Okay.

23         THE COURT:  So appropriate safety restraints have to

24   be put on the weapon in advance and the bailiff has to check

25   those items.  During the last trial I had involving multiple

1    firearms I will tell you that the jury was a bit put off by the

2    way the firearms were being mishandled in the courtroom and

3    pointed at people even though there were plastic straps through

4    the weapons to make sure that they were inoperable.  I just want

5    to make both sides aware of that.  You don't do yourself any

6    favors if you mishandle a weapon in front of a jury.

7                All right?

8                MR. FAHL:  Thank you, Your Honor.

9                THE COURT:  Thank you much.

10               MR. HAANSTAD:  Thank you.

11               (Audio file concluded at 13:16:44 p.m.)

12                              *     *     *

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF WISCONSIN

3

4        I, JOHN T. SCHINDHELM, RMR, CRR, Certified Transcriber

5  for the United States District Court, Eastern District of

6  Wisconsin, do hereby certify that I transcribed the foregoing

7  audio file, and that the same is complete and accurate to the

8  best of my ability and in accordance with the audio file as

9  provided to me.

10

11  Dated June 10, 2008, at Milwaukee, Wisconsin.

12

13  _____

       Official Court Reporter

14      United States District Court

15

16

17

18

19

20

21

22

23

24

25