UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

----------------------------------------------------------------

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )     Case No. CR 06-320
                                    )     Milwaukee, Wisconsin
     vs.                            )     May 13, 2008
                                    )     2:37 p.m.
DAVID OLOFSON,                      )
                                    )
                Defendant.          )

----------------------------------------------------------------

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE CHARLES N. CLEVERT, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:
  For the Plaintiff
  UNITED STATES OF AMERICA:    Office of the US Attorney
                               By: GREGORY J. HAANSTAD
                               517 E Wisconsin Ave  - Rm 530
                               Milwaukee, WI 53202
                               Ph: 414-297-4581
                               Fax: 414-297-1738
                               gregory.haanstad@usdoj.gov
  For the Defendant
  DAVID OLOFSON:               Federal Defender Services of
  (Present)                    Eastern Wisconsin, Inc.
                               By: BRIAN P. MULLINS and
                                   BRIAN T. FAHL
                               517 E Wisconsin Ave - Rm 182
                               Milwaukee, Wisconsin 53202
                               Ph:414-221-9900
                               Fax: 414-221-9901
                               brian_mullins@fd.org
                               brian_fahl@fd.org

  PROBATION OFFICE:            CYNTHIA McHENRY (414) 297-1431
  ALSO PRESENT:                JODY KEEKU, BATF
  U.S. Official Reporter:      JOHN T. SCHINDHELM, RMR, CRR,
                               johns54@sbcglobal.net

Proceedings recorded by mechanical stenography, transcript
produced by computer aided transcription.

1          P R O C E E D I N G S (2:37 p.m.)

2              THE CLERK:  Case Number 2006-CR-320, United States of

3     America v. David Olofson.  This matter is before the Court for

4     sentencing.  May we have the appearances, please?

02:38   5              MR. HAANSTAD:  Good afternoon, Your Honor, Gregory

6     Haanstad for the United States.  Also with me at counsel table

7     is Special Agent Jody Keeku from the Bureau of Alcohol, Tobacco

8     and Firearms.

9              THE COURT:  Good afternoon.

02:38  10              PROBATION OFFICER:  Good afternoon, Your Honor, Cindy

11     McHenry on behalf of the United States Probation Office.

12              THE COURT:  Go to see you, Ms. McHenry.

13              MR. FAHL:  Good afternoon, Your Honor, Brian Fahl and

14     Brian Mullins, Federal Defender Services, appear on behalf of

02:38  15     David Olofson who appears today in person.

16              THE COURT:  Good afternoon to you as well.

17              The Court would like to begin by addressing the

18     defendant's motion for a judgment of acquittal, as well as his

19     motion concerning disclosure.  Perhaps the disclosure motion

02:38  20     should be discussed first.

21              Is there anything that either side wishes to add to

22     consideration of that motion?

23              MR. FAHL:  No, Your Honor, I believe the briefing

24     takes care of the issues related to that motion.

02:39  25              MR. HAANSTAD:  The government has nothing to add in

1    addition to the argument it submitted, Your Honor.

2         THE COURT:  Well, as an initial matter in reviewing

3    the defendant's motion for disclosure it must be pointed out

4    that the court previously considered the issues raised by the

02:39    5    defendant in this motion for disclosure.

6         After trial the defendant is obviously renewing his

7    request for disclosure of information concerning the Olympic

8    Arms SGW rifle at issue in this case, and it is essentially the

9    defendant's request that the government be required to produce a

02:39   10    letter which was sent to Olympic Arms.  The Court denied that

11    request previously and the Court will deny the request this time

12    as well.

13         Mr. Olofson seeks to compel the disclosure of a copy

14    of any and all correspondence between the Bureau of Alcohol,

02:40   15    Tobacco and Firearms and SGW/Olympic Arms concerning SGW Olympic

16    Arms' use of M-16 parts in production of its AR-15 weapon since

17    1980 and 1990, particularly the use of M-16 triggers, hammers,

18    disconnectors and selectors.

19         Mr. Olofson maintains that the government's position

02:40   20    in this case is incorrect.  Moreover, he asserts now that this

21    letter is exculpatory because it contradicts evidence elicited

22    by the government during the course of his trial and was central

23    to the government's theory in this case.

24         Mr. Olofson has also submitted to the Court a

02:41   25    memorandum regarding any correspondence between the Bureau of

3

1    Alcohol, Tobacco and Firearms and Scheutzen Gun Works or Olympic

2    Arms concerning SGW/Olympic Arms' use of M-16 parts in the

3    production of its AR-15 type disconnectors, type weapons between

4    1980 and 1990, particularly the use of triggers, M-16 triggers,

5    hammers, disconnectors and selectors.

6         The reasons that this information is exculpatory,

7    because of, one, it contradicts the testimony of Officer Kingery

8    of the Bureau of Alcohol, Tobacco and Firearms.

9         Additionally, that it contradicts the government's

10    theory that the combination of four parts cause the weapon in

11    this particular case to fire multiple rounds.

12         A letter from ATF, Federal Firearms Licensing News

13    issued in the fall of 1986, notes that AR-15 rifles have been

14    manufactured with M-16 parts.

15         Nonetheless, it was not necessary and crucial to the

16    government's case to establish that the weapon in this case was

17    manufactured with M-16 parts.  What was and remains crucial is

18    the requirement that the rifle in question met the definition of

19    the statutes; that is, it was crucial that the government

20    establish that the weapon in this particular case could fire

21    automatically more than one shot without manually reloading by a

22    single function of the trigger.

23         Having said that, the Court does not believe that the

24    record would require it to delay this proceedings and so that

25    that particular information can be reviewed either directly by

1    defense counsel or by the Court.

2           Having said that, the Court is mindful that the

3    government has suggested that it could offer up this particular

4    document for in-camera inspection.  So I will interrupt my

02:44   5    remarks to ask whether under the circumstance the government

6    believes the Court should delay at least momentarily for the

7    purpose of reviewing any such document or documents if they are

8    here in court and available for consideration.

9           MR. HAANSTAD:  Yes, Your Honor, the government does

02:44   10   have the one responsive document here in court today.

11          Our understanding of Section 6103 is that if the court

12   were to order production of that document for in-camera

13   inspection, the government could then disclose it and not

14   violate Section 6103.  The government maintains its position

02:45   15   that nothing that the defense has so far suggested indicates why

16   it is that that particular letter is exculpatory, and, in fact,

17   the government maintains that the letter is not exculpatory.

18          If, however, the Court thinks that the defendant has

19   raised some sort of -- made some sort of threshold showing, the

02:45   20   government is able and would be willing at this time to provide

21   that document for in-camera inspection.

22          THE COURT:  Well, I'd like to hear the response of the

23   defense in that regard.

24          MR. FAHL:  Your Honor, not knowing the contents of the

02:45   25   letter it's hard for me to speak as to whether or not it is or

5

1   could be exculpatory. I think that the government is right that

2   this court can review in camera, we would request that it do so.

3   Understanding that this court has already determined that the

4   presence of the four parts would not -- if this document simply

02:46   5   indicates that it had these four parts, these four M-16 parts,

6   that that does not make it exculpatory, there still may be

7   additional information in the document concerning what the

8   combination of those four parts does, if it creates a

9   malfunction and what the ATF's official position is when a

02:46   10   malfunction occurs based on these four parts.

11        If information like that is present in the memo I

12   think it would be exculpatory and then should be disclosed.

13   However, not knowing the contents I can't speak fully to that.

14        THE COURT: Well, I'm not satisfied that your theory

02:47   15   with respect to what the Bureau of Alcohol, Tobacco and

16   Firearms' position may be is crucial to any final determination

17   in this case, keeping in mind that it was the jury which had the

18   definition of a machine gun for consideration along with all of

19   the evidence in the matter, and the jury did not consider what

02:47   20   theory -- did not consider what position the Bureau of Alcohol,

21   Tobacco and Firearms may have with respect to weapons generally.

22   That was not presented as part of the evidence in this case.

23        MR. FAHL: But if the ATF had a position, a specific

24   position about SGW/Olympic Arms AR-15 rifles manufactured in the

02:47   25   time Mr. Olofson's was, and whether or not those constitute

1    machine guns, even if they multiple fire, that I think would be

2    relevant and something the jury should have considered.

3            THE COURT:  Well, it may very well be something that

4    you feel the jury should have considered but at this juncture

02:48  5    I'm not satisfied that the record would support your conclusion

6    that it would be exculpatory to have that particular document or

7    several such related documents offered and considered during the

8    course of the trial.

9            Nonetheless, out of an abundance of caution and for

02:48  10   the sake of completeness of the record, the Court will direct

11   the government to produce any such materials which would be

12   covered by your motion if they are available in court at this

13   time.

14           MR. HAANSTAD:  They are, Your Honor.

02:48  15           THE COURT:  Please offer them up.

16           MR. HAANSTAD:  Your Honor, the government is producing

17   the one letter that ATF found that was responsive to the request

18   contained in the defendant's motion for discovery.

19           THE COURT:  What is the next exhibit number in this

02:49  20   matter?  I will give it an exhibit number for identification

21   purposes.

22           This document will be designated as Exhibit Number 14

23   for in-camera inspection.

24           It is a document on the letterhead of the Department

02:50  25   of Treasury, Bureau of Alcohol, Tobacco and firearms, and it

1    bears the date of 31 May 1983.  And it is over the signature of

2    an assistant director for regulatory enforcement.

3          The Court has reviewed the document.  It is in my view

4    clearly not of a nature that would make it exculpatory.  It

02:51    5    deals with M-16 type components as well as the AR-15 type

6    receivers, but it is in no way exculpatory or required to be

7    disclosed by the government in this case.  Nonetheless, I will

8    maintain this document which has been identified under seal in

9    the court record.

02:52   10          Next the defendant argues that he should have a new

11    trial.  Does the defendant wish to add to the remarks set forth

12    in his submissions?

13          MR. FAHL:  No, Your Honor.

14          THE COURT:  Does the government?

02:52  15          MR. HAANSTAD:  No, Your Honor, thank you.

16          THE COURT:  The defendant's request for a new trial

17    rests primarily upon his claim that there was newly discovered

18    evidence which contradicts the government's position.  The new

19    evidence obviously was the information which was just tendered.

02:53  20          Inasmuch as that information is not exculpatory and

21    would not have made a difference in the trial, or the, in this

22    court's view, the ability of the jury to reach the verdict of

23    guilty in this case, there is no basis for the court to grant a

24    new trial based upon newly discovered evidence.

02:53  25          A defendant must show that he became aware of this

1   so-called new evidence only after trial and he could not have

2   discovered the evidence by due diligence any sooner; that the

3   evidence is material and that the evidence would probably have

4   led to acquittal in the event of a new trial.

02:54   5   Again, as stated, the Court has concluded, after

6   reviewing this so-called new evidence which the government

7   obviously did not present to the defense prior to today's date

8   or at any time during the course of the trial, and the Court has

9   concluded that that material would not have affected the outcome

02:54   10   of this case.  Hence, the new trial motion has not been

11   sustained and the same must be denied.

12   Next, I turn to the defendant's motion for a judgment

13   of acquittal.  Does the defense wish to be heard in that regard?

14   MR. FAHL:  No, Your Honor.  The briefing is

02:55   15   sufficient, Your Honor.

16   THE COURT:  Does the government?

17   MR. HAANSTAD:  The government has nothing to add to

18   its earlier submissions, Your Honor.

19   THE COURT:  Well, then, considering the motion for

02:55   20   judgment of acquittal the Court went back and reviewed the

21   transcript and the evidence.  One piece of evidence was the

22   video which was shown to the jury and considered during the

23   course of the trial.  I'd like to run that video at this time.

24   You may proceed.

02:56   25   (Video file played in open court.)

1          THE COURT:  Having seen that I moved then toward

2     further consideration of the defendant's arguments.  It's the

3     position of Mr. Olofson that no rational jury could find he

4     knowingly transferred a machine gun, and that Section 5845(b) of

03:01    5     Title 26 which defines a machine gun is unconstitutionally

6     vague.

7          A federal grand jury returned a one count indictment

8     in this case charging that on or about July 13, 2006, in the

9     State and Eastern District of Wisconsin, this defendant, David

03:01    10    R. Olofson, knowingly transferred a machine gun.  The firearm

11    involved in this offense was an Olympic Arms .223 caliber SGW

12    Rifle, model CAR-AR, bearing serial number F-as-in-frank 7079,

13    all in violation of Title 18, United States Code, Sections

14    922(o) and 924(a)(2).

03:02    15         Title 18, Section 922(o) defines a machine gun as any

16    weapon which shoots, is designed to shoot, or can be readily

17    restored to shoot automatically more than one shot without

18    manual reloading by a single function of the trigger.  The Court

19    observed the test as did the jury.  Now, I do note that there

03:03    20    were two parts of this test and I believe during the trial the

21    latter was what was shown; is that correct?

22         MR. HAANSTAD:  Your Honor, there were actually three

23    tests overall of this particular gun.  One I believe was in

24    October of 2006.  That one was not videotaped.  One was later in

03:03    25    2006, that test also was not videotaped.  This particular test

10

1    fire, this third test fire is the only one that was videotaped

2    and that was conducted in February of 2007.

3         THE COURT:  I do not recall clearly whether both

4    segments of the DVD were shown, but I do know the portion where

5    the agent had each person identify himself or herself was indeed

6    shown; is that correct?

7         MR. HAANSTAD:  That's correct, Your Honor, and

8    actually the entire DVD on both segments were shown at trial.

9         THE COURT:  I do recall clearly the portion respecting

10   the firing where the agent mentioned the 20 rounds was in fact

11   shown.

12        But regardless, the video shows the weapon firing

13   multiple times on what appear to have been a single depression

14   of the trigger.

15        Nonetheless -- or a single function of the trigger.

16        Nonetheless, Mr. Olofson argues that the definition of

17   a machine gun is not fluid, it is either a machine gun or it is

18   not a machine gun, if it isn't a machine gun, if it fires

19   automatically once or twice.

20        In support of all of this Mr. Olofson cites Officer

21   Kingery's testimony and argues that Kingery testified that the

22   rifle exhibited a malfunction called hammer follow-through,

23   where the hammer follows the bolt carrier as it chambers another

24   round and accidentally strikes the newly chambered round of

25   ammunition.

11

1    When soft ammunition was used the weapon fired

2 multiple rounds with a single pull of the trigger.  Again, I am

3 quoting the argument of the defense.

4    Next, the defendant continues:  Kingery also testified

5 that the SGW Olympic Arms AR-15's were manufactured with some of

6 those M-16 parts.

7    Further, defendant submits:  Defense expert Len Savage

8 testified that he had contacted Bob Schuetzen, that's

9 S C H U E T Z E N, owner of Olympic Arms, and that during that

10 same period AR-15 rifles had been manufactured with an M-16

11 trigger, hammer, disconnect, and selector.  While these parts do

12 not create a machine gun, they may contribute to a malfunction.

13    I note here Mr. Savage did not testify from firsthand

14 knowledge.  He was utilizing hearsay.

15    Continuing:  Defendant asserts his conversion book --

16 that is a document which was received in evidence -- stated that

17 an auto sear, S E A R, must be added and there is no evidence

18 that an auto sear was used in this case.

19    Moreover, there was no M-16 bolt carrier which was

20 required to convert the AR-15 to a machine gun.

21    Earlier today the defendant submitted a letter to the

22 Court with a transcript of a proceeding from the Western

23 District of Pennsylvania.  That proceeding was -- involved a

24 defendant by the name of James P. Corcoran, C O R C O R A N, in

25 criminal case 88-11.  It was before U.S. District Judge Donald

12

1   Ziegler on April 5th of 1988.

2          In that case the Court indicated:  The auto sear,

3   known by various trade names including AR-15 auto sear, drop-in

4   auto sear and auto sear 2, is a combination of parts designed

5   and intended for use in converting a weapon to shoot

6   automatically more than one shot without manually reloading by a

7   single function of the trigger.  Consequently, the auto sear is

8   a machine gun as defined by 26 United States Code, Section 5845

9   -- I'm sorry, I'm talking here about ATF ruling 81-4.

10          In light of that ruling Judge Ziegler concluded it was

11   inescapable that without the auto sear the AR-15 is not a

12   machine gun and need not be registered.

13          It should be noted that this reference to the ATF

14   ruling 81-4 is not something new in this case.  There was

15   testimony respecting the same.  Indeed, Special Agent Kingery

16   was asked whether or not he was familiar with this ruling and

17   said yes, he had, and he went on to summarize the ruling

18   essentially by saying 81-4 refers to drop-in auto sears in

19   conjunction with a combination of M-16 machine gun fire control

20   components.

21          He was then asked essentially, is it correct to say

22   that the addition of the auto sear to an AR-15, and it can be an

23   AR auto sear, drop-in auto sear or an auto sear 2, when you add

24   that to a machine gun with the M-16 internal parts, that's what

25   makes it a machine gun, correct?

13

1       He responded:  No, sir, not as you just asked the

2   question.  If it's a machine gun it's a machine gun.  If you add

3   them to an AR semiautomatic rifle, they would make that

4   semiautomatic rifle a machine gun.

5       Further, Agent Kingery testified that an auto sear is

6   not required before ATF will determine that a firearm is a

7   machine gun.

8       Giving further consideration to the defendant's

9   argument that there was insufficient evidence and that the

10  weapon in this case merely malfunctioned, the Court notes the

11  following evidence:

12      A witness and customer of Mr. Olofson testified that

13  in March or April of 2006 he responded to an ad that Mr. Olofson

14  placed on the bulletin board of a Subway restaurant located

15  within a gas station in Berlin, Wisconsin.  When the customer

16  responded to the ad which offered to sell an AR-15 Colt, he

17  spoke with the defendant Mr. Olofson who said the AR-15 was gone

18  but that he could get him another one.  Olofson indicated that

19  he could order it, all the parts, the kit.  According to the

20  customer Olofson said he could put it together.  As a result,

21  Olofson and the customer planned to put the AR-15 together in

22  Olofson's basement which contained, as the witness described,

23  guns, gun parts, and ammunition.

24      Now, while awaiting on the kit, Olofson loaned the

25  customer an AR-15 four times for periods of approximately two

1    weeks.  He also, that is Olofson also provided the customer with

2    free ammunition.  And I'll come back to that later.

3         Olofson gave the customer 100 rounds on each of the

4    first three occasions.  On the latter occasion he gave the

5    customer 500 rounds.

6         The customer then went to the Conservation Club in

7    Berlin, Wisconsin when he observed that the borrowed weapon

8    contained a selector switch with three positions, which are:

9    Safety, fire, and unmarked.

10         Now, Olofson had informed the customer that he knew

11    that it was an automatic function.  Olofson mentioned to the

12    customer that he had fired the weapon in the three-round burst

13    position and the weapon had jammed on him.  There Olofson is

14    stating that he not only operated this rifle in the automatic

15    mode, but he had done so prior to turning it over to this

16    customer for firing.

17         Now, when the customer was at the Conservation Club on

18    July 13, 2006, he placed the weapon into the unmarked position

19    and testified that he -- that it shot three rounds or four

20    rounds when he pulled the trigger, and that he did this at least

21    twice, and that it jammed while his finger was on the trigger.

22         Subsequently, that is, later that day, local police

23    responded to a phone call that there was automatic machine gun

24    fire in the area.  They spoke with the customer, that is, the

25    person to whom Olofson had delivered the weapon in question,

1   there at the Conservation Club.  They took down the serial

2   number of the weapon.  And, they also looked at two other guns

3   that this customer had with him at the Conservation Club.  They

4   then told the customer that they wanted to make sure that the

03:15   5   weapons had not been stolen.

6       The local police advised the customer and several of

7   his friends who were there at the Conservation Club that someone

8   had called in and said that there was automatic machine gunfire.

9   The police then asked if he was the person doing that and the

03:15   10   customer responded yes.

11      Then, the officers took Mr. Olofson's AR-15 and then

12   contacted the Bureau of Alcohol, Tobacco and Firearms.

13      On the 16th of July, the Bureau of Alcohol, Tobacco

14   and Firearms contacted Mr. Olofson after receiving a call from

03:16   15   the Berlin Police Department.  During his interview by the ATF,

16   Mr. Olofson commented that he had owned an Olympic Arms .223

17   caliber SGW Rifle, model CAR-AR, with serial number F7079 and

18   lent it to the customer so the customer could maintain his

19   firearm skills.

03:16   20      The customer was planning to purchase a firearm kit

21   through Olofson and they were going to assemble it.

22      And this is according to Mr. Olofson's statement to

23   the BATF agent.

24      Olofson further advised that he had loaned firearms to

03:17   25   numerous people and that he did not keep records of who he had

16

1     loaned firearms out to because it would be dangerous.

2           Finally, Mr. Olofson told the agent that he knew what

3     a machine gun was and that he knew how to convert a nonautomatic

4     rifle into a machine gun.

03:17  5           At some point, subsequent to the initial contact at

6     the Conservation Club, the local police contacted Mr. Olofson's

7     customer who mentioned that -- I should say at some point after

8     the police contacted Mr. Olofson's customer, the customer

9     contacted Mr. Olofson and mentioned that he had spoken to the

03:18 10     police, and he told Mr. Olofson what had happened and mentioned

11     that the local police had mentioned that the gun had been firing

12     automatically and Olofson responded to his customer he's never

13     had trouble with the police while shooting an automatic gun at

14     the Conservation Club in Berlin.

03:18 15           During trial there was documentary evidence and of

16     course the video that we just viewed.  The documentary evidence

17     included a PDF document which was located on Mr. Olofson's

18     computer hard drive.  It's entitled, AR-15 to M-16 Conversion

19     Books.

03:19 20           Within that document there's a discussion at page 10

21     regarding the four AR-15 parts to be discarded: the bolt

22     carrier, the hammer, the trigger, the selector, and the

23     disconnector.

24           Also found on the computer hard drive was an e-mail

03:19 25     exchange dated June 28th, 2005 in which there was some

17

1    give-and-take between Mr. Olofson and someone else over M-16

2    associated weapons and parts.

3         Yet another e-mail included a statement by a person

4    who asked Mr. Olofson regarding untaxed registering of a machine

03:20   5    gun, and Mr. Olofson said in response, and this is a quote:

6         MG's are just the small toys one can get.  Remember,

7    as a sovereign you are unhindered by the regulations that the

8    federal citizens have to follow.  There is a separate set of

9    paperwork dealers must fill out to cover their, J G R E, butts

03:20   10   on where the weapons and other items went.  That is what a

11   sovereign alien I.D. number does for him.  It's just a way of

12   accounting for where it went.  Yes, you can build any weapon you

13   like.  You can learn more, especially details on the paperwork.

14   You should learn more about sovereignty first.  After some basic

03:21   15   knowledge we will walk you through everything the first time to

16   help you get the hang of it.  Finding real freedom for the first

17   time is like a baby's first step.  You haven't really done it

18   before so you don't know what it's like.  But we can change

19   that.  Then you can literally do most anything you want so long

03:21   20   as it interferes with no other's rights or person.  Near

21   Wisconsin by chance?

22        That's Exhibit 11.

23        The jury also heard the special agent who examined the

24   gun, who testified that the AR-15 rifle had been assembled with

03:21   25   four machine gun components: the trigger, the hammer, the

18

1    disconnector and the selector switch.  These four components

2    installed on the AR-15 would allow the weapon to fire

3    automatically.

4           He added that it is not necessary to discard and

5    replace all five AR-15 parts identified in Mr. Olofson's

6    conversion manual.

7           It was also pointed out, as Mr. Olofson has

8    maintained, that there was a malfunction of the weapon which was

9    loaned to Mr. Olofson's customer, and that in the test performed

10    by ATF in October of 2006 the rifle did not fire automatically

11    because military grade ammunition had been used and it has a

12    much harder primer than standard civilian ammunition.  As

13    Mr. Haanstad has noted, there were two other tests the results

14    of which have already been discussed.

15           The special agent added that he was aware that SWG/

16    Olympic Arms manufactured its rifles with internal M-16 parts

17    but testified that they never used this combination of M-16

18    parts, that is, SWG never used such combination.

19           There was further testimony by the agent that there

20    was no malfunction of the AR-15 rifle after examining the parts.

21    If there had been a malfunction he would expect to see that the

22    hammer had been worn, significantly rounded, or the spaces

23    between them would have been opened up such that the parts would

24    not function as capturing the hammer.

25           Mr. Olofson has placed considerable reliance on a

19

1    Supreme Court case, United States vs. Staples, 511 U.S. 600.

2    The court concludes that that case is not on all fours with this

3    case.

4         In Staples there was an AR-15 involved which was made

5    to fire only one bullet with each pull of the trigger.

6    Therefore, it was not a machine gun and not normally within the

7    statutory definition of firearm under Section 5861(d).

8         The Staples weapon had been modified to fire fully

9    automatically.  And the government in Staples argued that it was

10    a machine gun and the defendant possessed it -- and that the

11    defendant's possession of it was enough to convict under the

12    statute.  The Supreme Court disagreed and concluded that the

13    government should have been required to prove that the defendant

14    knew the features of this AR-15 that brought it within the

15    statute.

16         It was on that basis that upon remand the Tenth

17    Circuit Court of Appeals concluded that no reasonable jury could

18    find the defendant guilty beyond a reasonable doubt.

19         Here, of course, it is clear based upon the evidence

20    that I've reviewed, that Mr. Olofson knew the weapon at issue

21    here could fire automatically.  That was not the case in

22    Staples.

23         In addition, other evidence demonstrates that

24    Mr. Olofson knew and continues to know the difference between

25    his rifle and an automatic weapon and knew how to convert the

20

1    AR-15 to an M-16.

2         The information on Mr. Olofson's computer,

3    Mr. Olofson's conversations with the agent, Mr. Olofson's

4    statements to his customer, as well as the evidence that was

03:26    5    clearly viewed by the jury in looking at the video the Court

6    just had shown, satisfies the Court that a reasonable jury could

7    conclude beyond a reasonable doubt on legal admissible evidence

8    that this defendant is guilty as charged in the indictment in

9    this case.

03:27    10        Mr. Olofson, despite his argument that he owned a

11   legal albeit malfunctioning AR-15, was, on the basis of this

12   evidence, found guilty, and the Court cannot on this record

13   overturn that jury determination.  As a consequence, the motion

14   for judgment of acquittal is denied.

03:27    15        In light of all of those considerations the Court must

16   now inquire of you, Mr. Olofson, whether you've had a chance to

17   review with your counsel the presentence report which has been

18   prepared in this case.

19        THE DEFENDANT:  I have, Your Honor.

03:28    20        THE COURT:  Are you satisfied that you and your

21   counsel have had sufficient time to discuss not just the

22   presentence report or any and all other matters you believe your

23   attorneys should address at this hearing today?

24        THE DEFENDANT:  In relation to the one we filed, in

03:28    25   relation to the one the government filed I'm not sure if me and

21

1    them are clear on everything.

2         THE COURT:  If you'd like to take a short break we

3    will do so.  Would you like to take a break?

4         THE DEFENDANT:  Yes, Your Honor.

03:28   5    THE COURT:  We will take a short recess.

6         THE BAILIFF:  All rise.

7         (Recess taken at 3:28 p.m., until 3:40 p.m.)

8         THE COURT:  Mr. Olofson, have you now had sufficient

9    time to talk with your attorneys about any additional matters

03:41   10   you would like them to address during the course of sentencing?

11        THE DEFENDANT:  I believe so, Your Honor.

12        MR. FAHL:  Your Honor, before we begin to sentencing

13   if I could just get a couple clarifications about the ruling on

14   the motion for judgment of acquittal.

03:41   15   First, there was a void for vagueness prong of that

16   motion for judgement of acquittal that I don't believe the Court

17   addressed in its ruling here.

18        THE COURT:  There is nothing about the statute or the

19   way it was applied in this case suggesting it was void for

03:41   20   vagueness, or that you should be entitled to acquittal in this

21   case.

22        It's clear exactly what constitutes a machine gun.

23   Your suggestion is that the statute as applied, or that the

24   statute as written, makes it unclear what would constitute a

03:42   25   machine gun.

22

1      I do not find any support for either of those

2  arguments in either the evidence in this case, showing how the

3  statute was applied, or in the wording of the statute.

4      MR. FAHL:  Okay.  I understand.  I just want to make

03:42  5  sure the record is clear.

6      And the second thing I just wanted to make sure I was

7  clear on, is the conversion that the court was considering that

8  the jury could find was the replacement of the four AR-15 parts

9  with M-16 parts?

03:42  10      THE COURT:  My point was that there certainly was

11  evidence in the record concerning possible conversion.  But that

12  is not crucial.  That's not necessary.  What was necessary was

13  that the evidence showed your client knew this was a weapon

14  which could fire multiple times with a single function.

03:43  15      It was capable of such firing as well, at the very

16  least.  But the jury also could have concluded that there was a

17  conversion because there was testimony to support such

18  conclusion.

19      MR. FAHL:  Okay, thank you.  I wasn't quite clear on

03:43  20  that.  I just wanted to make sure I understood.  And then we are

21  ready to proceed to sentencing, Your Honor.

22      THE COURT:  Are there any objections to the facts as

23  set forth in the presentence report?

24      MR. HAANSTAD:  None from the government, Your Honor.

03:43  25      MR. FAHL:  None that have not already been submitted,

23

1    Your Honor.

2            THE COURT:  And I believe that they have all been

3    addressed adequately in the addendum; is that your view,

4    Mr. Fahl?

03:44   5            MR. FAHL:  Yes, that's correct, Your Honor.

6            THE COURT:  And are there any clarifications that

7    should be addressed before the Court proceeds further with

8    respect to the facts in the presentence report?

9            MR. FAHL:  No, Your Honor.

03:44   10           MR. HAANSTAD:  Not from the government, Your Honor.

11           THE COURT:  The Court is therefore adopting the

12   factual statements in the amended presentence report as well as

13   the guideline application in the absence of any objection.  Is

14   there perhaps an objection that I have not considered?

03:44   15           MR. FAHL:  No, Your Honor.

16           MR. HAANSTAD:  No, Your Honor.

17           THE COURT:  The advisory guidelines then would place

18   the defendant at offense level 18, criminal history category I.

19   The advisory guideline range is from 27 to 33 months of

03:44   20   imprisonment with at least two but not more than three years of

21   supervised release.  The fine range goes from $6,000 to $60,000,

22   and the special assessment called for by the Mandatory Victims

23   Restitution Act, Title 18, Section 3013 is $100.

24           Unless there is exception taken the Court will

03:44   25   therefore consider the arguments of the parties under 18 U.S.C.,

1    Section 3553.  Mr. Haanstad?

2         MR. HAANSTAD:  Your Honor, the government's position

3    is set forth in the sentencing memorandum that it filed.

4         The guidelines here recommend a sentence of between 27

5    and 33 months of imprisonment.  And the government recommends a

6    sentence at the top of that range, that is, a sentence of 33

7    months of imprisonment.

8         The defendant is asking for a sentence of 12 months of

9    probation.  And it's difficult to quantify just how far below

10   the guidelines their request is.  12 months obviously is less

11   than half of the low end of the guidelines imprisonment range,

12   and the defense asks for that entire term to be only probation.

13        In support of their request the defendant has offered

14   two principal bases, one of which has to do with the nature and

15   circumstances of this offense and the other of which has to do

16   with the personal history and characteristics of the defendant.

17        With respect to the nature and circumstances of this

18   offense, the defendant has repeatedly maintained that his

19   converted machine gun was simply a malfunctioning semiautomatic

20   rifle.  And the analysis that the court went through with

21   respect to the defendant's motions for acquittal and a new trial

22   showed that that simply is not the case.  There's no support for

23   that characterization in the record, and such a characterization

24   clearly is contrary to the unanimous jury verdict in this case.

25        So the type of offense that was committed here and the

25

1    facts underlying Mr. Olofson's offense are precisely the type of

2    conduct at which Section 922(o) was aimed.  And contrary to

3    Mr. Olofson's contentions, there's nothing here that mitigates

4    the seriousness of his offense, particularly not to the extent

03:46    5    that a sentence below the sentencing guidelines is warranted.

6        Mr. Olofson also claims that a sentence of probation

7    is warranted in light of certain personal history and

8    characteristics, particularly in light of his military

9    experience and background.

03:46    10        But, as the government explains in its sentencing

11    memorandum, while he was in the army Olofson used his position

12    in the army in a number of ways that are troubling.

13        He used his position to access and download sensitive

14    restricted files, including all unit information at the end of

03:47    15    each drill in which he was engaged with his army unit.  And his

16    activities in that regard raised concerns in the army that

17    Olofson had distributed those materials to militia groups that

18    Olofson himself acknowledged to other soldiers that he was

19    connected with.

03:47    20        The army also found that Mr. Olofson may have sold or

21    given the identities, including Social Security numbers, of as

22    many as 91 soldiers to people outside of the military, and that

23    Mr. Olofson may have allowed illegal access to military

24    information by outside organizations.

03:47    25        All this history and characteristics with respect to

1    Mr. Olofson's military service, as I said earlier, raises

2    concerns.  And what begins to develop is a picture of

3    Mr. Olofson where his military experience, his attitude towards

4    guns and gun laws, much of which flow from his involvement with

03:48    5    militias, and his illegal activities all are intertwined.

6         Not only was his military -- or, I'm sorry, his

7    militia connection apparent in the army investigation that took

8    place, but around that same time period Mr. Olofson was

9    communicating with an individual who was apparently the leader

03:48    10   of some sort of vigilante movement in the southern United States

11   and offering his, Olofson's, assistance to that individual, in

12   the course of doing so touting all of his military experience

13   and the military experience of other people that he was

14   connected with.

03:48    15        He also offered -- he offered not only personnel, but

16   also armor and weaponry to this leader of the vigilante group in

17   the southern United States.

18        Mr. Olofson also in a number of different ways evinced

19   really a disregard for federal firearm laws as well as state

03:49    20   firearms laws.

21        Mr. Olofson attempts to portray himself as a

22   responsible gun owner who has always exhibited respect for gun

23   laws.  But in fact, as the court explained in the course of

24   deciding the motion for judgment of acquittal, Mr. Olofson's

03:49    25   actually expressed his not only disagreement, but also his

27

1    unwillingness to abide by federal firearms regulations.  And I'm

2    here referring to the communication that he had with the

3    individual who was interested in the unlicensed -- or the

4    registration of unlicensed machine guns where Mr. Olofson told

03:49    5    him that as a sovereign he, Mr. Olofson, was unhindered by

6    federal firearms laws and didn't have to follow those laws like

7    ordinary United States citizens did.

8            Mr. Olofson also, again contrary to his claim of

9    responsible gun ownership, has a couple of prior convictions for

03:50    10   firearms related offenses, including one in which Mr. Olofson

11   was trick-or-treating with his son and was carrying a .9

12   millimeter pistol that was loaded with 15 rounds of ammunition

13   and was concealed at Mr. Olofson's back.

14           So again, Your Honor, all of these things suggest that

03:50    15   there are no mitigating circumstances with respect to

16   Mr. Olofson's personal history and characteristics, and that in

17   fact his personal history and characteristics, particularly with

18   respect to firearms and firearms laws, warrant a sentence at the

19   top of the applicable guidelines range, and it's that sentence

03:50    20   that the government asks for, Your Honor.

21           THE COURT:  Mr. Fahl?

22           MR. FAHL:  To begin with, Mr. Olofson's parents would

23   like to say something, address the Court.

24           THE COURT:  Certainly.  They can move forward and

03:51    25   stand at the lectern and speak.

28

1          THE CLERK:  Please state your name for the record.

2          MR. DAVID L. OLOFSON:  My name is David L. Olofson.

3   I'm the father of David R.

4          THE COURT:  You may proceed.  Thank you.

5          MR. DAVID L. OLOFSON:  Your Honor, I -- forgive me if

6   will I ramble a little bit.  I'm just still trying to get my

7   mind around this whole thing and where it's gone and how come

8   it's gotten this far.  And major reason for that is, I know the

9   weapon.  I have gone target shooting with him and I know that it

10   has never done what was shown in this video.

11          And contrary to what I just heard, I have always

12   preached to my son since he was eight years old when we went out

13   hunting together, that was the one thing that we always did is

14   we always went hunting together, and I reinforced that over and

15   over again, he had to follow the state laws, otherwise he

16   wouldn't go out with me.

17          Having said that, the community that he lives in knows

18   David very well, and you would be hard pressed to find one

19   individual that would not trust their lives with David -- or

20   that wouldn't be afraid to trust their lives with David.  His

21   house is a congregation point for all the kids after school.

22   And their parents are aware of that, and they do not have a

23   problem with that.  He's an assistant leader in a Boy Scout

24   group, and he takes kids on excursions, and he voluntarily takes

25   them out fishing, teaching them that sport and how to do it, and

29

1    on his own time and at his own expense.  And the kids love to go

2    with him.  You know, he does not have to ask if somebody would

3    like to go, they're asking him, when are we gonna go out next.

4    And it's not something that happens just occasionally, this is a

5    weekly basis that he is together with those kids and taking them

6    and doing numerous things which we as parents are proud of, that

7    he does take the time to spend with the kids, teaching them all

8    of these activities.

9         He's not teaching them anything about guns, as I would

10   be totally upset if he ever went down that path.  That is not

11   what he was brought up to do.

12        He is strong in his beliefs and that's one thing that

13   we have preached to him and all of our kids.  I have a daughter

14   who is in the Peace Corps right now down in Paraguay serving

15   this country.  He joined the army after high school, that's what

16   he always wanted to do, we encouraged them to do that.  If

17   that's what they believe rightfully to do, then go for it and

18   give your time to your country.  And he has.  And he has given

19   14 years to the army reserve as well.

20        In light of all that I would ask for leniency in the

21   court's sentencing.  Thank you.

22        THE COURT:  Thank you, Mr. Olofson.  Appreciate your

23   remarks.  Does your wife wish to move forward?

24        Please state your name and spell the last.

25        MS. PATRICIA OLOFSON:  My name is Pat or Patricia

1    Olofson.

2              THE COURT:  Good afternoon.

3              MS. PATRICIA OLOFSON:  This is very difficult for me.

4    David was always a bright, energetic, giving person from the

5    time he was a toddler.  Like my husband said, at the age of

6    eight he wanted to be a soldier.  I thought it was a phase he

7    was going through, but at the age of 18 he enlisted, against my

8    will.  But like my husband said, we brought up our kids to

9    believe in something and to give from your heart.  He gave to

10   his country.  He served four years.  And I prayed every night

11   that he would come home.  I was afraid he would re-enlist

12   because he was the type of person to make this a career, and as

13   a mother I was in great fear of that.

14             But because of things that he saw and things that the

15   government did to our own soldiers he chose to come home.  And

16   he met his wife and got married, and today he has three lovely

17   children.  He participates as a father in all kinds of

18   activities.  He's part of the community, and he shares and he

19   gives so much of himself.

20             He did go to school after he came out of the service,

21   and he went into the police force, but he had another calling to

22   computer work and he donated many hours in our different

23   communities, communities and clubs that couldn't afford to have

24   people fix their computers.  He volunteered and never asked for

25   anything.  He even bought the parts just so they could have

1    something to work with.

2            David has always given so much, and when he finds a

3    need or if somebody can't afford something he tries to work it

4    out.

5            And I believe who this person was that wanted to test

6    his gun, he loaned it for the goodness of his heart.  I have

7    never ever seen my son put a gun together.  He has always hunted

8    and fished with my family.  I had a brother who was a cop for 24

9    years, and he used to go hunting with him.  And my husband took

10   him hunting from early on.

11           He has respect for our country, our history, and to do

12   what's right even though everybody's against him.  And that's

13   his strong will.  And I love him for it.  It may not be the

14   right road because it's difficult, but he chooses to make sure

15   that the truth is known.

16           And I can't believe that something like this has

17   exploited and exploded beyond measures.  And I don't know what

18   to say about it because he never did any of those things.

19           And I ask you to take a hard look at this because as

20   an American citizen, a wonderful husband, and the things he's

21   done for his community and people that respect him, this would

22   be such a disservice.  That's all I got to say.

23           THE COURT:  Thank you very much.

24           Mr. Fahl?

25           MR. FAHL:  Your Honor, as I listened to the

1  government's sentence argument it seems to me that they want to

2  sentence Mr. Olofson at the high end of the guideline range

3  because he expresses views outside the mainstream.  They're

4  concerned about this idea that maybe he thinks he's his own

04:01  5  sovereign.

6  Mr. Olofson pays his taxes.  You know, that's not

7  somebody who believes in their own sovereign.  They don't pay

8  their taxes.  They don't follow the rules.  You know, he does

9  that.  Maybe he believes, you know, we should be our own

04:01  10  sovereign or you should do this, but he doesn't elicit the

11  behavior that matches that.

12  They talk about an e-mail to a member of the

13  Minute-Men.  Well, there's no evidence that David Olofson ever

14  went down there, or that he sent them weapons, or anything.

04:01  15  Maybe he's sympathetic with their cause, but all we have is an

16  e-mail.

17  We talk about his military service.  It's been long,

18  and it's been distinguished.  The government brings up an

19  investigation into Mr. Olofson.  Now, this investigation,

04:02  20  there's no indication that Mr. Olofson was ever in fact informed

21  of it.  It's my understanding of the military code of justice

22  that in order for an investigation or reprimand to be considered

23  official it must be received and signed by the person being

24  reprimanded.

04:02  25  THE COURT:  I believe there is some indication in the

1  record that this information was provided to Mr. Olofson.  He

2  had a chance, he was given a chance to respond to it as well.

3           MR. FAHL:  Your Honor, I didn't see -- I see that

4  there was suggestions about what should be done on the

5  recommendations and some annotations of what could have been

6  done, but I can't tell who those were, or whose markings those

7  were or whether in fact they took place.

8           Irrespective of that, Mr. Olofson could today -- he

9  has training maneuvers starting this weekend, training.  He is

10  still a member of this reserve group.  If this conduct was so

11  egregious, why would he still be a part of the reserves?  Why

12  would he be invited back to come back and continue his service?

13  And even during this time he received a commendation for his

14  service in the military.

15           So while there may have been an investigation, you

16  know, it's just that.  These are allegations.  There's no -- we

17  don't have the facts.  We have a letter of an investigation of

18  reprimand, we don't have the facts as to what was finalized,

19  what were the packets that were presented to Mr. Olofson, and

20  what were the official findings.

21           And like I said, in my understanding of the code of

22  military justice there has to be some acknowledgement as signed

23  by Mr. Olofson.  I don't see that here, and to my knowledge it

24  doesn't exist.

25           THE COURT:  Now, are you looking at the letter --

34

1          MR. FAHL:  Exhibit A of the government's sentencing

2    memorandum.

3          THE COURT:  Yes.  Exhibit A says in paragraph 4:

4          I intend to place this memorandum in the performance

5    fiche portion of your official military personnel file.  I'm

6    referring this memorandum to you for comment because it contains

7    derogatory information.  You will reply by memorandum, sample

8    enclosed, to me no later than 10 days from receipt of this

9    letter.  You may include comments and information regarding

10   matters in extenuation or mitigation.  I will consider any

11   timely submissions before deciding whether to make this letter

12   of reprimand final and the appropriate location for filing.

13         Does that in your view suggest your client was not

14   given an opportunity to be heard with regard to the comments

15   that were made respecting his downloading of information and

16   misuse of his position as a member of the military -- of a

17   military unit?

18         MR. FAHL:  Yes, Your Honor.  He never received a copy

19   of this memorandum.  When I presented this to him today, it was

20   a shock to him that he was under any sort of reprimand or

21   investigation considering -- especially considering the fact

22   that he received a commendation and award during this time

23   period.

24         THE COURT:  Now, I note that there is behind that

25   particular exhibit, Exhibit A, which is dated 14 September 2002,

1    a second document dated November 9th, 2002, and it indicates

2    that a copy was sent to SPC Olofson.

3            MR. FAHL:  I can see at paragraph 1 where it says it

4    was not accepted.  But we don't know where it was sent to, if it

5    was, you know, if it was attempted to be handed to Mr. Olofson.

6    Mr. Olofson said he never received a copy of the letter.

7            THE COURT:  But the document does indicate that

8    Mr. Olofson was sent not only the Exhibit A, but the second

9    memorandum, because the second memorandum says:

10           I fully considered the facts concerning my enclosed

11   memorandum of reprimand.  I also considered the soldier's lack

12   of acceptance of my memorandum.  Paren, delivery attempted on 18

13   and 23 September and 03 October 2002.  See enclosure.

14           MR. FAHL:  Right.  And my reading of that, Your Honor,

15   is that delivery was never completed.  And that's my

16   understanding.  And I don't know if this was attempted to be

17   given to him at a home address, at the base or the training

18   ground.  I mean, what I can represent to the Court is that

19   Mr. Olofson never received the letter.

20           THE COURT:  All right.  Then that would suggest as you

21   indicate, that Mr. Olofson may not have personally received the

22   information, albeit -- I should say notwithstanding the

23   information was apparently sent to him, or delivery was

24   attempted on the 18th and 23rd of September as well as on the

25   3rd of October 2002.

1      Go ahead.

2      MR. FAHL:  Going back to -- he's been in the military,

3  either the active military or the reserves but for a short time

4  for almost 20 years, Your Honor.  Somebody who is more

04:08   5  interested in paramilitary or extreme groups doesn't do that.

6  You heard his mom.  All he wanted to be from the time he was

7  eight years old was a soldier.  You know.  This is what he likes

8  to do.  This is what he wants to be.  This is a vocation.

9      And even assuming we take this reprimand at face

04:08  10  value, the army still wants him.  You know, if the judgment of

11  acquittal had been entered today Mr. Olofson would be right back

12  with the reserves training and waiting for potentially to be

13  called up to active service.  You know, his military service is

14  a factor that mitigates against a guideline sentence in this

04:09  15  case.

16      Talking about Mr. Olofson's gun ownership and his

17  beliefs.  Yeah, he has a rigid belief in the second amendment.

18  He believes that the second amendment should be more expansive.

19  But, again, he follows the rules.  Talking about his prior

04:09  20  crimes, Wisconsin does not have an open carry prohibition.  It

21  doesn't.  In Wisconsin --

22      THE COURT:  Well, the facts in the presentence report

23  which have not been objected to indicate that Mr. Olofson was

24  not carrying the pistol in the small of his back in an open and

04:09  25  notorious fashion, it was concealed.  He was charged with and

1    convicted of carrying a concealed weapon.  Now, there was with

2    respect to the first matter I believe open carry.

3            MR. FAHL:  And with the second matter it was

4    conviction of disorderly conduct.  The first one was a charge

5    for carrying a concealed weapon was dismissed based on the fine,

6    the second one was disorderly --

7            THE COURT:  Disorderly for carrying the weapon while a

8    lot of kids were trick-or-treating on Halloween.

9            MR. FAHL:  And I'm not here to argue to you the

10   soundness of that decision.  What I'm telling you is that what

11   he did does not violate the firearms laws.  Maybe he violated

12   it -- maybe he -- adequately and was probably charged with

13   disorderly conduct.  But what I'm talking about as gun

14   ownership, this is a person who follows the rules.

15           THE COURT:  Well, that was not following the rules,

16   Mr. Fahl.  He pled guilty to having failed to follow the rules.

17           MR. FAHL:  He pled guilty in a plea bargain to

18   disorderly conduct.

19           THE COURT:  But he pled to having failed to follow the

20   rules.  He can't have it both ways.  He may not have been found

21   guilty of the original charge of carrying a concealed weapon,

22   but the facts support a finding that he was in fact carrying a

23   weapon which was concealed.  Although the finding, the judgment

24   of conviction was for disorderly, the facts underlying the

25   disorderly conviction show that he was carrying a weapon on

1    Halloween with kids who were trick-or-treating.

2              MR. FAHL:  Your Honor, again, you're talking about

3    facts --

4              THE COURT:  I can't conclude anything else in large

5    measure because the facts in the presentence report have not

6    been objected to and the Court accepted those facts as true.

7              MR. FAHL:  Right.  And the facts are what they are.  I

8    mean, you can't argue with what the facts -- that was what they

9    were charged with.  There was no litigation, there was no

10   factual finding on that now -- on that at the time.  And you

11   can't go back.

12             I mean, I think the fact that it was pled down to

13   disorderly conduct indicates the lack of egregious nature.  The

14   fact that he can carry it on his belt, and if it's on the side,

15   as long as it's not --

16             THE COURT:  It was in the small of his back according

17   to the facts in the presentence report.

18             MR. FAHL:  But as long as he's not carrying it behind

19   a jacket that's still open, Your Honor.  Under the -- again,

20   this is perhaps --

21             The point I was trying to make with this is that if

22   there's a rule regarding the firearms, he's going to follow it.

23   He may toe it right up to that line, but he's going to follow

24   it.  And it was his belief and I believe it's correct that you

25   can open carry a gun in Wisconsin.  And it can be on your back,

1    on the side or the front, and that's what he was doing.

2         Now, is that the smartest thing to do on the night of

3    trick-or-treating?  No.  But again, the point is about his

4    respect for the laws regarding firearms.

04:13  5         THE COURT:  The argument that I was hearing was that

6    Mr. Olofson always follows the rules, and that is what I was

7    responding to.  The facts which this court must accept and has

8    indeed accepted show that he does not always follow the rules,

9    particularly with respect to his conduct on Halloween with the

04:13 10    kids.

11         MR. FAHL:  You know, and I understand what Your Honor

12    is saying, I'm just trying to point out that, you know, it's my

13    belief that based on this his conduct was perfectly legal as far

14    as carrying the concealed firearm.  Whether or not it would

04:13 15    constitute disorderly conduct is a separate thing that I was not

16    trying to take umbrage with.

17         Getting back to Mr. Olofson.  Again, I think his

18    military service is distinguished as a mitigating factor.  I

19    think --

04:14 20         THE COURT:  But that same service would suggest that

21    Mr. Olofson was and continues to be familiar, very familiar with

22    firearms.

23         MR. FAHL:  Yes, Your Honor.

24         THE COURT:  And he wasn't just some novice who

04:14 25    happened to loan a firearm to someone who was interested in

1    going to a gun range.  You're talking about a military man.

2         MR. FAHL:  Right.

3         THE COURT:  With considerable military experience.

4         MR. FAHL:  And we're talking about a weapon which is

5    essentially a military weapon but is the semiautomatic legal

6    version of that.

7         THE COURT:  But what you're arguing also goes the

8    other way because it shows knowledge.  Perhaps more knowledge

9    than the average person who has not been in the military.

10        MR. FAHL:  Right.  And I guess, you know, and it's

11   still the contention that he has knowledge of what is and what

12   is not a machine gun, and using that knowledge he did not

13   believe that what he had was a machine gun.

14        THE COURT:  But according to his own statements he

15   knew it was a machine gun, Mr. Fahl.  And again, that's part of

16   the record.  I don't have anything in the record to the

17   contrary.

18        MR. FAHL:  Again -- and, Your Honor, the statements

19   that you're relying on, again, Mr. Kiernicki, who, you know,

20   some of that was recanted on cross-examination, and in the

21   interview with Agent Keeku.  And it's true that there was only a

22   certain amount of evidence that came in during the trial.  But

23   at one point, and this is --

24        THE COURT:  Well, let me stop you there.  Where in the

25   record is there evidence that the witness recanted his statement

1    concerning the exchanges, the various exchanges he had with

2    Mr. Olofson respecting the weapon at issue?

3            MR. FAHL:  My recollection of the testimony,

4    Your Honor, was that after cross-examination he couldn't be sure

5    of exactly what Mr. -- you know, I think the lynchpin was

6    whether or not Mr. Olofson said this is a -- don't use this

7    third setting because it fires automatically.

8            Mr. Mullins cross-examined and asked questions

9    concerning isn't what he said that don't use the third setting

10   because it jams, and to which point I think there was an

11   answer -- well, I don't know, or -- and that's -- you know,

12   that's my recollection of the cross-examination.

13           THE COURT:  Well, let's go back and touch on that.

14   Mr. Mullins asked Mr. Keeku -- I'm sorry, Mr. Kiernicki, I

15   believe this is on page 53:

16           And did you not state in that statement that

17   Mr. Olofson expressed surprise to you that you got in trouble

18   because he had fired the gun automatically at the Conservation

19   Club before, correct?

20           Answer:  Correct.

21           And later on at line 21:

22           Question:  Is it possible that Mr. Olofson just said

23   to you, gee, I fired that gun at the range before and never had

24   any problems?  Is it possible that he just said that?

25           Answer:  No.

42

1          Also, during cross-examination I do not recall -- it

2    starts at page 41.  Page 44.  Cross-examination by Mr. Mullins,

3    there was the following exchange.

4          Line 5:  Okay.  And then you fired it.  It was a

5    semiautomatic gun, it didn't fire automatically the first time

6    that you had it.  Correct?

7                Answer:  Yeah.

8                Question:  And you had fired it at the gun club -- I'm

9    sorry, at the Conservation Club.

10               Answer:  Yeah.

11               And do you remember when this was?

12               Answer:  I don't remember, I don't know.

13               Question:  Okay.  So the second time you borrowed it

14   you returned it to Mr. Olofson after a couple weeks, correct?

15               Nods head.

16               Question:  And then a couple weeks later you came back

17   and borrowed it again, correct?

18               Answer:  Yeah.

19               Question:  And again, you never said, hey, this is

20   going to fire automatic if you put it in this third position,

21   correct?

22               No response.

23               Question:  That time that you went over there, when

24   you went to his house --

25               Answer:  He never mentioned anything about it until

1    the fourth time.

2            Question:  Well, I didn't ask you that.  The second

3    time, the second time he never said it fires automatically.

4            Answer:  True.

5            Question:  Okay.  And you fired it.  And again it did

6    not fire automatically.

7            Answer:  Yeah.

8            And then you came back a third time and again

9    Mr. Olofson never said, hey, this thing fires as a machine gun

10   or automatically.

11           Answer, it says nods head.

12           Question:  And you use it again and again and it

13   didn't fire automatically, correct?

14           Answer:  Yeah.

15           Okay.  And you weren't looking for an automatic gun.

16           Answer:  No.

17           Question:  That wasn't why you went to Mr. Olofson to

18   get a gun.

19           Nods head.

20           Question:  Okay.  Now, the fourth time.  You testified

21   that Mr. Olofson said you noticed it had this third selector

22   switch, correct?

23           Answer:  Yeah.

24           Question:  And you brought it up to Mr. Olofson, hey,

25   what happens when you put it in this position, correct?

1    Answer:  I don't know.

2    Question:  You don't remember what you said --

3    Correction.

4    Question:  You don't remember what you asked him?

5    Answer:  Yeah, I don't remember.

6    Question:  Okay.  So now, you testified that

7    Mr. Olofson told you that it fired in three-round bursts.

8    That's how you testified.

9    Answer:  Yeah.

10    However, do you recall speaking to police back in July

11    13th, 2006, you spoke to a Berlin police officer named Officer

12    Zache; do you remember that?

13    Answer:  Yeah.

14    And you told him that Mr. Olofson said the three-round

15    burst does not work because it was missing some type of thing.

16    That's what you told Officer Zache?

17    Answer:  Yes.

18    So Mr. Olofson essentially just told you, you asked

19    Mr. Olofson what happens if I put it into this third position,

20    he said, well, it doesn't work because it will malfunction if

21    you do that, correct?

22    Answer:  It would malfunction and jam, okay.

23    But you decided to do it anyway.  You decided to put

24    it in that third position anyway even though Mr. Olofson told

25    you not to because it would malfunction.

1          Answer:  Yeah.

2          Question:  Correct.

3          Answer:  Nods head.

4          Okay.  And it fired three rounds.  And you did that

5    about two, three times.

6          Answer:  At least twice and then it jammed.

7          And there was more ammunition in the gun but it wasn't

8    firing because the gun was jamming, correct?

9          Answer:  Yeah.

10         And it wasn't that you were taking your finger off the

11   trigger, it just jammed while your finger was on the trigger.

12         Uh-huh.

13         Question:  Okay.

14         Is that a yes or a no from the court?

15         The witness:  Yes.

16         Is that what you're referring to as the recantation?

17         MR. FAHL:  Yes.

18         THE COURT:  All right.  Go ahead.

19         MR. FAHL:  Going back to the nature of Mr. Olofson in

20   the 3553 factors.  The other factor that the court should

21   consider is his role in his family, as the stay-at-home father,

22   the primary child care while his wife works, and as you heard

23   his role as a Cub Scout leader and his activities in the

24   community which make him a vital part of that community.

25         When we turn to the nature of the offense, you know,

46

1    our consideration of what this offense actually is, it's fully

2    discussed in the briefs and I'm not going to enter into a

3    discussion of that here.

4         But I will say when you compare this offense to the

5    other types of offenses that are covered by the statute, people

6    buying, possessing an actual, you know, machine gun, one that

7    was designed and created by the manufacturer to function this

8    way, or people who are running guns or using these for elicit

9    purposes, they are subject to the same guideline structure that

10    Mr. Olofson is.  His conduct is significantly less egregious

11    than that.

12         We have a gun that, you know, we believe malfunctioned

13    in firing multiple rounds.  It's a gun that did not have an auto

14    sear, a drop-in auto sear or a lightening link.  Didn't have any

15    of these major conversions that can be done to a weapon to make

16    it fire automatically.  This was an AR-15 that has a slip in the

17    selector switch which allowed it to go to the third position

18    which then only 66 percent of the time would cause multiple

19    firings.

20         THE COURT:  66 percent of the times is not a figure

21    that's based on the record in this case, is it?  It may have

22    happened on several occasions according to the testimony, but

23    with regard to the overall use of this weapon there's nothing to

24    show that 66 percent of the times this weapon is used it jams if

25    it's put into the automatic mode.  Correct?

1        MR. FAHL:  You could say the one other time was,

2   Kiernicki would make it three out of four times.

3        THE COURT:  Well, those are occasions that it jammed,

4   but that's not a showing that whenever this weapon is operated

5   66 percent of the times it jams.

6        MR. FAHL:  We can say in 60 percent of the tests

7   performed by the ATF.

8        THE COURT:  That would be a more accurate statement

9   perhaps.

10       MR. FAHL:  And in those times you would use the soft

11  primered ammunition.  And what I'm trying to say there is that,

12  again, this isn't a gun that will even in ATF's own tests would

13  fire automatically every single time and it was clearly designed

14  that way.  This is a different sort of animal.

15       Regardless of what sort of culpability we assess to

16  Mr. Olofson on whether or not he converted this, whether this is

17  an accident, the hammer follow, it looks like, and the evidence

18  seems to show, that in ATF tests you need to put in the soft

19  primered ammunition for it to work like this.  This is a

20  different sort of machine gun than the average machine gun that

21  finds itself under 922(o) convictions.

22       THE COURT:  I have no idea what the average machine

23  gun is like.  There's nothing in the record or that I have had

24  offered in connection with sentencing that shows what the

25  average machine gun does or does not do when it has soft

48

1   primered ammunition or, I should say commercially available

2   ammunition according to the testimony of the officer in the

3   video.  Commercial ammunition as opposed to military ammunition.

4          MR. FAHL:  Well, a machine gun has an auto sear and I

5   think the evidence -- a gun, a weapon that is manufactured to be

6   a machine gun has an auto sear.  This gun did not have it.

7          THE COURT:  But the point of the statute is the

8   functioning of the weapon, not the parts that cause a particular

9   function.  The statute talks about the function, it doesn't talk

10  about the parts.

11         MR. FAHL:  No, it doesn't, Your Honor.  But, again, we

12  may differ on our interpretation of how Staples applies.  I

13  think when Staples drafted the knowledge requirement on there,

14  the intent was to make sure that the person or persons being

15  charged with these crimes, possessing a machine gun, were

16  possessing an actual machine gun, something they knew to be a

17  machine gun.

18         THE COURT:  And your client stated that he knew that

19  it was a machine gun.  He told his customer that it was a

20  machine gun, and he also indicated to the ATF agent, BATF agent

21  that he knew what a machine gun is.  And according to the

22  e-mails, he also was counseling people with respect to what

23  constitutes a machine gun.

24         MR. FAHL:  Correct.  We don't deny that Mr. Olofson

25  had the knowledge of what is a machine gun.  The question is

1    this was not that kind of machine gun.  A machine gun, according

2    to his knowledge, and this is --

3            THE COURT:  Let's confine it to the knowledge

4    demonstrated in the record.

5            MR. FAHL:  Which is buttressed by the AR-15/M-16

6    conversion book, indicates there are three ways to convert an

7    AR-15 into an M-16.  There's the conversion, the drop-in auto

8    sear, and the lightning light.  The latter two weren't involved

9    here.

10           The first one, to convert it, not only do you have to

11   replace those parts on pages 10 and 11, but you also have to do

12   a detailed machining.  Now, even if Mr. Olofson knew how to do

13   this, there's no evidence that he had any of the equipment or

14   the ability to actually make those machine parts.  And it must,

15   according to this conversion book, it must involve putting in a

16   permanent auto sear.  That wasn't present here.

17           So, what I'm getting at, Your Honor, is that this is a

18   different type of gun.  This is not -- the M-16.  This is not

19   one of these other military designed weapons that somebody has

20   when they shouldn't.

21           We have a legal AR-15 that had a problem.  And

22   whether -- I'm saying regardless whether you attribute that

23   problem to Mr. Olofson or to an accident, it's still different

24   than these larger military grade weapons where you have to go

25   out of your way to purchase this elicit weapon.  This is

50

1    something --

2            THE COURT:  This is not just a weapon that had a
3    problem, this is a weapon that fired automatically.

4            MR. FAHL:  Right, due to --

04:30  5            THE COURT:  In fact, the neighbors of the Conservation
6    Club called in to say it was firing automatically.

7            MR. FAHL:  Right.  Never did Mr. Olofson deny that --
8    we saw the video.  It must have fired automatically.

9            But again, just because something does that once it
04:30 10    does not make the machine gun make.  It is a machine gun or it
11    isn't.  And we're getting back to the motion.

12            THE COURT:  But it does have significance as far as
13    where the Court should sentence your client, so I'm certainly
14    appreciative of your argument.  And so I'm not trying to dismiss
04:31 15    your argument at this point.  I just want you to know that.  I
16    do appreciate what you're saying.  And it is significant that
17    you're pointing out that there were occasions when the weapon
18    malfunctioned, in your client's view and the view of Mr. Savage.
19    And, of course, the customer testified that the weapon
04:31 20    malfunctioned, but it malfunctioned with the knowledge of the
21    defendant that it would fire automatically with one function of
22    the trigger, one pull of the trigger, and he loaned it to this
23    customer knowing it operated in that fashion or had the ability
24    to operate in that fashion.

04:32 25            MR. FAHL:  And, Your Honor, although this was not --

1    this was not evidence that was in trial, and, you know, perhaps

2    I should have added this to the facts to be considered as part

3    of the presentence report, but there was, in his statement to

4    Agent Keeku, he did say he didn't believe that this was an

5    automatic rifle.  And he also, you know, said maybe it can --

6    sometimes the parts can wear down and fire fully automatic, but

7    then you have to fix them, you have to replace those parts.

8          THE COURT:  But there was testimony that the parts

9    were not worn.  When the gun was examined, the testimony was

10   that the parts were not worn so as to cause it to malfunction as

11   you suggest.

12         MR. FAHL:  I was just saying, in Mr. Olofson's

13   statement to Agent Keeku, he did say that this was not a machine

14   gun and it did not, it was not fully automatic.

15         Which again, goes to -- all I'm trying to indicate

16   here is that this is not somebody who went and purchased what is

17   already an elicit firearm, went out of his way to go through

18   back channels to find something.  This is, this was an AR-15

19   that fired automatically.

20         Now, as far as the deterrent effect, the conviction

21   itself will deter Mr. Olofson from any similar conduct because

22   from this point forward Mr. Olofson will not be able to possess

23   a firearm.  And so I think just by conviction the deterrence

24   factor of 3553 is met as it relates to Mr. Olofson.

25         As it relates to others, I'm not quite sure what that

1    deterrent effect is.  The prevailing understanding is that when

2    an AR-15 has M-16 parts, an auto sear is required before the ATF

3    will consider that a machine gun.  That's ATF ruling 81-4.

4        The reason why people are concerned about this case

5    and why this case has received the press that it has, is because

6    it now looks like that it's just simply replacing some AR-15

7    parts with some M-16 parts that can create a machine gun, or it

8    can be any gun that misfires causing multiple rounds to fire and

9    you again have a machine gun.  That is the concern that's out

10   there.

11       And so what deterrent effect this is going to have on

12   the general public, I don't know, maybe it over-deters.  And

13   that's something maybe the Court should consider when fashioning

14   a sentence here, is that what kind of an effect the sentence

15   will have on the greater population, especially those that are

16   gun owners.

17       As it relates to protection of the public, again, if

18   the concern is Mr. Olofson's use of firearms, that's met by the

19   conviction alone.  If he doesn't have the firearms then we don't

20   have this problem again, even arguably.  So, that factor is met

21   simply by conviction.

22       And there's also a matter of uniformity.  And although

23   I don't know much about many of the cases involving convictions

24   of 922(o), I am aware of one case from the Southern District of

25   Illinois which is United States vs. Harold Griffiths.  In that

53

1     case --

2          THE COURT:  What's the citation?

3          MR. FAHL:  Well, this is Criminal Case Number 0630013.

4     This is from the Southern District of Illinois.  We have an

04:36   5     indictment that was filed on January 19th, 2006, charging

6     Mr. Griffiths with knowing possessing a machine gun, Colt brand

7     model AR-15, .223 caliber rifle.

8          In that case I received a call from Mr. Griffiths'

9     attorney this morning who informed me that his client received

04:36  10     pretrial diversion in that case, and he wanted me -- to let me

11     know that before we came into the sentencing today.

12          And so there's a great disparity.  I can't tell you

13     much more about Mr. Griffiths' case than that, and because I

14     received this information by voice mail.  But somebody charged

04:36  15     with the possession of a machine gun and which appears to be

16     similar to Mr. Olofson's received pretrial diversion.  And so to

17     sentence Mr. Olofson to 33 months while somebody else is getting

18     pretrial diversion, that creates a great disparity.

19          And I understand that we don't know the particular

04:37  20     facts in this other case.  But, you know, we have to -- if the

21     government wants to sentence him to 33 months, the high end of

22     the guideline range, which is a significant departure from this

23     pretrial diversion, we should make sure that the sentence

24     Mr. Olofson receives is somewhat uniform and somewhat relatable

04:37  25     to other cases like this, especially considering Mr. Olofson's

1    personal circumstances and the nature of the offense.

2         In the end I want to repeat, it appears that the

3    government was more concerned about Mr. Olofson's personal

4    beliefs when looking to sentence him to 33 months, than they

5    were about the actual conduct involved in this particular case.

6    The conduct here is not that egregious.

7         And for that reason I think considering his military

8    service, his family history, his involvement in the community,

9    that Mr. Olofson should be sentenced to a term of 12 months

10   probation, which would be the lowest possible sentence this

11   court could impose.

12        Now, noting that post all, probation is considered

13   punishment.  And I should also note that Mr. Olofson has been on

14   supervision for 18 months, almost going on 18 months now since

15   his indictment and initial appearance in this case.  So he's

16   been under these harsher conditions for 18 months up to this

17   point.

18        So if this court were to impose a term of probation of

19   a year, you know, you could almost add another 18 months to what

20   Mr. Olofson has already been subject to.

21        And that's all we have, Your Honor.

22        THE COURT:  Mr. Olofson, do you wish to make a

23   statement at this time?

24        THE DEFENDANT:  No, Your Honor.

25        MR. HAANSTAD:  Judge, if I could just respond to a

55

1    couple things before sentencing.

2         THE COURT:  Sure, go ahead.

3         MR. HAANSTAD:  Again, just briefly on a couple of the

4    points that defense counsel raised.

04:39    5         First with respect to this army investigation.

6    There's a suggestion that Mr. Olofson was not aware of the

7    investigation, and more specifically wasn't aware of the

8    existence of what's been attached as Government's Exhibit A to

9    its sentencing memorandum.

04:39    10         That particular document or set of documents actually

11    came to ATF's attention because they found a scanned version of

12    that document on one of Mr. Olofson's computers when it was

13    seized in the summer of 2006.  So there's indications in the

14    report itself that Mr. Olofson had knowledge of its existence,

04:40    15    or at least the existence of the investigation.  For example --

16         THE COURT:  One second.  Let me interrupt you.  I'd

17    like to turn back to Mr. Fahl to ask whether or not you wish to

18    challenge that.

19         (Pause.)

04:40    20         MR. FAHL:  We still challenge -- Mr. Olofson has no

21    recollection of ever receiving that document.  We don't know how

22    it got on his computer if it was there.

23         THE COURT:  So you're saying that you have no, you're

24    not challenging the fact that the document was found on the hard

04:40    25    drive of your client's computer?

56

1        MR. FAHL:  Your Honor, we don't have any information

2  as to whether that could be or not.  Mr. Olofson couldn't know

3  how it would be there if it was there.

4        THE COURT:  Was this material made available to the

5  defense as part of discovery in this case?

6        MR. HAANSTAD:  Yes, Your Honor.  The government had

7  either four or five hard drives imaged and had those available

8  for discovery at the offices of the ATF, and also had printed

9  off copies of different materials including the manual, the

10  AR-15 to M-16 conversion manual, including this document,

11  including several others that were in paper format at ATF and

12  available for copying and inspecting.

13        THE COURT:  Mr. Fahl, do you wish to reply?

14        MR. FAHL:  This is the first time in Mr. --

15  Mr. Haanstad's sentencing memorandum is the first time that I

16  have seen the army documents.

17        THE COURT:  So, but you're not challenging the fact

18  that the hard drive material was part of the discovery in this

19  case available for your review and consideration with respect to

20  this case.

21        MR. FAHL:  It's my understanding the hard drive

22  material was made available to us at ATF.  I believe that's

23  true.

24        THE COURT:  All right.  Go ahead, Mr. Haanstad.

25        MR. HAANSTAD:  Your Honor, there are also indications

57

1    throughout this report that Mr. Olofson was aware of the

2    existence of the investigation.  That is, the army found that he

3    actually was not responding to phone calls and was not reporting

4    as he was required to do for duty, and they considered him

5    absent without leave.

6        Their conclusion was that he was -- that was part of

7    his trying to cover up the fact that he engaged in misconduct.

8    That, considered along with the fact that he had deleted some

9    files and destroyed some documents that were subject to the

10   investigation.

11       As to the issue of whether the customer who testified

12   recanted his testimony.  I think that what is a fair reading or

13   at least a permissible reading for the jury based on all of this

14   testimony is that Mr. Olofson communicated to the customer that

15   the gun when placed -- when the selector was placed in the

16   unmarked third position would fire automatically, but that it

17   also may jam after doing so.

18       And, in fact, that's exactly what happened when

19   Mr. Kiernicki fired the converted machine gun.  He fired I

20   believe the testimony was 100 rounds or more in semiautomatic

21   mode.  And it's not as though the gun just malfunctioned and

22   fired automatically after firing 100 rounds semiautomatic.

23   Mr. Kiernicki had to actually move the selector switch into the

24   fully automatic mode, and when he did the gun immediately fired

25   automatically.

58

1    So I don't think there's really any recant, that's

2  just consistent with the information that Mr. Olofson

3  communicated to Mr. Kiernicki, is consistent with what happened

4  when Mr. Kiernicki actually fired the gun.  And it's also

5  consistent with the fact that when Officer Kingery performed his

6  test fires, he didn't first test fire 100 rounds or so in the

7  semiautomatic mode.  On one occasion he test fired one, I think

8  one or two rounds in semiautomatic mode, and because he did that

9  the gun didn't have the opportunity to heat up like it did when

10  Mr. Kiernicki fired, again, as many as 100 rounds in

11  semiautomatic mode.  So there was no malfunction when

12  Mr. Kingery conducted his test fire.

13    Also, Your Honor, with respect to the test fires, on a

14  couple of occasions defense counsel has referred to the

15  ammunition that was used in the test fires as special soft

16  primary ammunition.  That ammunition was actually commercially

17  available civilian grade ammunition.

18    THE COURT:  That's what I found.

19    MR. HAANSTAD:  I'm sorry?

20    THE COURT:  That's what I found earlier.  And that's

21  what was stated on the video.

22    MR. HAANSTAD:  Correct.

23    THE COURT:  You don't have to clarify that point.

24    MR. HAANSTAD:  As for this notion this is somehow a

25  mitigated offense because of the construction of this particular

59

1    converted machine gun, or because Mr. Olofson was not alleged to

2    have been running guns or selling or transferring a large number

3    of guns and wasn't alleged or found to have transferred machine

4    guns for, as Mr. Fahl puts it, elicit purposes, 922(o), along

5    with Section 924(a)(2), provide for a maximum 10-year term of

6    imprisonment.

7         And what we're really talking about here is trying to

8    determine where within the range of zero to 10 years Mr. Olofson

9    should fall.  The sentencing guidelines suggests that a sentence

10   of between 27 and 33 months is appropriate for a non-aggravated

11   violation of Section 922(o).

12        If Mr. Olofson had been found to have been

13   transferring large numbers of machine guns, or was found to have

14   been transferring machine guns so that they could be used in

15   further criminal endeavors, guidelines enhancements would have

16   been applicable.  And under consideration of the 3553(a) factors

17   that relate to the nature and circumstances of the offense,

18   under those circumstances a sentence of more than 33 months

19   would have been appropriate.  But the absence of those factors

20   doesn't further mitigate this offense.  Again, the 27- to

21   33-month range is what the guidelines commission has deemed

22   appropriate for a non-aggravated violation of Section 922(o),

23   and that's exactly what we have here.

24        THE COURT:  Ordinarily the defense gets the last word

25   at sentencing, and so, Mr. Fahl, if you'd like to respond to

1    anything that Mr. Haanstad said I will give you an opportunity

2    to do so.

3              MR. FAHL:  Nothing, Your Honor.

4              MR. HAANSTAD:  Judge, I'm sorry, but there actually

5    was one more thing I was going to get to and I will freely give

6    Mr. Fahl a chance to respond.

7              THE COURT:  This will be the last word.

8              MR. HAANSTAD:  Yes, Your Honor.  I just want to

9    respond briefly to this notion that the government's recommended

10   sentence is somehow punishment for Mr. Olofson's having

11   expressed views that are outside the mainstream.

12             Mr. Olofson and other citizens are free to express

13   views they like with respect to things like sovereignty, and

14   they are free to express and hold beliefs in which they are

15   sympathetic to certain causes.  They are free to disagree on

16   federal firearms laws.

17             What individuals are not free to do, however, is to

18   act in a way that is in accordance with those beliefs such that

19   they're violating, for example, the federal firearms laws.  And

20   that's what the concern is here.  Mr. Olofson has expressed not

21   only his disagreement with federal firearms laws, but then has

22   acted consistently with those beliefs.

23             And that's the type of concern that the court should

24   bear in mind when determining whether the sentence it imposes is

25   going to have a significant or sufficient deterrent effect and

61

1    whether it's going to is sufficiently protect the public.

2        THE COURT:  The Court has reviewed the evidence in

3    this case and has recounted some of the significant aspects of

4    the evidence during the course of this proceeding.  It has

04:48  5    certainly given very serious consideration to the arguments of

6    both sides.  It is, therefore, the Court's view that a guideline

7    sentence is warranted in this case, in part, because this is not

8    an aggravated case, but it's also not a case where Mr. Olofson

9    was proceeding naively.

04:49  10        This is a man who has considerable knowledge of

11   weapons, considerable knowledge of machine guns, and touted that

12   knowledge.  The evidence shows that Mr. Olofson was incredibly

13   familiar with the weapon at issue in this case and counseled his

14   customer respecting its use.

04:50  15        The fact that Mr. Olofson gave to this customer 100

16   rounds of ammunition on three occasions suggests to me that he

17   knew this guy was likely to go out and fire this weapon

18   automatically.

19        Quite frankly, the suggestion to me is that this was

04:50  20   not the first time this weapon was used in automatic mode.  That

21   is, the 13th of July of 2006.  But when you add to this the fact

22   that 500 rounds of ammunition were loaned to this man by a

23   person who claims he was only earning $188 a month, who had a

24   cash flow of only about $40-plus a month, it just doesn't seem

04:51  25   to fit.

1    Mr. Olofson has, in this court's view, shown that he

2    was ignoring the law, and that he was doing so, in part, for

3    financial gain.  So there is no reason for this court to look --

4    to accept the defendant's argument that he is deserving of a

5    sentence below the sentencing guidelines.

6    The defendant argued that his character warrants a

7    sentence below the sentencing guidelines.  The arguments that

8    were offered by the government were considered by the Court as

9    responsive to the defendant's statements regarding his

10   character; the defendant's contention that he is and has always

11   been a loyal soldier, a person who has been in the proper

12   service and true service of his country at all times.  However,

13   as the exhibit, Exhibit A, suggests, that hasn't necessarily

14   been borne out by the facts as presented in Exhibit A.

15   That Mr. Olofson would go trick-or-treating with kids

16   while carrying 15 rounds of ammunition on Halloween also

17   undercuts his claims regarding his character.  You don't put

18   kids at risk on occasions such as Halloween and then deserve the

19   label of good citizen who always follows the law.

20   Mr. Olofson, in his e-mail communications, also

21   demonstrates disrespect for the law.  Hence, this court cannot

22   conclude that the law should be bent and interpreted in a way

23   that rewards him as opposed to punishes him -- as opposed to

24   punishing him I should say.

25   That one particular defendant in the Southern District

1    of Illinois may have been diverted is certainly something that

2    is worthy of note, but that doesn't suggest that the heartland

3    of sentencing -- of sentences for this offense is diversion.

4    The heartland is essentially where the guidelines place

5    Mr. Olofson.

6         I have to hasten to add, these guidelines are no

7    longer mandatory.  Personally I'm glad they're not, because it

8    allows the Court to tailor sentences to the circumstances so

9    that a sentence will punish those who are justly deserving of

10   punishment, and a sentence will deter others from engaging in

11   similar conduct.  I'm placing Mr. Olofson essentially at the

12   center of the range to help make that statement.

13        Now, after serving a 30-month term the Court is

14   placing the defendant on supervision for a period of two years.

15        While on supervised release Mr. Olofson is to comply

16   with the standard conditions which have been adopted by this

17   court and, in addition, he's not to violate any federal, state

18   or local laws.  He's also required to report to the probation

19   office in the district where he's released within 72 hours of

20   being released by the Bureau of Prisons.

21        Of course, the defendant is not to possess any

22   firearms or dangerous weapons while on supervision, and he is

23   also precluded from possessing any illegal controlled substances

24   while on supervision, as such possession will result in

25   revocation of the supervision term and the defendant will be

64

1    obligated to serve a further term of incarceration.

2            The Court must emphasize the defendant shall refrain

3    from unlawful use of controlled substances.  Nonetheless, the

4    Court is at this stage mindful that there is no indication by

5    virtue of Mr. Olofson's conduct while on pretrial release and

6    post-trial release, there's been no evidence of drug use.

7            In light of the defendant's financial circumstances

8    the Court is not going to impose a fine.  There is no reason for

9    a fine to be imposed in this case because the defendant does not

10   have the wherewithal to satisfy such an obligation.  On the

11   other hand, the defendant is required by the DNA Backlog

12   Elimination Act as amended to submit a DNA sample under the

13   guidance and supervision of his supervising probation officer.

14           The Mandatory Victims Restitution Act which was

15   mentioned earlier requires the payment of a special assessment

16   of $100.  That is due immediately and is payable in the Office

17   of the Clerk of Court in room 362 of this building.

18           There is one other thing that I believe is

19   appropriate, particularly in light of the arguments concerning

20   Mr. Olofson's character, and in light of the facts concerning

21   Mr. Olofson's conduct particularly on Halloween.  The Court is

22   going to require that the defendant engage in at least 30 hours

23   of community service during each year of his supervision.  That

24   community service is -- does require that he get the approval of

25   his supervising probation officer as to the nature of the

1    service.  It is important that Mr. Olofson give back to the

2    community in a positive way.  If indeed he has engaged in the

3    various activities as outlined here today by family and counsel,

4    then this will be an opportunity for him to acquaint others with

5    the importance of compliance with our laws and the need to be a

6    good citizen.

7           Now, Mr. Olofson, you do have a right to appeal not

8    only your conviction but also your sentence in this case.  There

9    are three ways in which you may do so.

10          First, you may ask the clerk of court to file a notice

11   of appeal for you, provided you make the request on the record

12   before you leave the courtroom here this afternoon.

13          Alternatively, your counsel can file a notice of

14   appeal or you without your counsel's help may file the notice of

15   appeal.  Regardless of how the appeal is initiated, your trial

16   counsel is obliged to represent you in the court of appeals

17   unless or until he is relieved of that responsibility by the

18   Seventh Circuit Court of Appeals which sits in Chicago.

19          If you would like to appeal and feel you do not have

20   the wherewithal to pay the necessary filing fee, you may seek to

21   appeal in forma pauperis, that is, without a payment of fees.

22   Would you like the clerk to file the notice for you?

23          MR. FAHL:  Mr. Olofson would request that the clerk

24   file the notice of appeal on his behalf.

25          THE COURT:  That will be done.

66

1      What is the government's position with respect to

2 reporting?  I note the defense has filed a motion seeking a stay

3 pending appeal.  Obviously an appeal has been requested, and so

4 the request of the defense is now the subject for consideration.

05:01   5      Mr. Haanstad?

6      MR. HAANSTAD:  Your Honor, I'm not sure if the court

7 received the government's filing in connection with that motion.

8      THE COURT:  I received your filing but I want to hear

9 what you have to say in light of what has transpired on the

05:01  10 record.

11      MR. HAANSTAD:  I would just ask that whatever the

12 reporting date typically is, if it's two weeks out that it be

13 left at two weeks.  I don't think there's any basis for staying

14 the execution of his sentence pending appeal.

05:02  15      As I noted in our response to defendant's motion in

16 that regard, he's not established a substantial question of law

17 which is likely to result either in reversal or a new trial.  He

18 identifies I believe three issues but doesn't really explain how

19 any of those are likely to result in either reversal or a new

05:02  20 trial.

21      I think that given the state of the law with respect

22 to those three issues, that is, given the already resolved

23 question of the constitutionality, the Section 922(o), given the

24 nearly insurmountable task that defendants typically face when

05:02  25 challenging the sufficiency of the evidence, and given the fact

1    that this court instructed the jury consistent with the Supreme

2    Court decision in United States vs. Staples, there's no basis

3    for believing that there's a substantial question of law that's

4    presented here such that the defendant should be granted bond

05:03    5    pending appeal.

6            THE COURT:  Is there anything you'd like to add,

7    Mr. Fahl?

8            MR. FAHL:  Just as I indicated earlier.  I think that

9    this -- the holding that originates out of this court's decision

05:03    10    has created a sort of sea change for the way people can consider

11    that ATF is going to treat AR-15 style rifles.

12            As such, including their relationship with Staples to

13    these guns, the particular rulings 81-4 and what is actually

14    required for something to become a machine gun.  Because the

05:03    15    ruling here is considered a departure from what has been the

16    policy of the ATF in the past, that is going to be subject to

17    the appeal, part of the appeal, and so a ruling on there one way

18    or the other poses a substantial question.  If the defense's

19    argument is correct that this could not be a machine gun,

05:04    20    obviously that would require coming back for an acquittal.

21            And we believe that, again, the law isn't that we have

22    to show that you are going to succeed, but just that there is a

23    substantial question.  I think that is a substantial question,

24    and especially in light of the Supreme Court's consideration of

05:04    25    Heller which is going to re-examine the teeth as it were of the

1    second amendment in relation to the DC gun ban.

2           So, I believe there is a substantial question and so I

3    think that prong is met.

4           THE COURT:  I respectfully disagree with the arguments

05:04 5    that you have advanced in support of a stay pending appeal.  I

6    would agree with what the government has asserted.

7           Further, it is not the intention of the court to

8    direct that the defendant be remanded to the custody of the

9    United States Marshal at this time.  I'm certainly mindful of

05:05 10   Mr. Olofson's conduct during the pendency of this case.  He has

11   towed the line.  He has been respectful to the Pretrial Services

12   people inasmuch as I have not received any negative reports, and

13   he's certainly been here in a timely fashion for various

14   proceedings and has handled himself appropriately.  And so the

05:05 15   Court will allow Mr. Olofson to self-report.

16          I do note several things in giving Mr. Olofson this

17   opportunity:

18          One, if you have the opportunity to self-report,

19   Mr. Olofson, that means you must pay for transport to whatever

05:05 20   site is designated by the Bureau of Prisons.

21          Two, when you are allowed to self-report, failure to

22   proceed as directed will cause you to be an escapee and you may

23   well be prosecuted again for bail jumping.

24          Lastly, by giving you this opportunity to self-report

05:06 25   on average it's taking more than 30 days to get a designated

1   institution as opposed to several weeks as suggested by the

2   government.  This will give you an opportunity, if you wish to

3   avail yourself of that opportunity, to seek a stay from the

4   Seventh Circuit Court of Appeals which may very well disagree

5   with this court.  But I believe that on the basis of this record

6   there is no basis for this court to grant your request for a

7   stay pending appeal.

8           Is there anything else from the defense?

9           MR. FAHL:  Your Honor, we would request a placement

10  from the Bureau of Prisons, a facility that's as close to the

11  Eastern District of Wisconsin as possible.

12          THE COURT:  I will recommend such a facility.  Is

13  there anything else from the government?

14          MR. HAANSTAD:  No, Your Honor, thank you.

15          THE COURT:  Is there anything else from Probation?

16          PROBATION OFFICER:  No, Your Honor, thank you.

17          THE COURT:  Very well, that concludes today's

18  proceeding.

19          (Proceedings concluded at 5:07 p.m.)

20                  *    *    *

21

22

23

24

25

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF WISCONSIN

3

4           I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

5   Reporter for the United States District Court, Eastern District

6   of Wisconsin, do hereby certify that I reported the foregoing

7   proceedings, and that the same is true and correct in accordance

8   with my original machine shorthand notes taken at said time and

9   place.

10

11  Dated June 10, 2008, at Milwaukee, Wisconsin.

12

13  _____
    Official Court Reporter
14  United States District Court

15

16

17

18

19

20

21

22

23

24

25