US DIST COURT EAST DIST. WISC.
FILED

OCT 12 2010

10-C-0896

Sentencing 5/13/2008

AT_____O'CLOCK_____M
JON W. SANFILIPPO CLERK

1    MR. FAHL:  Your Honor, we don't have any information

2    as to whether that could be or not.  Mr Olofson couldn't know

3    how it would be there if it was there

4         THE COURT:  Was this material made available to the

5    defense as part of discovery in this case?

6         MR. HAANSTAD:  Yes, Your Honor.  The government had

7    either four or five hard drives imaged and had those available

8    for discovery at the offices of the ATF, and also had printed

9    off copies of different materials including the manual, the

10   AR-15 to M-16 conversion manual, including this document,

11   including several others that were in paper format at ATF and

12   available for copying and inspecting.

13        THE COURT   Mr. Fahl, do you wish to reply?

14        MR. FAHL   This is the first time in Mr.

15   Mr. Haanstad's sentencing memorandum is the first time that I

16   have seen the army documents

17        THE COURT:  So, but you're not challenging the fact

18   that the hard drive material was part of the discovery in this

19   case available for your review and consideration with respect to

20   this case.

21        MR  FAHL:  It's my understanding the hard drive

22   material was made available to us at ATF   I believe that's

23   true.

24        THE COURT   All right   Go ahead, Mr  Haanstad

25        MR. HAANSTAD:  Your Honor, there are also indications

57

B. Characteristics of the AR-15 Semiautomatic Sport Rifle

The AR-15 rifle is a civilian, semiautomatic version of the United States Military M-16 standard issue rifle. There are certain differences between the component parts of the fully automatic M-16 and its legal counterpart, the semiautomatic AR-15 rifle. Five parts used in the manufacture of these two rifles come in both "automatic" and "semiautomatic" versions: the bolt carrier, the selector switch, the trigger, the disconnector, and the hammer. Although an AR-15 can be assembled with the fully automatic versions of the bolt carrier, selector switch, trigger, disconnector, and hammer, the gun is still not capable of fully automatic fire without one additional part, the "sear" or "auto-sear." Thus, the exclusively semiautomatic versions of the bolt carrier, selector switch, trigger, disconnector and hammer are called "AR-15 parts," while the not exclusively fully automatic parts of the same nomenclature are sometimes referred to as "M-16 parts." The sear, or auto-sear, has no semiautomatic counterpart and therefore, in all cases, would be an M-16 part.

Despite this difference between "M-16" parts and "AR-15" parts, many of the "after-market" manufacturers of civilian, semiautomatic models of the M-16/AR-15 have made and sold large numbers of the AR-15's out of M-16 fully automatic parts, that is, with the fully automatic or "M-16" version of the bolt carrier, selector switch, trigger, disconnector, and hammer. (Tr. pp. 304-306, Aplt. App. #O, pp. 228-230). n2 The reason is that the market became flooded with surplus (actually military-rejected) fully automatic "M-16" parts, and it was less costly to construct civilian AR-15's from those "M-16" internal parts, rather than to construct the AR-15 from specially made and more expensive semiautomatic "AR-15" parts. (Tr. p. 112, Aplt. App. #Q, p. 302). The AR-15 which is the subject of this action contains these common internal M-16 parts. (Tr. p. 95, Aplt. App. #Q, p. 285). The government's expert, a ATF enforcement officer, Agent McLaughlin, conceded at trial that the AR-15 rifles containing internal "M-16" components are still legal semiautomatic AR-15 rifles provided they are not equipped with the sear or auto-sear. n3 (Tr. p. 109, Aplt. App. #Q, p. 299).

n2 "Aplt. App." refers to the Appellant's Appendix which is a two volume set filed in the Tenth Circuit Court of Appeals in United States v. Staples, Case No. 91-5033.

No. 92-1441

n3 It was undisputed that there was no auto-sear seized nor had this AR-15 been modified to accommodate an auto-sear. (Tr. pp. 191-193, Aplt. App. #Q, pp. 325-327).

No. 92-1441

n3 It was undisputed that there was no auto-sear seized nor had this AR-15 been modified to accommodate an auto-sear.

(Tr. pp. 191-193, Aplt. App. #Q, pp. 325-327).

Even though, upon seizure, the AR-15 at issue was
inoperable, absent critical parts and in a state of disrepair,
the government prosecuted Mr. Staples for possession of an
unregistered firearm. The fact of the matter is, and the ATF
enforcement officer again conceded, that the AR-15 was and is
not a registerable weapon pursuant to the National Firearms
Act. This AR-15 at issue was not registerable because it was
not equipped for an auto-sear, the essential registerable
component which in and of itself would convert the AR-15 to a
machinegun. The Registry did not and would not consider such
a weapon a machinegun for registration purposes. ATF
enforcement Officer McLaughlin testified:

Q. (By Mr. Brewster) Could Mr. Staples have registered the
AR-15 with the five M-16 parts in?

A. No, sir.

Q. So, the day before his house was searched, he couldn't
have even
registered the gun then?

A. No, sir.

Q. The gun wasn't registerable by him, was it?

A. No, sir.



WAYN

Home Account Club **Profile** Travel | Music Friends Videos Messages Share Profile ... Forums Photos Videos Blogs Search

My Profile Edit Profile **Add Content** | ... Featured Profiles | Who Has Viewed My Profile | Profiles I Have Viewed

Make the most of everyday activities. Get tips now

## Member Profile

### Robert Kiernicki

**Profile**

| | |
|---|---|
| Name | Robert Kiernicki |
| Sex | Male |
| Age | 30 |
| Nationality | American |
| Current Location | ... Wisconsin, United States ... |
| Website Address | |

| | |
|---|---|
| Eye Color | Blue |
| Build | Medium |
| Occupation | |
| Religion | |

**Personal Words**

**Recent Trips**

My favorite

| | |
|---|---|
| Type of music | |
| Song | |
| Band/Group | |
| Person | |
| Quote | |
| Place to party | |
| Place to relax | |
| Place to holiday | |
| Book | |
| Sport | |

My hobbies & interests

Adventure
Camping
Discussion Groups
Fishing/Hunting
Music & Concerts
Nightclubs
Playing Cards
Playing Sports
Restaurants/Eating out
Shopping
Traveling
Watching Sports

Buy job postings in bulk and save up to 70%

LEARN MORE

Make the most of everyday activities. Get tips now

# THE GLOVER TAPE:
## Caught In The Act of Innocence

John Glover's passion was firearms. He loved to build rifles from the kits he ordered and made his creations so precise he was known throughout the gun show circuits as a master craftsman. While his rifles did not bring top dollar (only because he did not want to take advantage of fellow gun enthusiasts), those who purchased John's rifles were promised the best, most accurate rifle for the money.

When the BATF knocked on his door in July, 2002, asking to see his guns, he had no problem letting them in and displaying all the firearms in the house. The agents explained to John that someone had reported that he was manufacturing illegal semi-automatic assault weapons in his garage shop, and they were just conducting a routine check to see if the story had any basis. After examining John's firearms, the BATF agents left quietly thanking John for his cooperation. They saw everything John had and seized nothing. John thought nothing of it because his guns were perfectly legal. "As far as we are concerned, this matter is closed," they said.

Three months later, the same BATF agents called John and asked if they could come to his house again to look at his guns. At the arranged time, the agents appeared with local law enforcement. John had all of his guns laid out for inspection. This visit, however, would be different. The agents explained that John's rifles used primarily imported parts and had more than three characteristics of illegal assault weapons. They proceeded to confiscate seven rifles for violations of 18 U.S.C. § 922(r).

Such was the beginning of a "series of unfortunate events," as the BATF might call it. John called it a nightmare.

Gun enthusiasts can build their own weapons from parts kits which can be purchased over the internet, at gun shows, and from publications such as the "Shotgun News." Depending on the weapon, the kits cost a couple hundred dollars, and the finished product depends on the workmanship of the builder. Once finished, the rifle must still comply with the various and specific requirements of the Firearm Owners Protection Act (FOPA), 18 U.S.C. § 921, *et seq.*.

The FOPA allows certain semi-automatic (one trigger pull, one shot) assault weapons to be built from parts kits that can be purchased from a variety of sources. Rather than buy an AK-47, many gun owners would rather build the rifle themselves using imported and domestic parts. Glover had built seven FN-FAL type rifles[1], a favorite of marksmen because of its accuracy. FAL's are similar in style to the American M-14 but considered more accurate because of its design. Since most FAL's are manufactured outside of the United States for military purposes, the foreign made FAL's contain a safety sear allowing the rifle to fire automatic. None of John's rifles contained a safety sear or had a provision allowing a safety sear to be installed.

When the BATF seized his rifles, John explained to them that the rifles were not finished and would comply with the FOPA when completed. In 30 minutes, John explained, he could make each of the rifles compliant. His pleas fell on deaf ears of agents intent on following the letter of the law. But, one rifle, now in the hands of the agents, held a secret not even John knew which would become the basis for trouble for John for the next year.

---

[1] "FN-FAL" is Fusil Automatique Leger or "Light Automatic Rifle" designed in Belgium by Fabrique National and copied by the military in many countries.

2

Since domestic manufacturers of parts (Enterprise Arms, Pacific Armament Corporation and Williams Arms, for example) are heavily regulated by the BATF, the Government did not want individual gun enthusiasts to buy foreign parts and construct, on their own, illegal semi-automatic assault weapons. Therefore, Congress made it illegal to assemble from *imported parts* any rifle identical to those listed in 18 U.S.C. § 921(a)(30)(A), which includes copies of FAL-type rifles.

A rifle having ten or more imported parts (listed in 178 C.F.R. § 178.39[2]) qualifies as an illegal assault weapon, punishable by five years imprisonment. This prohibition forces individuals to use primarily domestic parts which are heavily regulated by the Government.

Finally, even if a semi-automatic assault weapon contains less than ten imported parts, it may still be illegal if it has the ability to accept a detachable magazine and has at least two of:

        (i)     a folding or telescopic stock;
        (ii)    a pistol grip that protrudes conspicuously beneath the action of the weapon;
        (iii)   a bayonet mount;
        (iv)   a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and
        (v)    a grenade launcher.[3]

Since none of John's guns were illegal, he did not concern himself with anything except how to retrieve his rifles. He was served with the requisite forfeiture papers, which he filled out and sent to the BATF. Each rifle, as a finished product, would only

---

[2] The rifle must have "10 or less" foreign parts of the following: (1) Frames, receivers, receiver castings, forgings or stampings; (2) Barrels; (3) Barrel extensions; (4) Mounting blocks; (5) Muzzle attachments; (6) Bolts; (7) Bolt Carriers; (8) Operating guides; (9) Gas pistons; (10) Trigger housings; (11) Triggers; (12) Hammers; (13) Sears; (14) Disconnectors; (15) Buttstocks; (16) Pistol grips; (17) Forearms, handguards; (18) Magazine bodies; (19) Followers; and (20) Floorplates.
[3] 18 U.S.C. § 921(a)(30)(B).

3

bring about $400-$600 at a local gun show so he could not afford to pay an attorney to fight the confiscation. His job at a local gunsmith didn't pay well, and he supplemented his family's income building the FAL rifles from the kits he ordered.

In May, 2003, John received a surprising call from BATF agent J.J. Berger. He explained that John had been indicted by the Grand Jury for the Western District of North Carolina for six counts of possession of illegal assault weapons, one count of manufacturing a fully automatic machine gun, and one count of possession of a machine gun. The agent informed him that he would need to be in Federal Court in a few days with an attorney to answer the charges.

John was devastated. While the seized FAL rifles did not yet technically comply with the Act, the rifles were a work in progress and, by the time they were finished, would be compliant.[4] John was confused as to how one of his rifles could be considered a machine gun. He had not built any of the guns to fire full-auto. Many sleepless nights were to follow.

John Glover's indictment alleged six separate violations of 18 U.S.C. § 922(v), "Manufacture, transfer or possession of a semi-automatic assault weapon;" one count of violation of 18 U.S.C. § 922(o), "Manufacture, transfer, possession or sale of a machine gun;" and possession of an unregistered machine gun, a violation of 26 U.S.C. § 5861.[5] The maximum punishment for each count was five years imprisonment; ten years each for manufacture and possession of a machine gun.

---

[4] All Glover had to do to most of the rifles is unthread the barrel and/or remove the bayonet mount; either operation would take less than ten minutes per gun.

[5] Section 5845(b) of the NFA defines the term "machine gun" as "any weapon designed to shoot, or can be readily restored to shoot automatically more than one shot, without manual reloading by a single function of the trigger

4

John was confused and frightened by the charges. He had sought guidance from the BATF in December, 2002, when he began to build FAL rifles from parts kits. He received a letter from Curtis Bartlett, Chief, Firearms and Technology Branch of the BATF, informing him of the requirements of the above statutes. He made certain his rifles conformed to the BATF directive. There was no way one of the rifles was a machine gun, unless, he explained, the rifle had been tampered with.

When discovery arrived, the BATF report indicated that each rifle was examined not by a *technician* at the agency but by an *enforcement* officer, Michael J. Cooney. The report recited that each of the FAL rifles possessed features that put them within the prohibitions in 922(v), but the rifles were not yet completed and the BATF knew that. John's explanation was left out of the report. The report further stated that rifle #4, upon examination, "metal had been removed from the front section of the hammer/trigger axis locking plate found within the trigger group housing. This modification permits additional forward travel of the hammer which then pushes the firing pin forward. When the selector was rotated to the 'auto' selector position, Exhibit 4 shoots automatically more than one shot, without manual reloading, by a single function of the trigger."

"No way," John replied. "Impossible." But we wondered why an enforcement officer in Washington, DC, would fabricate an official BATF report.[6]

Rifle #4 was John's prize rifle. He had built it several years ago and used it in sharpshooter competitions where he had won many awards. It was the oldest of the seized rifles, but by far, the best constructed. Common sense would say there was no

---

[6] The BATF report stated that Agent Berger and Cheramie had "field tested" each of the 11 rifles Glover showed them on July 9, 2002. According to the BATF agents, two of the rifles had "field-tested" positively as being fully automatic. On the October 15, 2002 visit, six of the seven FAL rifles seized "field tested as possibly being fully automatic." How a rifle "dry fires" fully automatic is beyond the expertise of this author, and most firearms experts.

5

possibility that the sharpshooter competitions would allow a fully automatic machine gun at their venue. We, therefore, had to prove the report and the BATF were wrong. So much for the presumption of innocence.

We were put in contact with Mr. Len Savage of Historic Arms, L.L.C., in Franklin, Georgia, who designs and builds rifles for a living. He has designed and created many sought-after firearms and has daily conversations with the BATF. He knows the names of all BATF technicians, having dealt with each at some time. He was immediately suspicious as to why an enforcement officer was examining John's rifles. He explained a technician would be the best person to determine whether a firearm was a machine gun, and, more importantly, why.

When Savage read the BATF report, his conclusion was the same as John's, "No way." He explained that the trigger axis locking plate had as much to do with the ability of the rifle to fire automatic as does the sight at the end of the barrel. The locking plate serves only to keep the firing pin from springing out during cleaning. He poured over Agent Cooney's report and concluded that the Agent's conclusions were impossible. "We have to examine and fire that rifle," Savage insisted.

Reports of scientific tests are discoverable under Rule 16 of the Federal Rules of Criminal Procedure. It is also well-settled that the prosecution must allow the defense access to all scientific tests or experiments so as to allow its experts the opportunity to test, and, if possible, duplicate the Government's experts' findings. How the testing is to be conducted is up to the Government, in its fairness, to determine.

At first, the AUSA was reluctant to allow Glover to be at the testing range since he was an indicted felon. I explained to the AUSA that Glover was the only one in the

6

world who could verify that the rifles being examined were, in fact, his. My concern was that the BATF would bring to the test rifles that were not Glover's and/or were tampered with. By this time, our trust factor with the BATF was eroding, and, while I did not share my concerns with the AUSA, he saw the advantage of allowing Glover as a witness to the tests. Glover could not participate but would be the cameraman for the taping of the tests.

Len Savage was confused, if not frustrated, by Cooney's report. Maybe it did fire three rounds, but the reason was not the "axis locking plate." The obvious risk of having Cooney fire rifle #4 again on videotape would be that the rifle may, indeed, fire automatic and, therefore, verify Cooney's findings. Where would our defense be then? The risk was huge, but Savage insisted that if rifle #4 fired automatic, it was not by design, and he was determined to find out why.

There are surprisingly few cases on what qualifies as a machine gun. The statutory definition is simple enough, but where does *mens rea* come in? The best case defining the Government's burden in this regard is *Staples vs. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994).

In *Staples*, the defendant was prosecuted for possession of an unregistered machine gun (26 U.S.C. § 5845(b). At trial, Staples testified that the rifle had never fired automatically when he possessed it, and that he was ignorant of any automatic firing capability. The defendant requested the Court to charge the jury that the Government must prove beyond a reasonable doubt that the defendant "knew that the gun would fire automatically." The District Court rejected Staples' proposed instruction, and instead charged the jury as follows: "The government need not prove the defendant knows he's

Y

7

dealing with a weapon possessing every last characteristic [which subjects it] to the regulation. It would be enough to prove he knows that he is dealing with a dangerous device of a type as would alert one to the likelihood of regulation."

The Supreme Court held that Congress did not intend to eliminate a *mens rea* requirement for violation of that statute. "Thus, to obtain a conviction, the government should have been required to produce evidence that petitioner knew of the features of his AR-15 that brought it within the scope of the act." 511 U.S. 600, 610 S.Ct. 1793. The conviction was reversed.

The Court further stated that the user/defendant must know of the capability of the weapon to fire automatically or the intent element cannot be proven. Thus, if an individual inherits a rifle from a relative and does not know it has been altered to fire automatic, he cannot be found guilty of possession of a machine gun.

In *United States vs. Hitt*, 981 F.2d 422 (9th Cir. 1992), the defense argued the rifle in question was modified to fire automatic by the previous owner, which was the reason that the rifle was malfunctioning. The Appellate Court reversed the conviction on an evidentiary ruling in which the trial court admitted a photograph of the defendant's multiple-firearms which tended to unduly prejudice the defendant. The jury, apparently, did not believe defendant's experts who could not replicate the automatic firing of the rifle.

Was rifle #4 designed to fire as a machine gun? John Glover said no; the BATF said yes. We would soon find out.

Arrangements were made at the Law Enforcement Range to examine the rifles seized from Glover and fire rifle #4. We met early that morning with Savage and Russell

8

Weeks, another expert who sells firearms commercially. Savage showed me a detailed drawing of the FAL and its working parts and explained in detail each part of Cooney's report and why it was wrong. John would run one videotape recorder and my associate, David Strickland, would have another camcorder as backup.

After John verified, on tape, that the guns Cooney brought were his, Cooney put one round in rifle #4 and pulled the trigger. One bang. He then put three shells in the clip and moved the selector switch to "auto" and pulled the trigger. We held our breath.

Bang!

Only one shot had fired. Agent Cooney said, "Light primer hit caused the weapon to fire one time."

He again loaded three shells into the magazine of #4. Once again only one shot rang out. Again and again, Cooney tried to duplicate his testing of the "machine gun," but #4 would only fire one round. He even tried several different types of ammunition, to no avail.[7]

Savage retrieved and examined each unspent and spent casing after each attempt. He realized that rifle #4 was malfunctioning and warned Cooney (on videotape) that the gun was firing "out of battery" and was dangerous. Such a defect could allow #4 to explode. We were asked to back up. Despite the warnings and obvious danger, Cooney proceeded, sweating in the hot, May, Carolina sun.

Then, on the last attempt, #4 fired three shots with one trigger pull. Everyone there was aghast (except Cooney who had managed, finally, to duplicate his findings.)

[7] Ammunition manufactured by Remington, Winchester, Portuguese Military and Chile Military were used in the testing.

9

Savage wondered what makes a rifle fire single shots then multiple shots without warning.

Glover, the BATF agents, the defense experts, and attorneys went into the facility to further examine #4 as well as the other FAL's John had built. Savage could scarcely hold his enthusiasm and curiosity. He disassembled #4 in about 20 seconds. Agent Cooney then admitted, on videotape, *he had not taken the gun apart.* He further admitted he did not know how to disassemble the FAL. Once it fired automatic, he examined the receiver for anything unusual and noticed a chip taken out of the axis locking plate. The chip, Cooney concluded, was the cause of the multiple round firings. Savage pointed out this condition is usually a result of "dry firing" and is not a modification but a by-product of extreme use.

Len Savage then held up the firing pin spring, dirty and brittle from age and use. The spring that pushes the firing pin back into place after a round had discharged was worn out, causing the firing pin to "float" and not recede to its original safe position. Parts of the spring were coming off in shavings in Savage's hand. In two minutes, he had solved the mystery of why #4 behaved so erratically. A $0.30 part had caused Glover to be indicted by a Federal Grand Jury. It was no wonder the official BATF report was wrong – Cooney had not bothered to disassemble the weapon to see why it had behaved like a machine gun. Had Agent Cooney taken a few minutes to disassemble the rifle (which, ironically, he could not do), he could have seen the problem which was obviously not by design and which caused the multiple round firings.[8]

___

[8] Savage also pointed out that #4 had no safety sear/machine gun gear which is a necessary part in a fully automatic machine gun. The absence of this sear should have been obvious to anyone familiar with automatic firearms.

10

We copied the videotape for the AUSA, who posited, "He got the rifle to fire more than one round with a single pull of the trigger," which, technically, makes #4 a machine gun. We also provided him with a detailed report by Savage as to the real cause behind the automatic firings. However, we still had the problem that there were six more rifles that fit the definition of illegal assault weapons.

There are no cases found which define, or even relate to, the definition of "design," in that the Government must prove that the rifle was "designed" to fire more than one round with a single pull of the trigger. Relying on the "intent" issue in *Staples* only would allow us a decent jury argument. We were afraid that, as much as John knew about guns, the jury might find he knew or should have known that the rifle had the capabilities of a machine gun. Obviously, the BATF would stand by their report that the rifle fired more than once with a single pull of the trigger, and, since it did so on two different occasions, Glover should have known #4 was a machine gun. The Government could withstand a Motion to Dismiss, and, thus, leave Glover's innocence to be proven by Savage and others.

We decided that we would take the fight to the Government first. The videotape evidence was compelling and clearly showed Agent Cooney's frustrated attempts at proving #4 was a machine gun, as he had written in his report. We decided to file Motions which would get us into court and allow a Federal Judge the opportunity to observe for himself the quality (or lack thereof) of the Government's evidence. We were determined to show the Court video, and then maybe the Judge would conclude as a matter of law that the rifle did not fit the "intent" requirement of *Staples*, nor was the gun "designed" to fire automatic because it was simply a *malfunction*. The legal inquiry had

11

no precedent – could a malfunctioning rifle be considered a machine gun within the definition of 26 U.S.C. § 5845(b) of the NFA? If the Court could see that the weapon was merely malfunctioning, then perhaps he could "encourage" the prosecution to not proceed.

We filed a Motion to Dismiss and attached as evidence Cooney's report and the videotape, also starring Agent Cooney.

All experienced trial lawyers, particularly in criminal defense know the value of the right timing. Even if the Court dismissed the machine gun charges, Glover still had six other rifles for which he could be prosecuted and the videotape would be irrelevant.

The Motions to Dismiss were filed on August 13, 2004. On September 13, 2004, the Assault Weapons Act was not renewed by Congress and therefore "sunsetted."[9] That event meant that the other six rifles confiscated by the BATF from Glover were now perfectly legal. The six rifles could still be viewed by a jury as illegal when seized but, since the law that made them illegal in the first place was no longer in effect, we had a valid argument for the Court and jury.

On October 11, 2004, I received the call all defense attorneys cherish. All charges against John Glover would be dismissed with prejudice.

It is the author's opinion that the BATF did not want a Federal Judge to see, first hand, the sloppiness of their investigation of Glover. Because Agent Cooney could not or would not disassemble rifle #4, a man with no prior criminal record was called to answer for crimes he did not commit.

---

[9] Sections 922, 923, and 924 of the FOPA were enacted on September 13, 1994, for a ten year period. Since Congress would not touch the issue, the repeal went into effect September 13, 2004.

12

I was later advised by the AUSA that the Glover tape, as it is now called, has made its way to various websites. The "Jews for the Preservation of Firearms" website is selling the videotape for $17.76. Other websites such as "Gun Owners of America" have linked the JPFO site for easy reference. There is a bill to be submitted by Congress sponsored by the National Rifle Association that *requires* the BATF to videotape *all* firearm tests if the testing is the subject of a criminal investigation. Glover is considering a lawsuit against the BATF under the Tort Claims Act.

The Glover case stands, if anything, for the need of defense counsel to take the fight to the Government and not to rely on any supposedly "scientific" test that implicates a defendant. Many times the science is only as good as the scientist, and it is incumbent on defense attorneys to challenge, at every opportunity, the Government's scientists, experts, and methods. We must be aggressive in our endeavor as "justice is truth in action," (Benjamin Disraeli, 1851).

H.M. Whitesides, Jr., is a Board Certified Specialist in Federal and State Criminal Defense and the Senior Partner in Whitesides & Walker, L.L.P., in Charlotte, N.C.. His last article "Motions Practice and Trial of a Clean Water Act Case" was published in the Champion in July 1995.

13

UNITED STATES DISTRICT COURT FOR THE EASTREN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

Vs.                                    CASE NUMBER#06-CR-320

DAVID ROLAND OLOFSON

---

## AFFIDAVIT OF PERSONAL KNOWLEDGE OF FACTS

I, Candice Marie Olofson, deposes and states as follows:

On July 19th 2006 my house was raided by the ATF and local law enforcement. I was at work at the time and contacted by someone from the ATF and asked if it was alright if my kids were released from police custody to go home Everett. I remember trying to get information from the person about what was going on and if the kids were ok. She refused to tell me anything. I then left work promptly in a panic for the kids' safety.

When I reached home. I was not allowed near the house. There were many people taking an assortment of items things from the house The Berlin Police said that the kids were ok and with Everett. The neighbors were all outside watching what was going on at my house. The police refused to say what was going on and would not let me go into the house.

I picked up the kids at Everett's house in the country and drove the kids back home. We went to a neighbor's house to wait for them to leave. It was quite a while before I saw David come home in a vehicle with 2 other women They pulled up to the house on the far side of the road and all got out. The Blond haired women standing next to David put her arm on his shoulder when he tried to cross the street. They stood there for quite some time before they entered the house The police then came over to the neighbors to let me know we could go home

On November 21, 2006 I arrived home with the kids and I noticed Ms. Keeku and another man with her parked next to our driveway As I approached the house, they were already out of their vehicle and coming towards the house. I took the kids in and was by the door when Ms. Keeku forced her way into the back porch, uninvited and stated, "we know David has more guns in the house. You had better turn them over or we will be taking David into custody again." At no time did I invite her into the house but asked her to leave. She and the other man just kept pushing forward into the house until they were standing next to the kitchen nook. I told them that there were no other guns in the house They said that "they would again take David back in and that I had better turn everything over to them or else." I stated that I only knew of some parts of some guns upstairs and Ms. Keeku said, "You'd better give them over to us or we will need to take you in also." I was afraid for the kids and feeling very threatened by the forceful entry into my house and the repeated threats of arrest, so I went upstairs and retrieved the only parts I knew of. I came back downstairs and placed them on the nook next to Ms. Keeku, but she said, "That can't be all." I said that was it and the only other thing in the house was an old musket that they didn't take during the original search. She told me to go and get it, which I did, but she said that she wasn't going to take it when I showed it to her

Ms Keeku kept insisting that there were more firearms in the house, but I again told her that there weren't. I also repeated my request that both of them leave. I told them as they were leaving that what they did to the kids during the original search was disgraceful. They knew that the kids were downstairs by themselves (because we found out that she was staking out the house for a little while prior to the raid) and when they broke into the house, they pointed very large machine guns at A█████ (age 6) and I█████ (age 2). Ms. Keeku said "that they were the ATF and could do whatever they think is necessary! I reminded her that these are very little kids with no weapons and

how dare she put them in harm's way without any regard for their lives. Was this the same way she treated all children, with complete disregard for them?" I also reminded her that this constant harassment and stalking of our house was not good for me because it was causing complications during my pregnancy. Ms Keeku said as they were leaving. "Your husband is the one causing all the problems."

*(signature)*

Subscribed and sworn to before me

This 10 day of July, 2008

*(signature)*

Notary Public. State of Wisconsin
My commission expires on: 8-30-09

UNITED STATES DISTRICT COURT     EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA.
Plaintiff,

v.                                                          Case No. 06-CR-320

DAVID R. OLOFSON,
Defendant.

---

### AFFIDAVIT OF PERSONAL KNOWLEDGE OF FACTS

---

Michael Robert; Berg, being first duly sworn on oath deposes and states as follows:

1. That I am an associate and friend of David Roland; Olofson, and have known him for several years.
2. That prior to December 2006 I had many opportunities to engage in range practice with David Roland; Olofson.
3. That on many of these occasions we would fire each other's firearms to gain familiarity with various types of firearms.
4. That David Roland; Olofson is known to me to have owned a "pre-ban Olympic AR-15" that is known to be approximately twenty years old or more.
5. That I have personally fired and cleaned said firearm upon several occasions, as well as having observed others doing the same.
6. That specifically on the date of 17 APR. 2005 I witnessed David Roland; Olofson Qualify with said firearm at the Berlin firing range. During this time David Roland; Olofson made 40 hits in 40 rounds, and I was one of 2 men who signed off on his Qualification target.
7. That at no time in my experience did said firearm ever function in any way contrary to it's originally designed intent, that being semi-automatically (one cartridge fired per pull of the trigger).
8. That David Roland; Olofson is not known to me to own, nor has he ever claimed to have owned any Class III firearms, registered or otherwise.
9. That he has never claimed to be a "dealer" of firearms, of any variety.
10. That he has never offered to "convert" any firearm from a semi automatic to a full automatic.
11. That he has never claimed to have the skills, tools, or related blueprints to make such a conversion.

So Sworn Before God

Subscribed and sworn to before me

This 19 day of May , 2008

ANITA L. ELKINS
Notary Public, State of New York
Qualified in Clinton County
My Commission Expires 8. 22 2010

Notary Public, State of New York
My commission expires on: 8. 22. 2010

UNITED STATES DISTRICT COURT FOR THE EASTREN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

Vs.                                    Case No. 06-CR-320

DAVID ROLAND OLOFSON

### AFFIDAVIT OF PERSONAL KNOWLEDGE OF FACTS

I, Patricia A. Olofson, am the mother of David R. Olofson.

In October 2006, while visiting my son at his residence, he stated that he had found a part on the floor of his garage, which he showed me and my husband. I didn't know what it was and he explained that it was an auto sear for an M16. My son said that he was surprised to find this and that someone had to have put it there. I asked him if he had ever had these parts ever at his house. He said that he did not. For fear of being caught with this part he gave the part to my husband, which he got rid of.

During the week of November 20, 2006 my husband informed me that he had received a call from SA Keeku regarding our son. He informed me of the conversation. My husband indicated that SA Keeku would be stopping by to discuss our son's situation with us and not to be alarmed when they show up knocking at the door. She never stopped by. While cleaning I discovered a small zip lock baggy in our sun room. I thought it was some small engine parts since my husband is always fixing engines etc. I really didn't think anything of it until I mentioned it to my husband about the parts I found. I gave him the small bag and he told me they were parts to a gun. I asked my husband if these were the same type of parts David had found in his garage. He indicated they were the same. I felt this was not coincidental that my son found one and now we had found one, as to my knowledge no one has ever had parts for an automatic in my house. At that time we both realized that someone had to have broken into our home for it to be here. I gave the bag with the parts to my husband and he disposed of them.

I have never heard my son ever claim to be a gun dealer or claim to convert guns into machine guns let alone own a machine gun. I have never witnessed my son claim that the gun in question malfunctioned in any way to produce multiple shots with one pull of the trigger.

Patricia H. Olofson

Patricia H. Olofson

Subscribed and sworn to before me

This 17th day of May, 2008

Notary Public, State of Wisconsin
My commission expires on: Oct 31, 2015

UNITED STATES OF AMERICA

Vs.                                          CASE NUMBER#06-CR-320

DAVID ROLAND OLOFSON

---

## AFFIDAVIT OF PERSONAL KNOWLEDGE OF FACTS

---

Martin John Horkan, deposes and states as follows:

1.    That on April 17th 2005 and numerous other occasions I have witnessed Mr. Olofson firing the weapon in question, Olympic Arms/SGW serial number F7079. On that particular date I did sign off on a reduced range qualification target after watching Mr. Olofson fire 40 out of 40.

2.    That at no time did this rifle function as a machine gun, or fired more than one round with each pull of the trigger.

3.    That on April 17th 2005 and other occasions I have personally fired the rifle in question and at no time did it function as a machine gun.

4.    That over the 5 years I have known Mr. Olofson I have never seen him possess a machine gun or anything illegal.

5.    That to my knowledge Mr. Olofson has never transferred or sold any machine guns.

6.    That at no time Mr. Olofson has suggested he possessed machine guns or anything illegal.

7.    That Mr. Olofson has never claimed to be a gun dealer.

8.    That he has never at any time told me this gun would malfunction to fire more than one round.

9.    That I have never heard him say, nor have I had the safety on this weapon move to a position other than safe or fire.

10.  That at no time did he ever comment that he had the ability to make any weapons fully automatic.

11.  That I met with Mr. Olofsons father at a gun show in Fond Du Lac and was given gun parts that he said were found in their home by his wife to verify their existence, remove from his fathers possession, and dispose of being fearful of the implications of having such parts.

Martin Horkan

Subscribed and sworn to before me

This 16 day of May, 2008

Suso Smith

**Notary Public, State of Wisconsin**
My commission expires on:

UNITED STATES DISTRICT COURT FOR THE EASTREN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

Vs.                              Case No. 06-CR-320

DAVID ROLAND OLOFSON

AFFIDAVIT OF PERSONAL KNOWLEDGE OF FACTS

I, Kelly Harris have known Dave Olofson since early 2002. I have witnessed Mr. Olofson fire the gun in question on many occasions over several years. This was usually done in the presence of multiple witnesses. I, as well as my oldest son, have fired the gun in question on numerous occasions over several years.

I was present at the Berlin Conservation Club on April 17, 2005 when Mr. Olofson engaged in target shooting with the gun in question. Also present were my family, friends, acquaintances and members of the Berlin club. My oldest son, James, used my laser rangefinder to place the target at the proper distance. Mr. Olofson fired forty single shots, striking the target forty times. He had just replaced the old, worn out barrel with a new one and was very pleased with the accuracy of the new barrel.

I borrowed the gun for several weeks in the fall of 2005, firing it many times. At no time that I used the gun in question did the selector switch ever move into an "unmarked third position" other than "safe" or "fire". At no time that I used the gun or witnessed others use the gun, did it ever fire more than one round with one pull of the trigger.

I have never witnessed Mr. Olofson claim to be a gun dealer, convert or claim to be able to convert guns into machine guns. I have never witnessed Mr. Olofson possess or claim to own a machine gun. I have never witnessed Mr. Olofson fire or claim to fire the gun in question as a machine gun. I have never witnessed Mr. Olofson claim to fire machine guns at the Berlin range. I have never witnessed Mr. Olofson claim that the gun in question had a selector switch that would move into a third position, or malfunction in any way to produce multiple shots with one pull of the trigger. The only time I have seen the gun in question malfunction, giving the appearance of being a machine gun, is on a video edited and produced by the BATF.

I was present during the trial of Mr. Olofson as well as a pre-trial motions hearing. I recall the government denying Mr. Olofson access to evidence, claiming it was privileged as it contained tax information.

Subscribed and sworn to before me

This _5_ day of _May_, 2008

Melanie S. Guz
Notary Public, State of Wisconsin
My commission expires on: _9/13/09_

UNITED STATES OF AMERICA

Vs.                                    Case No. 06-CR-320

DAVID ROLAND OLOFSON

## AFFIDAVIT OF PERSONAL KNOWLEDGE OF FACTS

I, David L. Olofson, am the father of David R. Olofson. I have witnessed David R. Olofson fire the rifle in question on many occasions over the entire time he has owned this rifle. This occurred from the time he was honorably discharged from the Army up to the time the rifle was confiscated. During this time I also fired this rifle and at no time did it fire multiple rounds or malfunction. At no time while I fired this rifle did the selector ever move to an unmarked third position. The use of this rifle for me was just for the pleasure of target shooting and usually in the presence of multiple witnesses. I and my son have enjoyed that pleasure since he was eight years old. I have always stressed, and practiced with him, hunter and gun safety, checking and following the laws regarding such. I have continually stressed that he must always be within the law and when he is questioned, always adhere to our Constitution and to the court system to reconcile any questions, if necessary. This he has done that to this day. He has never intentionally broken any laws of the state or this country. On the contrary he has continued to serve his country in the Army Reserve to the point of requesting to be deployed to Afghanistan in his last reenlistment, which some members of our family did not necessarily agree with, including me.

Approximately the first week in October 2006, while visiting my son and Candice at their residence, my son stated that he had found some parts on the floor of his garage after the ATF ransacked it, one of which he showed me. I did not know what it was and he explained that it was an auto sear for an M16. My son said that he was surprised to find this, and that someone must have dropped it. The implications were obvious. I asked him if he had ever had parts of that sort or a full auto weapons ever at his house, to which he answered no. If he did, this was not acceptable with us. He gave the part to me, which I promptly disposed of.

During the week of November 20, 2006 I received a call from SA Keeku regarding my son. She reviewed the charges against him, weapons in my house, and conversations she had with Candice Olofson my son's wife. SA Keeku said that Candice agreed that my son had broken the law and that my son would be staying at our house. That is absolutely false, as I personally verified it with Candice and in addition I never indicated my son would be staying at my residence, as he has his own. This directly contradicts what SA Keeku has reported. SA Keeku also indicated that they would be stopping by to discuss the situation with me and my wife Patricia. She never stopped by and/or left me any other messages, EXCEPT my wife's discovery of some M16 parts in a zip lock bag, to include an auto sear in our sun room, shortly after her call. Coincidental that my son found one and now we had found one, I think not, as no one has ever had an automatic weapon or parts for an automatic weapon in my house. In addition someone had to break into my residence to drop these parts. Not a simple task as I have a state of the art security system. I promptly disposed of them thru a 3rd party in front of other witnesses.

I have never heard my son claim to be a gun dealer, convert, or claim to be able to convert guns into machine guns. I am an engineer in the manufacturing industry for 30 years, and my son does not have the machining knowledge or the tools to convert the rifle in question 24 have never witnessed my son possess or

claim to own a machine gun. I have never witnessed my son fire or claim to fire the rifle in question as a machine gun. I have never witnessed my son claim to fire machine guns at the Berlin range. I have never witnessed my son claim that the rifle in question had a selector switch that would move into a third position, or malfunction in any way to produce multiple shots, as shown by the BATF video, with one pul of the trigger. The only time I have seen the gun in question malfunction, giving the appearance of being a machine gun, is on a video edited and produced by the BATF. I do know that the rifle in question has had parts replaced with factory parts, per my son, as he indicated he had encountered a jamming condition and that the manufacturer had recommended their replacement. This replacement happened well over a decade ago.

David L Olofson

Subscribed and sworn to before me

This 15 day of May, 2008

Notary Public, State of Wisconsin
My commission expires on: July 06, 2008.

Michael Robert; Berg
General Delivery
Plattsburgh NY 12901
5-6-08

The Honorable C. N. Clevert
U.S. District Judge
517 East Wisconsin Avenue
Milwaukee, WI 53202

Subject: Specialist David Olofson

Dear Judge Clevert;

Greetings, sir. I am writing to you today concerning an issue of great importance to me. That being the pending imprisonment of David Roland; Olofson. It is my understanding that Mr. Olofson has been convicted of "transferring a Machine Gun" in a court case where he was effectively prevented from placing any defense.

I find it disturbing that this charge of "Transferring a Machine Gun" can be placed without the prerequisite charge of "possession", as one must be guilty of the latter in order to perform the former.

I have Known Mr. Olofson for several years now, and find him to be an upstanding Citizen and an honest man. He goes out of his way to stay within the limits of the law, such as they are. Though he may be eccentric in his tastes at times, he is quite honest in all his dealings.

He gives of himself to better those around him. In my own case, he has helped me to develop an understanding of the legal system and that of Law in general. He was also invaluable to me as counsel in a case where I was wrongfully accused of a crime I did not commit.

From my understanding this whole case revolves around a single incident where a single firearm malfunctioned while not even within Mr. Olofsons sphere of influence. If this is a crime by definition, then you may as well order the arrest of 85% of the gun owners in the country. I myself had an AR-15 malfunction in exactly the same way. This is neither safe, nor fun. A replacement set of fire control parts (trigger, hammer, and disconnect) and the problem was solved. If this case should stand than I must be a felon.

Quite frankly sir; this case is a travesty of justice, and allowing Mr. Olofson to go

to prison for this would be paramount to spanking a newborn baby for soiling itself. From my observations of this case, and I am watching with Great interest, the message from the ATF is clear. "We are after your guns, and we don't care what it takes."

This sends a message to the people that the government and legal system as it stands is now broken, and that no justice can be found in either entity. That indeed, "Justice shall not prevail". I sincerely hope that this is not allowed to happen.

Yours with great concern

Michael Robert; Berg

Charles Poirier 605 Wolcott
St. Sparta WI. 54656

May 4th 2008

The Honorable C.N. Cleverts
U.S. District Judge
517 East Wisconsin Avenue Milwaukee
WI 53202

Dear Judge Cleverts:

Subject: Sentencing of SPC. David Olofson

My name is Charles Poirier. I met David Olofson about 14 months ago when I returned to the states. I had been stationed over sea for over 4 years and was retired after an injury. This time of my life was very stressful and trying for my family and myself.

During this time I was trying to cope with loosing the use of my right arm and hand. These trials were not made easy with having to move back to the states after being away for so long. Mr. Olofson helped me get though with my issue with my injury and the time I spent in Iraq. David also assisted my family with our relocation in many different ways. While Mr. Olofson was taking time out of his life to help someone he had just met, he was going through his own issues.

I do feel incarceration of Mr. Olofson would be an injustice. Mr. Olofson has showed the values of a true American by his action of selfless service. I can tell you that I would not have been able to face my trials with success with the help of David Olofson. I can only speak of my dealings with Mr. Olofson. I do know the imprisonment of this man will leave other fellow Americans at a loss.

Sincerely,

SPC. Charles Poirier

Martin Horkan
940 Council St.
Baraboo Wis. 53913
5/6/08

The Honorable C.N. Clevert
U.S. District Judge
517 East Wisconsin Ave.
Milwaukee, WI 53202

Subject: Sentencing of Specialist David Olofson

Dear Judge Clevert,

 Mr. Olofson has served his country for numerous years.
He is an asset to the community and our country.
I urge you to reconsider any penalties in sentencing
and ask for leniency in this case.

 I believe a great injustice has occurred as well as
many other concerned Americans. Numerous large news agencies
and publications have done reports on this case. Most people
cannot understand how this could happen, especially to a
veteran who is sworn to protect our country.

 In the five years I have known Dave he has been a good
friend and help to me and many others. I do not believe
for one second that he would violate the law or commit the
crime he is accused of. I know him to be an honest and
trustworthy man, I trust his word and I would trust him
with my life. He is not a violent person in the least, he
has never displayed a hint of violence or disregard for the
law.

 I find it very disturbing that the full weight of the
government or A.T.F. is being brought to bear on him,
over a rifle apparently malfunctioning. This is scary
for every gun owner and American. Also the fact that the
individual in possession of the rifle was not charged but rather
a witness for the prosecution is very disturbing. It is also
very disturbing that my testimony and other evidence in this case
have been suppressed, I feel justice has not been served.

 His family has gone through this terrible ordeal as well
as himself, I urge you to think of them also. They have suffered
a great deal over this and I ask you to put yourself in their shoes.
To separate him from his family would be another terrible injustice.

Sincerely, Martin Horkan

Kelly Harris
140 S. Cecil St.
Bonduel, WI 54107
5-4-08

The Honorable C. N. Clevert
U.S. District Judge
517 East Wisconsin Avenue
Milwaukee, WI 53202

Subject: Sentencing of Specialist David Olofson

Dear Judge Clevert:
I lived until recently in Berlin, WI, for ten years and have known Dave Olofson for over
six years. I am a truck driver with Homeland Security clearance to haul hazardous
materials. I am therefore very careful of how I act and who I associate with; my career
depends on it.

I have found Mr. Olofson to be an honest, peaceable and law abiding man. He loves his
family and his country which he serves in the Army. Dave is willing to help other people
at his own expense and sometimes to his own detriment. He's used his law enforcement
background to help those unjustly accused. "No good deed goes unpunished", as the
saying goes: I believe that's why he's in the trouble he's in right now.

Even though the jury heard only one side of the story, I found it hard to believe they
convicted him of a crime. He's anything but the maniac the prosecution made him out to
be. I've never known him to start trouble, never seen him violent, enraged or even raise
his voice. The most exciting thing Dave does is fishing.

I'm writing to ask that you don't send him to prison. He's not a threat to anyone, but has
been known to speak his mind. Prison would not only punish Dave (for what, a
malfunction he had nothing to do with?) but his family, friends and community as well.

Thank you for your time, sincerely,
Kelly Harris

c/o 197 East Moore Street
Berlin, Wisconsin state uSA

January 15, 2007

In regards to: Case Number 06-M-0252

Christopher W. Rose
Attorney at Law
ROSE & ROSE
5529 Sixth Avenue
ROSE PROFESSIONAL BUILDING
Kenosha, Wisconsin 53140

Attention: Christopher W. Rose

Dear Christopher W. Rose,

Subject: Witness List

I have the following volunteers for witnesses. I have made it clear to all the folks that I
know I will not force them to testify. These should be sufficient, but I will probably have
a few more by the end of the week. They will cover me and the firearm in question from
1993 forward. Three of them were at the range with me when I last used it. I also have a
singed reduced range target to prove that. One of them was the last one to have it on loan
before Robert Kiernicki borrowed it. He can attest to it not being an automatic weapon
when he was shooting it. Everyone can attest to one or more of the following:

"Looking for folks who can do an affidavit, and/or testify to (either live or telephonically)

1) That I have never offered to convert a semi auto weapon to a machine gun or
   sell any kind of machine gun to you.
2) That you have never been witness to me having an unregistered machine gun
   in my possession.
3) That you have been to a shooting range with me, and have not seen me
   shooting any unregistered FA's.
4) That you have not known me to have any full auto parts and/or
   DIAS/Lightning Link for an AR.
5) That you have not known me to offer any of those kinds of parts for sale.
6) That you do not know of me having any kind of machining skills, or
   machines needed for machining/converting weapons to any kind of unlawful
   configuration."

The following personal have responded that they will do so if needed.

Michael Robert; Berg
c/o P.O. Box 321
Berlin, Wisconsin 54923
(518) 561-4418

Michael Jason; Diels
c/o W7319 Towline Circle
Van Dyne, Wisconsin
(920)924-6099

Keith Fraley
W612 County Road H
Mondovi, WI 54755
(815) 455-6533

M.J. Horkan
940 Council Street
Baraboo WI 53913
(608) 356-9612

Rick Serafin
537 Cy Avenue
Casper, Wyoming 82604
(307) 324-3122

Ron & Jennet Wilke

Neshkoro, WI
(920) 293-4995
Kelly Harris
140 South Cecil Street
Bonduel, WI 54107
(715) 758-6743

And I would like to try and get the following for an Industry Expert Witness. He has
impeccable credentials and has helped in past cases. I will enclose additional
documentation dealing with him and the BATFE.

Len Savage
Historic Arms L.L.C.
(706) 675-0287

More information can be attained from the following:

Jews For The Preservation of Firearms Ownership, Inc.
P.O. Box 270143
Hartford, WI 53027

Phone (262) 673-9745
Fax (262) 673-9746

They have been aware of this situation from the first week.

I also have a summery of some cases I have found at the end of this.

As for motions I should expect to start we should move the court to dismiss the case
(with prejudice) for lack of evidence. This is the first case I am aware of where someone
is being forced to answer in court based only on an allegation. It would be different if
they had anything to prove I did any of what is being alleged, but I do not believe one
person's word is enough to bring this on another person without supporting evidence that
the gun in question was somehow and in some way modified by me.

Furthermore, as you stated previously we should move for suppression of anything taken
from my house based on improper warrant (no supporting affidavit at time of service, and
failure to state what was to be searched for), and biasing of the jury pool.

I expect all of those should go through with a minimum effort on our part. If not and the
case should continue I will add supporting affidavits and challenge the courts jurisdiction
of person and subject matter as well as looking at Quo Warranto so I can preserve my
rights for a later time.

Please notify me of any changes or communications pertaining to this case ASAP.

Thank you,
David Roland; Olofson
DRO

# Why the ATF's Firearm Testing Procedures are Scientifically Invalid

by Len Savage
*Owner, Historical Arms LLC*

With the amount of documentation now publicly available it has become obvious that there is a serious problem within the Firearms Technology Branch (FTB) of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF).

The technicians who work at FTB testify before the courts as "experts" on the technology of firearms. They may or may not have any real-world or industry experience. It is a fact that no technician at FTB has ever held a federal firearms license or ever designed a firearm. Unfortunately the problem runs even deeper than that. The recent public exposure of an incompetent FTB technician, Michael J. Cooney *(U.S. v. Glover)*, which resulted in the dismissal with prejudice of a federal prosecution of an innocent citizen, raises troubling questions about the legal validity of past prosecutions in which Mr. Cooney testified, and possibly those of other FTB technicians.

Congress has given the ATF the task of "classifying" firearms - for instance, determining whether a firearm is a common, semi-automatic that fires one shot with each trigger pull or whether it is a machine gun, designed to fire multiple rounds on one trigger pull (full auto). Numerous gun owners and gun makers have been bankrupted or imprisoned because the ATF stated that their firearms were "illegal machine guns" rather than semi-autos. If the ATF's classifications were accurate, then this would just be a matter for lawyers and lawmakers. But there is ample evidence – and not only in the case of Mr. Cooney -- to indicate that the ATF's classifications are arbitrary and inaccurate. The ATF seemingly does not employ consistent testing criteria and standards.

The core issue is the methodology (or lack of) in making firearm classifications. The ATF does not employ the time-honored and well-honed methods of scientific inquiry.

## The Scientific Method

Science is distinguished from other forms of inquiry by its requirement of systematic experimentation. The scientific method is designed to reduce the influence of individual, social, or institutional bias on experimental findings.

In short the scientific method is a process in which scientists or technicians try to build an accurate (that is reliable, consistent, repeatable, and NON-arbitrary) representation of the world or things in it. It has four steps that must be followed:

1. ***Observe and describe a phenomenon*** (example: A researcher thoroughly examines an FN-FAL, which is suspected of being a machine gun).
2. ***Formulate a hypothesis (educated guess) to explain the phenomenon*** (example: The presence of a full-auto safety selector installed in the lower receiver of a FN-FAL-type firearm could cause the firearm to fire fully automatic, and thus meet the statutory definition of a machine gun).
3. ***Use the hypothesis to predict the existence of other phenomenon*** (example: The lower receiver had to be modified or redesigned to make the firearm function in full-auto mode).
4. ***Perform experimental tests of the predictions that can be replicated by other independent experimenters using written testing protocols and uniform evaluation standards*** (example: Test fire the suspected FN-FAL on the range using standardized procedures and various types of ammunition, keeping careful notes and video-recording the testing process).

**The ATF Method**

While FTB does use some of the above steps, tech branch "experts" tend pick and choose indiscriminately among the four steps and also to perform the steps in a faulty manner. For instance, they may well observe and describe, but if they have no real world or industry experience, do they know what they are looking at or looking for?

*Example:* I submitted an SGMB semi-auto rifle to FTB for classification. They observed that if they removed the safety selector, the sear did not disconnect with every pull of the trigger. (A safety selector, usually called a "safety," is used to render the firearm in a condition to fire if the trigger is pulled, or conversely to prevent it from firing. The sear is the component that releases the hammer.) Upon cursory examination, this configuration appeared to enable the firearm to fire multiple times on one trigger pull, and therefore the ATF declared it a "machine gun" -- without ever test firing it.

They failed, however, to observe that the firearm had a second disconnector that operated independently of the trigger pull. (A disconnector is a component that prevents full-auto function; it is a part that distinguishes a semi-auto from a machine gun.) Operating off of the bolt carrier movement, this second disconnector prevented full-auto fire. Due solely to the ATF's own lack of firearms knowledge and incomplete testing methods, they wrongly classified this SGMB as a machine gun - *even though in real-world practice it was incapable of and not designed for full-auto fire.*

The lack of consistent testing standards and criteria by FTB is well documented. When a firearm is submitted to FTB for classification firearms makers can receive no clear answer to their questions as to what tests may or may not be performed. The ATF simply has no standard test procedures.

For instance, the FTB often attempts to demonstrate that a semi-automatic version of a firearm could be "readily restorable" into a machine gun.(1) If the gun is "readily restorable" it may be illegal to possess or manufacture without special licensing.

To prove how "readily restorable" a firearm is, one of the agency's "experts" may do something as quick and simple as perform a test fit of full-auto components into the semi-automatic firearms – about 15 minutes work. An "expert" in another case may give a similar firearm to a machinist and allow him eight hours in a modern machine shop and try to make the firearm into a machine gun. Yet each expert may testify in court that he performed reliable tests to determine that a semi-automatic weapon was "readily restorable" -- that is, quickly and easily convertible into a possibly illegal weapon.

No owner or manufacture has any idea which standard will be applied to his own firearm. Yet freedom and/or economic survival may hang on the ATF's decision.

## Plastic cable ties, duct tape, and shoelaces

While FTB criteria for testing and classifying firearms can flip-flop at will, that is only one aspect of the ATF's violation of accepted scientific method. At times, ATF methodology becomes downright bizarre.

For instance, in attempting to "prove" that a semi-automatic firearm is, or can easily be made, full-auto, ATF "experts" have been known to attach a variety of devices to the gun being tested. They commonly, for instance, fasten new parts to the firearm or remove parts from the firearm, then hold the resulting device together with duct tape, plastic cable ties, or small metal bars before test firing it. They use these aids because otherwise the components of the jury-rigged test weapon will not hold together on their own. *Such a device would be useless in the real world*, yet the ATF freely uses these Rube Goldberg contraptions to "prove" that a weapon is illegal, and that the original maker or owner of the firearm is committing a federal crime!

These strange ATF-created lab contraptions can also be so dangerous that the testers hide behind barriers to protect themselves against exploding firearms. Yet ATF agents may still tell a jury that such a weapon is a usable "machine gun."

On September 30, 2004, the ATF sent a letter to a Mr. Brian Blakely stating that if a person tied an ordinary household item (in this case, a shoestring) to the trigger of a firearm in order to induce that firearm to shoot multiple rounds on one trigger pull, then that household item was -- in and of itself -- a machine gun. (According to law and BATFE interpretation, any components designed to induce a weapon to fire in full-auto mode are themselves machine guns, even if they are inert and incapable of firing anything when standing alone). But if that is true, then are not the duct tape, plastic cable ties, and small metal bars also machine guns? Are these ATF-applied devices not intended to convert otherwise ordinary semi-automatic firearms into machine guns? And is not the ATF - rather than the gun maker or owner -- the culprit in that case?

We have seen that the ATF uses arbitrary testing criteria and faulty methods. But worse, strange techniques like the above violate yet another aspect of the scientific method: The methods are not chosen to discover the facts. They are designed to produce whatever results fit the ATF's hypothesis - *regardless* of the facts.

Consider the example of aftermarket upper receivers for the M-11/M-10. This family of firearm is normally magazine-fed via a pistol grip in its lower receiver. If the firearm is full-auto, the lower receiver is considered a machine gun, while the standard upper receiver is not a machine gun.

The industry has produced aftermarket upper receivers that can also be used to feed rounds into the chamber of the M-11 or M-10. Some of these are magazine-fed. Some are belt-fed.

The FTB has decided – without testing – that the magazine-fed upper receivers are not machine guns. For instance, Andrew Smith's and Capt. Monty Mendonhall's "Soumi" upper, or my own Historic Arms "Calico mag" upper are not classified by the ATF as machine guns.

On the other hand, the FTB has decreed that the belt-fed upper receivers, like Socomm's M-11/RPD and my own Historic Arms BM-3000 upper, are machine guns, in and of themselves.

Why? you might ask. While these components may look different, they are all replacement upper receivers for the M-11/M-10. They are all open- bolt in operation, and all of them incorporate a device that feeds ammunition directly into the upper receiver.

The most astonishing thing is that RPD-style uppers were "proven" to be machine guns after being subjected to a test in which they were clamped down in a shooting vice with a chain, and copious plastic cable-ties and a small metal bar were added to capture the recoil spring system, and pull back the cocking handle and release. The firearm did fire, although it was unsafe, uncontrollable, and impractical (unless you can tote a vise and shooting table around in your trench coat).

Now, it would actually be far easier to make a magazine-fed upper to fire as a "machine gun" using this strange and dangerous method of testing. DO NOT EVER TRY THIS, it is unsafe, and could kill you! But it is a fact: Using the ATF's own testing methods, the "non-machine gun" component would perform just like the "machine gun" component – in fact, would do so more easily. The FTB is aware of this; I've discussed it with their personnel. Yet they persist in proclaiming that the belt-fed uppers are "machine guns" and the magazine-fed uppers non-machine guns.

Why? No one can be sure of their motivations, but based on the fact that they tested the belt-feds and not the magazine-feds, it appears they simply "knew" (as any TV viewer who ever watched a late-night war movie "knows") that anything belt-fed *must* be a machine gun. Therefore they devised a test to prove what they already assumed.

**Conclusions**

Inconsistent testing standards, faulty testing methods, and tests seemingly designed to prove a foregone conclusion, are a major inconvenience and financial problem for a manufacturer. For a defendant in a felony firearms case the ATF's lack of scientific method could mean a very long prison sentence for an innocent citizen, or a "get out of jail free card" for a real criminal.

Without clearly defined testing criteria and standards, and without test results available to all interested parties, in every case (another chronic problem), the FTB will continue to contradict itself and produce faulty judgments and faulty evidence in legal cases.

The FTB, the American firearms industry, prosecutors, and defense teams all need a published and readily available procedural manual of testing criteria and standards. And those procedures must rigorously follow scientific method.

The current lack of standards and the inability to replicate test results invalidates FTB conclusions at best. At worst, the ATF's methods and resulting claims could be construed as conspiracy to deny civil rights to American citizens.

The FTB resists the creation of industry oversight committee that would allow genuine experts - gunsmiths, firearms manufacturers, and federal firearms license holders - to have input into testing procedures. Currently, those whose run afoul of faulty ATF methods and resulting accusations of illegal activity and/or financial hardship have no means of redress other than a civil suit. A method of checking and balancing ATF behavior needs to be established to prevent institutional bias from overwhelming the justice system and the firearms industry with bad science and false accusations.

*(1) "Readily restorable" is a term used in the National Firearms Act of 1934 (NFA) and the Gun Control Act of 1968 (GCA). The term was never technically defined when the laws were written or enacted. In practice, the term "readily restorable" was written into the law to forbid any firearm design that could be converted from semi-automatic to full-auto with "a quick modification." "Quick modification" can be interpreted by FTB to mean "15 minutes with simple hand tools" or "eight hours in a modern machine shop" depending on the whim of the examiner.*

**********

## References

1. Wilson, E. Bright. "An Introduction to Scientific Research" (Mcgraw-Hill, 1952)

2. Kuhn, Thomas. "The Structure of Scientific Revolutions" (Univ. Of Chicago Press, 1962).

3. Barrow, John. "Theories of Everything" (Oxford Univ. Press, 1991).

4. nsrl.rochester.edu

Supporting letters attached.

## **Common Mistakes in Applying the Scientific Method:**

Most high school and college science text books warn of common mistakes when applying the scientific method. I will quote four that apply to FTB.

* "When testing a hypothesis (educated guess), the scientist or technician may have a preference for one outcome or another, and it is important that this preference not bias the results or their interpretation."

* "The most fundamental error is to mistake the hypothesis for an explanation of a phenomenon, without performing tests. Sometimes "common sense" and "logic" tempt us into believing that no test is needed." *(Remember the SGMB semi-auto and the safety selector?)*

* "Sometimes, however, a scientist or technician may have a strong belief that the hypothesis is true (or false), or feels internal or external pressure to get a specific result. In that case there may be a psychological tendency to find something wrong." *(For an example of this view an actual ATF test-firing on the DVD "BATFE Fails the Test," available from www.jpfo.org. Without any disassembly or detailed examination, an FTB "expert" insisted a semi-automatic rifle was a "machine gun" solely because it would occasionally fire more than one round on a single trigger pull; a few minutes examination of the gun's components showed that the gun's aging parts were merely malfunctioning.)*

* "Another common mistake is to ignore or rule out data that does not support the hypothesis". (Example: In testing of the BM-3000 upper, FTB stated in documents that its jury-rigged device fell apart in half of the tests. When evaluating the results, however, the FTB simply chose to ignore that half of the tests. In another case, when the ATF's duct-taped and plastic cable-tied Inter Ordnance PPSH parts blew apart on the second round fired, the FTB chose to completely ignore the fact that the ATF-created device exploded. It fired twice, therefore Inter Ordnance was responsible for a manufacturing and selling an "illegal machine gun.""

Bailey v. U.S., - U.S. - (1995)
In this case the Supremes look again at the drug crime sentencing enhancement provided when a suspect uses a gun in a drug offense. In this case they review the enhanced sentences of drug dealers who were caught with guns, and drugs at the same time, but the circumstances suggested they merely possessed the guns, and did not use them in any active sense of the verb. One had the gun in a closet at home, the other in his locked trunk while in his car. The court decides that some kind of active employment of the gun needs to be shown for the law to apply. Mere possession is not sufficient.

Barrett v. U.S., 423 U.S. 212 (1976)
This case decides whether you have to acquire a gun interstate in order to violate part of the GCA, or if the gun just needs to have moved interstate at some point in its life. The court opts for the more broad interpretation.

Beecham v. U.S., - U.S. - (1994)
A supreme court case on whether a removal of felony status under state law, for a state conviction, also operates to remove the felony status from a federal conviction, for the purpose of owning guns. The court says no, relief from the federal conviction must come from the feds.

Brief for appeal of U.S. v. Bryan, 122 F.3d 90 (2d Cir. 1997)
(see original case)

Bryan v. United States, - U.S. - (1998)

In this case the court affirms the 2nd circuit ruling, which essentially equates the state of mind "wilfully" with "knowingly" in the Gun Control Act, even though both terms were used, and wilfully traditionally means a greater state of mind (awareness of what you are doing, whether it you it on purpose, versus whether you know you are violating the law in question) than knowingly. Justice Stevens, who believes gun owners are evil, decides that all the government need show is that the defendant knew he was violating any law, and not the specific requirement the defendant is being charged with. The addition of states of mind was a reform in the 1986 FOPA, before that ATF regularly got convictions against persons who had no idea they were doing anything wrong at all, and in fact thought they were just selling off their gun collection. This in essence repeals part of that reform, by judicial decision.

### Caron v. U.S., - U.S. - (1998)

In this case the Supreme court decides that in order for a felon's right to own firearms to be considered restored under state law, the state must give him the right to own any firearm at all, and not just some firearms, even if the specific firearms he is caught with he is allowed to have under state law. In this case Caron could legally have long guns under Mass. law, but could not possess handguns outside his home or business, due to his felony convictions under Mass. law. He was caught possessing only rifles and shotguns, but the federal court still enhanced his sentence for committing another crime for being a felon in possession of firearms. The Supreme court affirms that reasoning, deciding that the fact that his firearm possession was legal under the state law, the same law that is supposed to determine whether his conviction bars him from owning firearms does not matter, as this is a federal law, and this is what Congress must have meant, to deny firearms ownership rights to the largest group of people possible. The court in this case, and in the Bryan v. US, eviserates two of the reforms the NRA pushed very hard to get in the 1986 FOPA.

### Church of Scientology v. IRS, 484 U.S. 9 (1987)

In this case the Supreme Court construes 26 USC 6103, the Watergate era statute that prohibits the release of a tax return by the federal government. In this case the court decides that section 6103 prohibits the release of a return under the Freedom of Information Act, even if the information identifying the taxpayer is blocked out from the released copy. The court construes the statute literally, that the return document may not be released, period. Since the NFA transfer forms are treated by ATF as tax returns (rightly in my opinion, I don't know of any cases on the subject, but I would expect a court to agree with that interpretation), they are not available under FOIA. The taxpayer can get a copy of his returns, in fact he is entitled to them. Section 6103 doesn't apply to government entities either, so possibly transfer forms of government entities may be obtainable by FOIA. However, as the court notes, a recompilation of tax return data, which strips out identifying information is releasable. That clause was apparently meant to allow IRS to continue to release generic information gathered from income tax returns, however it may have application in the NFA context, since ATF does prepare recompilations of transfer information.

Dickerson v. New Banner Institute, Inc., 460 U.S. 103 (1983)

This case is the supreme court deciding if one is convicted of a felony, that operates to prohibit someone from having an FFL, or being a principal in a company with an FFL, where someone gets a deferred sentence, and succesfully completes it, such that under the laws of the state where they were prosecuted, they are not a felon. The court decides that pros. counts, and such a person is a felon, and decides Congress cannot have meant to have "conviction" governed by the law of the state where the person was prosecuted, although they do not really suggest an alternative. In any case, Congress overruled this case by amending the GCA in 1986 to expresly indicate that a state conviction was governed by state law. As indicated in the Beecham case, a federal conviction can only be negated by federal law, for purposes of owning guns.

### Haynes v. U.S. 390 U.S. 85 (1968)

This was an appeal from someone convicted of violating the old NFA, failing to register a weapon in their possession. Prior to the changes to the NFA in 1968, as part of the Gun Control Act (forced in part by this case, the case was decided in Jan., the law changed in Nov.) a person was required by law to register an NFA weapon in their possession. But it was illegal to possess an unregistered weapon, the law punished you if you failed to report a gun, and punished you (or potentially did) if you did report a gun. The Supreme Court decided this arrangement violated the 5th amendment, and decided that anyone charged with violating the NFA could assert, as an absolute defense, the 5th amendement prohibition on compelled self-incrimination. Thus one could freely make NFA weapons between 1/68 and the effective date of the changes to it, in November, and ignore the NFA. The Amnesty was designed in part to pick up these weapons, as well as adding DEWAT's and DD's. As a practical matter the government would sometimes let you register unregistered weapons in your possession, if your possession was non-criminal. Like the gun came in as a war souvenir and you were ignorant of the registration stuff, or you bought a Thompson before 1934 and missed the boat on registering it. Or the government changed the classification of the gun (sort of like the DD thing with the evil shotguns) as they apparently did with the T-48's H&R sold publicly after that program ended.

### Huddleston v. U.S., 415 U.S. 814

A supreme court case construing the GCA. In this one, the court decides that when one gets a gun back from a pawn shop, one has to fill out the 4473, and getting your own gun counts as an "acquisition" such that if you are a felon getting your own gun back (or your wife's, as was claimed in this case) you cannot legally get it back, and can be prosecuted for lying on the 4473 about your felon status.

### Lewis v. U.S., 445 U.S. 55 (1980)

This is a 1980 Supreme Court case that notes in a footnote that prohibiting felons from possessing firearms does not violate the 2nd amendment. The case itself is over whether a felony conviction that is arguably void because it was obtained w/o appointed counsel for the defense, still makes one a felon, and thus makes it illegal for that person to possess a firearm. The court decides that yes it does; even if the conviction could have been overturned, if the person had bothered, they need to do that before they can possess a firearm.

Brief of amicus Gun Owners Foundation, in Mack v. US.

## Malloy v. Hogan, 378 U.S. 1 (1964)

This case is concerned with whether the right to be free from self incrimination, as found in the fourth amendment, applies to the states through the fourteenth amendment. The court decides yes; and Malloy got out of jail for refusing to answer questions from some stupid Conn. body investigating gambling.

The interesting point of it is the second footnote in the court's opinions, where it notes that the second amdnement is one of the rights not yet held applicable to the states through the 14th amendment.

## Maryland v. U.S., 381 U.S. 41 (1965)

This is a very very tangential case to second amendment issues. It is with Perpich on the militia concept. Here, in deciding if a Air National Guard pilot who drove his plane into a passenger jet is an employee of the state or of the feds, the court says that the National Guard is the modern militia guaranteed to the states under article 1 sec 8 of the constitution. But the court does not have anything to say about what the militia in the second amendment means. But this case provides more info about the federal co-opting of the state militia, which is certainly inconsistent with reading the 2nd amendment to mean states can have militias, not to mention that it makes art 1 sec. 8 redundant in a big way. BTW the court decides the pilot was a state employee in this context.

## Miller v. Texas, 153 U.S. 535 (1894)

This is a very short case, in which the Supreme court refuses to hear a 2nd Am. challenge to a Texas law prohibiting carrying weapons on the person. As the issue was not raised in the lower court, the Supreme court refuses to review it. And the court also suggests that the 2nd amendment does not apply to states, although it does seem to recognize an argument could be made that it does apply to the states through the 14th amendment (as most, but not all of the Bill of Rights now does). This case was cited in the challenge to the Ca. AW ban, Fresno Rifle Club v. Van de Camp.

## Morissette v. United States, 342 U.S. 246 (1952)

In this case the Supreme court considers the intent required to be convicted of stealing US Government property, and decides that the same intent required at common law is required under the statute, and that just because Congress didn't recite any intent doesn't mean they intended to make the theft a strict liability crime. Compare this discussion to the Staples case.

## Muscarello v. United States, - U.S. - (1998)

In this case the Supreme court, construing the meaning of "carrying" a firearm for purposes of the sentencing enhancement found at 18 USC 924(c), decides that the word should be given an extremely broad meaning, and applies it to having a firearm anywhere in the means of transportation, not just on the person, or within reach. A gun in a trunk of a car, or locked glove box would also count. The dissent cleverly quotes extensively from a decision that the author of the majority decision, Justice Breyer wrote, when he was a court of appeals judge. The applicability of this case to "carry" outside of this particular

federal statute is unclear, it may not have much applicaiton except to people selling drugs, who also have a gun.

## Perpich v. Dept. of Defense, 496 U.S. 334 (1990)

This is a 1990 Supreme Court case that pretty well extinguishes the argument that the 2nd amendment means states can have a National Guard w/o interference from the feds. Perpich was governor of Minn., who didn't want any of his National Guard troops being put on active duty for training in Central America. In 1987 the federal law that made state Guards part of the US Guard was amended to take away from governors the power to veto active duty missions, except for very limited circumstances; being a commie governor opposed to missions in Central America wasn't one of them. The court said that the feds could if they wanted make state Guards part of the US armed forces, as they had, and subject to being called to active duty as part of the Army, w/o the consent of that state's governor. The court identified the Guard as the "active militia" drawn from the general population of the state, which was the militia. While the court said it might violate the constitution for the feds to do such training with a truly state militia, (under the militia clause of the Constitution) the National Guard was just an extension of the US Guard, which was almost half of the manpower of the US Army, although not on active duty except when needed. Minnesota never made an argument that the 2nd amendment prohibited having the state militia be under the thumb of the feds. Even though that is precisely what HCI would have you believe it means. The National Guard is clearly a militia, but it can hardly be the one in the 2nd amendment, given the otherwise constitutional relationship it has to the federal government. And the opinion in this case was unanimous.

## Presser v. Illinois, 116 U.S. 252 (1886)

This is one of the two post-Civil War 19th Cent. cases addressing the 2nd amendment. (the other is Cruikshank). In this case Presser was part of a citizen militia group, (the Lehr und Wehr Verein) and was caught parading through Chicago with a group of other men, carrying guns. He was convicted of violating an Illinois law making it a crime to be a part of an armed unit parading or existing w/o a permit from the Governor. (Presser got a $10 fine). He claimed the law violated his rights under the 2nd amendment, among other things. The court disagreed, and upheld the law and his conviction. Basically they decided that the 2nd amendment was not a right to form or be part of a militia. It related to people (individuals, it seems) bearing arms for the use of the US government, and as part of the militia as called up by the government.

## Printz v. U.S., - U.S. - (1997)

In this case the Supreme Court reverses the 9th circuit's decision in Mack v. U.S., and decides that the burdens placed on local law enforcement by the Brady handgun control law are unconstitutional, under the 10th amendment, and general federalism principles.
Robertson v. Baldwin, 165 U.S. 275 (1896)
This is a Supreme Court case from 1896. Like the Verdugo-Urquidez case it only mentions the 2nd amendment tangentially. The case is over whether a federal law that made it a CRIME for a seaman to refuse to do his seaman thing, after signing a contract to work as such, is constitutional, under the 13th amendment prohibition of slavery and

involuntary servitude. The court decides that is ok, the seaman can be sent to jail for refusing to work according to the terms of employment contract. Justice Harlan dissents, and I tend to agree with him; I don't think this case, if it hasn't already been overruled, would be followed today. In any case, they mention that the rights in the Bill of Rights are not unlimited, in trying to explain why being a slave isn't being a slave if you work on a ship. And two of their examples are limits in terms of libel/slander, blasphemy and indecency on the first amendment, and that limits on carrying concealed weapons do not violate the second amendment. Then of course this case is cited in Cases, for the proposition that the second amendment is limited, without mentioning the limitation expressed in it; to justify their own, very different conclusions as to the second amendment. A subtle pattern of misrepresenting prior cases emerges, until you reach the perversions exemplified in the 1970's by Warin.

### Scarborough v. U.S., 431 U.S. 563 (1977)

A supreme court case deciding whether a felon needs to acquire a gun before or after his felony conviction to be busted under sec. 1202(a), the former no felons with guns law, it was changed in 1986, as part of FOPA. The court decides the person must ditch all their guns when they become a felon. If they had guns before hand they become instantly guilty of violating 1202(a) as soon as they are a felon.

### Smith v. U.S., 508 U.S. -, (1993)

In this case the Supreme Court takes a look at what it means to "use" a firearm in a drug crime, for purposes of enhancing one's sentence for the drug crime. Smith traded, or attempted to trade, a MAC type machine gun for cocaine. Such activity adds 30 years to the sentence. The court holds that using the gun as a medium of exchange falls under the law; the gun need not be used as a gun in the traditional sense, ie as a weapon. A similar holding was reached by the DC Circuit in the Harris case, also on the server.

### Sonzinsky v. United States, 300 U.S. 506 (1937)

This is a case before Miller where the court reviewed the constitutionality of federal regulation of gun dealers; by requiring a special occupational tax (SOT) of dealers in NFA weapons. Sonzinsky was pedding NFA guns w/o the SOT. The court decides, based in large part of its review of the Narcotic Act previously, that the government may enact a tax for whatever it wants. As long as it facially raises revenue, it is fine. This case is often cited as upholding the transfer taxes, which have serious 2nd amendment implications when it does not. It only reviewed the dealer regulation. This case does not address the registration of guns, or transfer taxes, although it is often cited to that effect. staples_briefs.txt

This is the text of the briefs submitted by the parties to the Supreme Court, in the case noted below.

### Staples v. U.S., - U.S. - (1994)

This is also a very interesting case, where the Supreme Court reversed the 10th circuit and decided that in order to convict someone under the NFA of possessing an unregistered (untaxed) weapon, they must prove the defendant knew it was the sort of gun regulated by the NFA. In this case they had to show the defendant knew the rifle in

question was fully automatic. This case was really answered in the Freed case, where the court said part of a violation of the NFA was the defendant's knowing the weapons in question were the sort subject to regulation. Freed held explicitly, and Staples didn't touch, that the government need not prove the defendant knew about the registration stuff, only the nature of the weapon that made it subject to registration. Lower courts had however been ignoring Freed, claiming the government needed to only show the guns were in fact the sort regulated, regardless of whether the defendant knew they had that feature. In Freed the NFA weapons were hand grenades, which made showing the defendant knew the nature of the weapons sort of irrelevant, although I guess there could have been an issue about whether he knew there was explosive material inside them. However with an mg, it can appear to be a regular semi-auto. This case will end a lot of stupid prosecution, for possessing a weapon that didn't work, but the feds could work on till it did, or for the feds to tape together parts kits - they can do whatever they want, but they will have to prove the defendant knew the thing was a machine gun, not just that they could make it behave as one.

Department of Treasury v. Galioto, 477 U.S. 556 (1986)
In this case the Supreme Court reverses and remands a district court decision deciding under the pre-1986 GCA, that the prohibition on relief from the firearms disability for former mental patients, but the provision of a relief procedure for felons, violates due process. Since Congress changed the relief statute while the appeal was pending, to allow anyone with a disability, for whatever reason, to apply for relief, the issues dealt with by the District Court were now gone, and the case was moot.

U.S. v. One Assortment of 89 Firearms, 465 U.S. 354 (1984)
In this case the supreme court decides that an acquittal in a prosecution for violating the GCA does not prohibit the feds from trying to forfeit the guns in question to the government, for the exact same conduct for which one was acquitted. In other words, if the feds strike out in court, they can try and steal the guns anyway, under the much lesser civil burdens of proof.

U.S. v. Bass, 404 U.S. 336 (1971)
This case concerns the same issue as in US v. Synnes, whether the gun possessed by a felon for which he is prosecuted under a law that no longer exists, 18 USC sec 1202, needs to have moved in interstate commerce, or otherwise be connected to interstate commerce. Other courts, including Synnes, said no. The court disagreed, looking only at the language of the law. However it foreshadows both the Lopez case, and any challenge to 922(o), by deliberately ducking the issue of whether Congress has the power to ban mere possession of a gun, w/o any nexus to a enumerated Congressional power. The court they were reviewing apparently said Congress could not ban mere possession, there was no enumerated power allowing that, and construed the law to require an interstate commerce nexus. The court also so construed it, but explicitly refused to decide the constitutional issue. They decided the text of the law suggested an interstate commerce nexus.

U.S. v. Biswell, 406 U.S. 311 (1972)

In this 1972 case, the US supreme court upheld the warrantless search of FFL's under the GCA, against a challenge based on the 4th amendment. This case will explain the "administrative search" concept, or why officials do not need a warrant to verify compliance with primarily regulatory, as opposed to criminal, laws, in areas that are considered to be "pervasively regulated". It is a crummy doctrine, this was before the law was amended to only permit one such search per 12 months. When the GCA was passed, the feds could be at your shop tearing it apart every day, if they wanted, without a warrant, and without probable cause.

United States v. Cruikshank, 92 U.S. 542 (1875)
The case was over the constitutionality of the Enforcement Act, which prohibited anyone from interfering with the constitutional rights of others, either because of race, or not. It is a little sketchy, but it appears Cruikshank, et al, were Klansmen in Louisiana, who killed two black men in 1873. The court decided the law was unconstitutional, as outside the power of Congress, at least in the way Cruikshank and cohorts were indicted. Part of the act made it a crime to interfere with anyone keeping and bearing arms for a lawful prupose. The court said that was not a constitutional right as such, it was an inalienable right, not granted by the Constitution. They said the second amendment only prohibited Congress from interfering with that right, and gave Congress no power to make it a crime for one citizen to interfere with that right of another citizen. The power to regulate that was in the States. As constitutional law Cruikshank is not very valid any longer. Congress now has virtually unlimited police power, something the Cruikshank court says is beyond argument that they do not have. The supreme court could revive this doctrine, it is sort of the idea the 5th circuit used to void the Gun Free Schools Zone Act in Lopez v. US, now under appeal to the court. And that the Bownds court used to void 922(o).
U.S. v. Dewitt, 9 Wall. 41 (1869)

U.S. v. Freed, 401 U.S. 601 (1971)
In this case the court re-examined the NFA after the revisions of 1968, and found it was just fine, at least as to the 5th amendment problem of the old NFA. Freed was caught with hand grenades in Calif; one of his claims was that he couldn't register them because that would put him in violation of state law. The court said that would be compelled self incrimination, except that the NFA forbade the release of registration info, so the feds could not tell Calif. about his grenades, nor could the fact of registration be used in a Calif trial against him. The court also pointed out that the new NFA changed the burden of registration, and admitting possession to the transferor, not the transferee, as before. Thus Freed could not register anything in his possession, nor was he required to. But possession of unregistered items was still illegal, and he could be prosecuted for that. This also closed the ability for persons to add weapons in their possession to the Registry; NFA weapons could be added to the Registry only upon making or import (or by a law enforcement type agency, for their own use). Any law that requries gun registration, w/o promising confidentiality of the registration info, likely violates the 5th amendment, as there is no protection from using the info to prosecute a felon or other such person for possessing a firearm when they are not permitted to by law. However it is questionable as to whether this defense to non-registration can be used by anyone except someone who would actually be incriminated; that is you must be actually unable to lawfully possess

guns, and then be prosecuted for failing to register them, to take advantage of the loophole. This is why registration schemes are by definition only aimed at the law abiding. Felons have a 5th amendment protection from being prosecuted for violating such schemes.

U.S. v. Lopez, __ U.S. __ (1995)

This case is from 1995, where the court, on a 5-4 vote struck down the Gun Free School Zones Act (18 USC sec. 922(q)) as being beyond the power of Congress to enact, under the Constitution. Congress claimed, as it does with most of its enactments, that it was exercising its power to regulate interstate commerce, and had all sorts of made-up reasons why kids with guns at local public and private schools affected interstate commerce. The Court said no, it was too much of a stretch. Yes, they had let Congress run rough-shod over the principle of a limited federal government, or enumerated powers in the past, they were drawing a line now. Check out Justice Thomas' concurrence, no one else would join him. In it he lays out a truly revolutionary idea - that the fundamental ideas the court has used to review Congressional enactment for constitutionality, at least since the 1930's are wrong, and need to be scrapped. Excellent thinking, too bad no one else there agrees with him. Anyway, this case is a good argument to use anytime a federal law is nominally based on the power to regulate interstate commerce, but goes far beyond that sort of commerce, or doesn't note any connection to commerce. Like 922(o), the mg making ban, for instance. The federal district court in US v. Bownds used the 5th circuit opinion in this same case, which the Supremes affirmed here, to strike down 922(o) as beyond Congressional power. It gives a good boost to a Bownds on appeal to the 5th circuit.

Compilation of U.S. v. Miller documents by Patrick L. Aultice

U.S. v. Miller, United States v. Miller, 307 U.S. 174, 59 S.Ct 816, 83 L.Ed. 1206 (1939) - Supreme Court on 2nd amendment

This is the only Supreme Court case where the court examined whether the 2nd amendment inhibits the feds from regulating guns, in this case the NFA regulation. Two guys transported a sawed off shotgun through the South (the case even lists the serial number and make) and were charged with violating the NFA. The lower court decided the law violated the 2nd amendment, and let the guys out. They promptly fled, or died, take your pick, and the government pursued an appeal, with no representation for Miller and his buddy. The court decides the law does not on its face violate the second amendment, at least as applied to a sawed off shotgun. The case is mostly ramblings about the meaning of "militia". The court does seem to hold the door open that if it is shown a gun is a "militia weapon" then the 2nd amendment forbids the feds from regulating that weapon. Personally I see that as weaselly crap, the court would never have decided the law violated the 2nd amendment, even though it obviously did. A militia weapon is totally irrelevant, it is whatever one wields in defense of home and country. There is no class of weapons that are protected, and class that isn't. But the court decides the case on whether the possession of a sawed-off shotgun by these persons furthers the militia, leaving the door for the gross and unsightly twisting of the 2nd amendment regularly seen in federal appellate court cases now.

U.S. v. Powell, 423 U.S. 87 (1975)

In this case the Supreme court upholds the federal law declaring pistols, revolvers and other firearms concealable on the person as "nonmailable", and the prosecution of a woman for sending a sawed off shotgun with an overall length of 22 1/2" through the mail. The court decided the law applied to any firearm a jury found to be concealable on the person, even the one in question, which was much larger than the average pistol. The court also decided the law wasn't so vague as to not apprise defendants of what was prohibited, and thus unconstitutionally vague.

thompson_briefs.txt

This is the text of the briefs submitted by the Government, only.
Brief of Thompson/Center in the Supreme Court case

Brief of amicus curiae senators Larry Craig,a Steve Symms and Robert C. Smith in Thompson/Center v. U.S.

U.S. v. Thompson/Center Arms Co., - U.S.- (1992)

This is another recent examination of the meaning of the language of the NFA by the Supreme Court, along with Staples. Neither involves constitutional law. In this case the court was called upon to decide what constituted a short barreled rifle. T/C wanted to market a kit consisting of one receiver for their Contender gun, a 16"+ barrel, a >16" barrel, a pistol grip and a shoulder stock. This kit could be used, as intended, to assemble a rifle or a pistol, or it could also be used to assemble a SBR. As it could be so used, ATF decided it was a SBR. T/C made one unit on a Form 1, then sued for a tax refund, claiming it wasn't subject to the NFA. This is the way to challenge such a classification. Doing the thing York or SWD did, in those cases, is an invitation to a prosecution. The Staples case will limit such things, but one can easily lose....Here all that was at stake was money. The court decided that the language of the definition of a SBR was vague, and gave it the reading most favorable to the taxpayer, T/C. They decided the kit was not a SBR, nor was any set of parts where they could be used for a legitimate purpose, even if they could also be used to assemble a SBR. However a SBR fully assembled was also clearly a SBR. Thus the other grey area was a SBR in parts form, like an Uzi carbine and a Uzi SMG barrel. A lower court had held in a prior case that that set of parts was a SBR. The court agreed; that if the parts had only one use, to make a SBR, and a person possessed them all that was a SBR also.

United States v. Verdugo-Urquidez, 494 US 259 (1990)

This is a case with "dicta" (an offhand remark not needed to reach the legal conclusion of the case, and thus may not carry the weight of precedent with lower court judges) that the 2nd amendment, with the use of the word people, means indiviudals, (and by extension not states). The case itself concerns whether the 4th amendment rights as to search and seizure apply to a foreign national, whose property located in Mexico is searched by the DEA w/o a warrant or probable cause. The court decides the 4th amendment does not apply to property outside the USA owned by a foreign national.

U.S. v. Watts, - U.S. - (1997)

In this case the Supreme court decides that facts underlying a crime which a defendant was acquitted can still be used by the judge, if he finds them to be true by a lower evidentiary standard, to give the defendant a longer sentence than he would otherwise get, on crimes for which the defendant was convicted. In any case the sentence has to be within the statutory maximum, but in one of these cases, even though the defendant was acquitted of carrying or using a firearm in a drug crime, the court enhanced his sentence based on his possessing a firearm during the drug crime.

This is to address what I want done before the trial along with a discussion of motions that may or may not be applicatable. I do expect that any objections you may have to them be address separately as your opinion and the law (case and written).

1) Witnesses

## Expert for gun

Len Savage if we can get him. The local guy if we can't.

Some expert from the manufacturer to testify that the receiver has not been modified and that the ATF has ruled the receiver can not be readily modified. They will have paperwork to this affect.

Fingerprint expert for the trigger parts that have been installed in place of the ones I had in the weapon. One from the local schools will do. I have already talked with 2 of them so I can make some of those arrangements if you wish.

PI report from interviewing the other witnesses at the range. I need to know everything they know.

Character and material witnesses on my end.

1. Kelly Harris (715) 758-6743 Had the weapon last before the kid borrowed it. Can attest to it only being a semi auto while he had it.
2. M.J. Horkan(608) 356-9612 Can attest to the weapon being semi auto when I had it shooting last. Also have the military reduced range target to back this up done the same day and singed by him.
3. Chad Zimmerman(920) 398-8955 Can attest that the cd's taken from the house along with other things were his that I sell for him at the gun shows, along with him giving some to me without solicitation. He also was one of the parties that bought ars with us as a group. He can also attest to the fact no one buys guns from me; they all have to get them from the dealer, him included.
4. Bill Buch(414) 795-4954 can attest to me having the weapon at least from the time he knew me starting in June of 93 and that it was semi auto back then. It was also inspected by ATF back in 94 and found to be semi auto. He witnessed what was most likely one of their agents checking it out during a display and radiothon.
5. Candice Olofson Can attest to their never being any automatic weapons in my possession, no manufacturing or distribution either. Also about ATF criminal activity and witness tampering after my arrest along with theft from my house of gun parts without my consent or a warrant.
6. Dave L. Olofson (920)923-1480 Can attest to much the same as my wife, along with communication with ATF and what appears to be attempted intimidation of them when they visited his house.
7. Patricia A. Olofson Same as my father.

May be more after I see what the PI's come up with. I also need to speak with some of the officers at the range about some stuff the kid said to me on the phone that day.

| From: | RADDAD1@comcast.net |
| Sent: | Thursday, July 07, 2005 11:49 AM |
| To: | cloverleaf762@charter.net |
| Subject: | RE: AR15.Com Email :: RADDAD ::          HOGUE TUBE |

| Follow Up Flag: | Follow up |
| Flag Status: | Completed |

Just The Bolt  $50.00 is what I'd sell It for.

-------------- Original message --------------
Is that both the bolt and carrier, or just the bolt?

-----Original Message-----
**From:** RADDAD1@comcast.net [mailto:RADDAD1@comcast.net]
**Sent:** Thursday, July 07, 2005 9:10 AM
**To:** cloverleaf762@charter.net
**Subject:** RE: AR15.Com Email :: RADDAD :: HOGUE TUBE

David,  I can offer you a Colt Bolt (MPC) in Ex. con. in Trade
for the Tube.  LMK  StevO

-------------- Original message --------------
Yea. So far surprisingly little interest in something I put up at almost half the going price.

-----Original Message-----
**From:** RADDAD1@comcast.net [mailto:RADDAD1@comcast.net]
**Sent:** Wednesday, July 06, 2005 11:00 PM
**To:** cloverleaf762@charter.net
**Subject:** RE: AR15.Com Email :: RADDAD :: HOGUE TUBE

DAVID,  Just got back to Town,  Do you still have the tube ?
StevO

-------------- Original message --------------
If your still interested shoot me an exact listing of what you have in 30 round
mags and m16 parts, or anything else you think I could use. Pix would be
helpful.

-----Original Message-----
**From:** RADDAD1@comcast.net [mailto:RADDAD1@comcast.net]
**Sent:** Tuesday, June 28, 2005 11:08 AM
**To:** cloverleaf762@charter.net
**Subject:** RE: AR15.Com Email :: RADDAD :: HOGUE TUBE

Good  Day 2 you, I have many 30rd Mags for the M-16 as well
as
the 3 mag Military  pouches for the M-16 .  mags are
all from

the Corp, when my son was in the Marines 1991. have most if
not all working parts for the M-16. From Uppers to Bolts &
All Small Parts.
Lmk StevO

-------------- Original message --------------

> What do you have? On smaller things I could always
use mags for any of the
> many firearms I have. But I also could use some
hydration bladders and MOLLE
> II pouches . Mainly 2-5 more canteen pouches and
some good pouches for
> holding m16 and .308 mags for my interceptor vest.
>
> -----Original Message-----
> From: raddad1@comcast.net
[mailto:raddad1@comcast.net]
> Sent: Tuesday, June 28, 2005 2:42 AM
> To: cloverleaf762@charter.net
> Subject: AR15.Com Email :: RADDAD :: HOGUE
TUBE
>
>
>
> I MIGHT BE OPEN TO A TRADE , WHAT DO
YOU NEED ?
> AND WHAT DO YOU SEEK ?
> StevO LMK
>
> ----------------------------------------------------------
> Email Generated From: AR15.Com
>

--
No virus found in this incoming message.
Checked by AVG Anti-Virus.
Version: 7.0.344 / Virus Database: 267.11.7/112 - Release Date: 9/26/2005